## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SHILPA PHARMA, INC.,<br>            Plaintiff,<br><br>    v.<br><br>NOVARTIS PHARMACEUTICALS<br>CORPORATION,<br>            Defendant,<br><br>        -and-<br><br>NOVARTIS PHARMACEUTICALS<br>CORPORATION,<br>                Defendant-Counterclaim Plaintiff,<br><br>    v.<br><br>SHILPA PHARMA, INC.,<br>            Plaintiff-Counterclaim Defendant,<br><br>        -and-<br><br>SHILPA MEDICARE LIMITED,<br>            Counterclaim Defendant. | C.A. No. 21-558-MN-JLH<br><br>██████████████████████<br><br>PUBLIC VERSION FILED: March 8, 2023 |

## DECLARATION OF ROBERT W. TRENCHARD

I, Robert W. Trenchard, hereby declare as follows:

1.   I am a partner at Gibson, Dunn & Crutcher LLP.  We represent defendant and counterclaim-plaintiff Novartis Pharmaceutical Corporation ("Novartis").  I submit this declaration in support of Novartis's letter brief asking the Court to modify the Protective Order in this action (D.I. 52) to allow documents produced in this litigation to be used in connection with parallel *inter partes* review ("IPR") proceedings.

2.  This is a patent case in which Shilpa Pharma Inc. ("Shilpa") alleges that Novartis's Gilenya® multiple sclerosis medicine infringes U.S. Pat. No. 9,266,816.  The 816 Patent claims a particular crystalline form, or "polymorph," of Gilenya's active ingredient fingolimod hydrochloride.

3.  On April 20, 2022, Novartis filed a petition for IPR of the 816 Patent on the grounds that the asserted claims are anticipated and/or obvious, including in view of Novartis's Mutz patent publication that Shilpa relied upon in its Complaint to establish infringement.  (Ex. 1 (IPR No. 2022-00886, Paper 1); D.I. 1 ¶¶ 38–44.)

4.  The Patent Office instituted IPR on October 26, 2022, "find[ing] the evidence of unpatentability so strong as to be compelling."  (Dkt. 186-1 at 43.)  Addressing Novartis's argument that the 816 patent misleadingly and confusingly distinguishes the crystalline forms described in Mutz as "thermal transition based forms," the Patent Office found that "[t]he passage of the '816 patent's Specification describing Mutz, quoted above, is at best incomplete."  (*Id.* at 49.)

5.  On November 22, 2022, my partner Jane Love emailed counsel for Shilpa, requesting that, ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████.  (Ex. 2 (Nov. 22, 2022 email from J. Love) at 1.)  The email further stated that "Novartis is happy to work with Shilpa on an appropriate Protective Order to the extent one is necessary."  (*Id.*)

6.  On November 14, 2022, the Court had a discovery dispute teleconference in which the IPR proceedings were raised.  During that conference, counsel for Shilpa stated that the PTAB was wrong in stating that Shilpa's characterization of Mutz was "incomplete."

7.   Upon review of Shilpa's Patent Owner Response filed January 21, 2023 (Ex. 3), it was apparent that Shilpa had not abided by its obligation under ████████████████   Accordingly, on February 7, 2023, I emailed Shilpa proposing two alternative ways to resolve the issue: (1) Shilpa could de-designate the documents so that Novartis could use them in the IPR, or (2) Shilpa could serve the documents in the IPR as required by ████████████ under an appropriate protective order.  (Ex. 4 (Feb. 7, 2023 email from B. Trenchard) at 1.)  The email further notified Shilpa that to the extent it declined to de-designate the documents or give permission to Novartis to use them in the IPR (subject to a PTAB protective order), Novartis planned to seek an order from the district court modifying the Protective Order, citing similar cases in which district courts had done so.  (*Id.*)

8.   On February 13, 2023, Shilpa sent a letter to Novartis disputing that the documents Novartis identified ████████████████, and declined to either de-designate the documents at issue or serve them in the IPR.  (Ex. 5 (Feb. 13, 2023 letter from B. Sylvester).)

9.   In its letter, Shilpa cited *B/E Aerospace, Inc. v. MAG Aerospace Industries, LLC*, 2016 WL 1082741, *6 (Patent Tr. & App. Bd. 2016), in which the Board denied Petitioner's request that the Board order Patent Owner serve documents as routine discovery because the Petitioner already had the documents from the related litigation.  (Ex. 5 at 2.)  ████████████████ ███████████████████████████████████████████████████ ██ ███████████████████████████████████████████████ ████████████████████████

10. ███████████████████████████████████████████████████ ████████████████████████████████████. (Ex. 6.) ████████████████

████████████████████████████████████████████████

██████ (Ex. 6 at 1.)

11. Attached as Exhibits 7 to 65 are the documents that Novartis contends are ███████

████████████████████████. Those documents are listed by category ███████

██████ in Appendix A.


I declare under penalty of perjury the foregoing is true and correct.


Dated:  March 1, 2023

New York, NY

_/s/ Robert W. Trenchard_____
Robert W. Trenchard

# EXHIBIT 1

U.S. Patent No. 9,266,816
IPR2022-00886

UNITED STATES PATENT AND TRADEMARK OFFICE

―――――――――――――

BEFORE THE PATENT TRIAL AND APPEAL BOARD

―――――――――――――

NOVARTIS PHARMACEUTICALS CORPORATION,
Petitioner

v.

SHILPA PHARMA, INC.
Patent Owner

―――――――――――――

IPR2022-00886
U.S. Patent No. 9,266,816

―――――――――――――

**Petition for *Inter Partes* Review of U.S. Patent No. 9,266,816**

Mail Stop **PATENT BOARD**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

U.S. Patent No. 9,266,816
IPR2022-00886

## TABLE OF CONTENTS

Page

I.     PRELIMINARY STATEMENT ...................................................................1

II.    FACTS .........................................................................................................4

    A.     Fingolimod .........................................................................................4

    B.     Prior Fingolimod Hydrochloride Polymorphs ...................................5

    C.     Prosecution of the '816 Patent ..........................................................9

    D.     The Issued '816 Patent and Claims .................................................13

    E.     The District Court Action .................................................................14

III.   REQUIREMENTS FOR PETITION UNDER C.F.R. § 42 .........................15

    A.     Grounds for Standing (37 C.F.R. § 42.104(a)) ................................15

    B.     Identification of Challenge and Relief Requested (37 C.F.R. § 42.104(b)) .....................................................................................15

    C.     Requirements for IPR (37 C.F.R. § 42.108(c)) ...............................16

    D.     Claim Construction (37 C.F.R. § 42.204(b)(3)) ..............................16

IV.    GROUNDS OF UNPATENTABILITY ......................................................17

    A.     The Person of Ordinary Skill ...........................................................17

    B.     Priority Date .....................................................................................17

    C.     Ground 1:  Claims 1–4 Are Anticipated by Mutz under 35 U.S.C. § 102 ...................................................................................18

        1.     Claims 1–4 Are Anticipated by Mutz ....................................18

            a.     Claim 1:  Fingolimod hydrochloride crystalline Form-β characterized by X-ray powder diffraction pattern comprising characteristic 2θ° peaks selected from the XRPD peak set of 3.54, 7.07, 10.66, 15.35, 20.52, 21.43 and 25.10±0.1 2θ°...............................................................................18

            b.     Claim 2:  Fingolimod hydrochloride crystalline Form-β according to claim 1, which is further characterized by DSC isotherm comprising

## TABLE OF CONTENTS *(continued)*

Page

endothermic peaks ranging between a. Peak-1—Between 40 to 45° C., b. Peak-2—Between 65 to 70° C., c. Peak-3—Between 107 to 115° C., d. Peak-4—Between 265 to 270° C....................21

c. Claim 3:  Fingolimod hydrochloride crystalline Form-β characterized by X-ray powder diffraction pattern comprising characteristic 2θ° peaks selected from the XRPD peak set of 3.54, 7.07, 10.66, 15.35, 20.52, 21.43 and 25.10±0.1 2θ° and DSC isotherm comprising the endothermic peaks ranging between 40 to 45° C. (Peak-1), 65 to 70° C. (Peak-2), 107 to 115° C. (Peak-3) and/or 265 to 270° C. (Peak-4)........................25

d. Claim 4:  Fingolimod hydrochloride crystalline Form-β according to claim 3, characterized by X-ray powder diffraction pattern as disclosed in FIG. 3 and DSC isothermal pattern as disclosed in FIG. 4........................26

D. Ground 2:  Claims 1–4 Are Obvious over Mutz and the Knowledge of a Person of Ordinary Skill Alone or Further in View of the '005 Patent........................29

1. Overview of Ground ........................29

2. Claim 1 ........................31

3. Claim 2 ........................31

4. Claim 3 ........................34

5. Claim 4 ........................34

E. Ground 3:  Claims 1–4 Are Anticipated by the '005 Patent under 35 U.S.C. § 102 ........................36

1. Claim 1 ........................36

2. Claim 2 ........................37

3. Claim 3 ........................39

4. Claim 4 ........................39

U.S. Patent No. 9,266,816
IPR2022-00886

## TABLE OF CONTENTS *(continued)*

Page

V.     THE PTAB SHOULD INSTITUTE REVIEW ...............................................40

          1.    Mutz ...................................................................................42

          2.    '005 Patent .........................................................................44

VI.    MANDATORY NOTICES .........................................................................45

     A.    Real Party-in-Interest (37 C.F.R. § 42.8(b)(1))....................................45

     B.    Related Matters (37 C.F.R. § 42.8(b)(2)).............................................45

     C.    Lead and Backup Counsel (37 C.F.R. § 42.8(b)(3)).............................45

     D.    Service Information (37 C.F.R. § 42.8(b)(4)) .......................................46

VII.   PAYMENT OF FEES (37 C.F.R. § 42.15(A)) .............................................47

VIII.  CONCLUSION...........................................................................................47

U.S. Patent No. 9,266,816
IPR2022-00886

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Advanced Bionics LLC v. MED-EL Elektromedizinische Gerate GmbH*,
   IPR2019-01469, Paper 6 (PTAB Feb. 13, 2020)..........................................40, 41

*Apple Inc. v. Fintiv, Inc.*,
   IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020)............................................40

*Atlas Powder Co. v. IRECO, Inc.*,
   190 F.3d 1342 (Fed. Cir 1999) ....................................................................24, 28

*Eisai Co. v. Glenmark Pharms., Ltd.*,
   No. CV 13-1279-LPS, 2015 WL 1228958 (D. Del. Mar. 17, 2015).................26

*Facebook, Inc. v. Palo Alto Research Center Inc.*,
   IPR2021-01264, Paper 13 (PTAB Jan. 25, 2022) ............................................44

*H. Lundbeck A/S v. Apotex Inc.*,
   No. CV 18-88-LPS, 2019 WL 3206016 (D. Del. July 16, 2019)......................26

*Intel Corp. v. VLSI Tech. LLC*,
   IPR2019-01192, Paper 15 (PTAB Jan. 9, 2020) ..............................................44

*PEAG LLC v. VARTA Microbattery Gmbh*,
   IPR2020-01212, Paper 8 (PTAB Jan. 6, 2021) ................................................40

*Peters v. Active Mfg. Co.*,
   129 U.S. 530 (1889).........................................................................................20

*Shilpa Pharma, Inc. v. Novartis Pharmaceuticals Corporation*,
   Case No. 1:21-cv-00558-MN (D. Del.) ......................................................14, 45

*Snap, Inc. v. SRK Technology LLC*,
   IPR2020-00820, Paper 15 (PTAB Oct. 21, 2020)............................................40

*Toro Co. v. Deere & Co.*,
   355 F.3d 1313 (Fed. Cir. 2004) ........................................................................28

U.S. Patent No. 9,266,816
IPR2022-00886

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*Upsher-SmithLabs., Inc. v. Pamlab, L.L.C.,*
  412 F.3d 1319 (Fed. Cir. 2005) .........................................................................20

*Verdegaal Bros. v. Union Oil Co. of California,*
  814 F.2d 628 (Fed. Cir. 1987) ...........................................................................23

### Statutes

35 U.S.C. § 314(a) ..............................................................................................16

### Other Authorities

Kiuchi *et al.*, *Synthesis and Immunosuppressive Activity of 2-
  Substituted 2-Aminopropane-1,3-diols and 2-Aminoethanols*, J.
  MED. CHEM 2000, 43, 2946–2961 .....................................................................11

M.P.E.P. § 2133 .................................................................................................17

M.P.E.P. § 2139.01 ............................................................................................17

U.S. Patent No. 9,266,816
IPR2022-00886

## TABLE OF EXHIBITS

| Exhibit No. | Exhibit Description |
| --- | --- |
| 1001 | U.S. Patent No. 9,266,816 ("the '816 patent") |
| 1002 | Declaration of Dr. Richard McClurg ("McClurg Decl.") |
| 1003 | U.S. Patent No. 5,604,229 ("the '229 patent") |
| 1004 | PCT Patent Publication No. WO2010/055028 A2 ("Mutz") |
| 1005 | U.S. Patent No. 8,766,005 ("the '005 patent") |
| 1006 | PCT Patent Publication No. WO2012/041358 A1 ("Westheim") |
| 1007 | Kiuchi *et al.*, "Synthesis and Immunosuppressive Activity of 2-Substituted 2-Aminopropane-1,3-diols and 2-Aminoethanols," J. MED. CHEM. 2000, 43, 2946–2961 ("Kiuchi") |
| 1008 | U.S. Patent No. 7,026,522 ("the '522 patent") |
| 1009 | U.S. Patent No. 8,735,627 ("the '627 patent") |
| 1010 | Chinese Patent Publication No. CN 1814583 A ("CN '583 publication") |
| 1011 | Certified English translation of Chinese Patent Publication No. CN1814583A |
| 1012 | Japanese Patent Publication No. JP 4079505 B2 ("JP '505 patent") |
| 1013 | Certified English translation of Japanese Patent Publication No. JP 4079505 B2 |
| 1014 | May 14, 2015 Amendment & Response in U.S. Application No. 13/635,207 ("5/14/2015 Response") |
| 1015 | May 14, 2015 Declaration by Dr. Vimal Kumar Shrawat, Ph.D. |

U.S. Patent No. 9,266,816
IPR2022-00886

| Exhibit No. | Exhibit Description |
|---|---|
|  | Under 37 CFR 1.111 in U.S. Application No. 13/635,207 ("Shrawat Decl.") |
| 1016 | Diab *et al.*, "Stimulation of Sphingosine 1-Phosphate Signaling as an Alveolar Cell Survival Strategy in Emphysema," AM. J. RESPIR. CRIT. CARE MED. 2009, 181, 344–352 ("Diab") |
| 1017 | Salomone *et al.*, "Analysis of sphingosine 1-phosphate receptors involved in constriction of isolated cerebral arteries with receptor null mice and pharmacological tools," BR. J. PHARMACOLOGY 2008, 153, 140–147 ("Salomone") |
| 1018 | Keller *et al.*, "Immunomodulator FTY720 Induces Myofibroblast Differentiation via the Lysophospholipid Receptor $S1P_3$ and Smad3 Signaling," AM. J. PATHOLOGY 2007, 170(1), 281–292 ("Keller") |
| 1019 | Indian Application No. 3563/CHE/2010 |
| 1020 | Jan. 29, 2018 Application Deemed Withdrawn in European Application No. EP11842990.1 ("1/29/2018 Application Deemed Withdrawn") |
| 1021 | Wang *et al.*, "Insight into the conformational polymorph transformation of a block-buster multiple sclerosis drug fingolimod hydrochloride (FTY 720)," J. PHARMA. & BIOMED. ANAL. 2015, 109, 45–51 ("Wang") |
| 1022 | PCT Patent Publication No. WO2012/070059 A1 |
| 1023 | Feb. 23, 2012 International Search Report in PCT Application No. PCT/IN2011/000586 |

U.S. Patent No. 9,266,816
IPR2022-00886

| Exhibit No. | Exhibit Description |
|---|---|
| 1024 | Final Order, Office of Enrollment and Discipline Proceeding No. D2018-27 (Apr. 30, 2019) ("4/30/2019 OED Order") |
| 1025 | Feb. 25, 2015 Nonfinal Rejection in U.S. Application No. 13/635,207 ("2/25/2015 Rejection") |
| 1026 | Sept. 9, 2015 Final Rejection in U.S. Application No. 13/635,207 ("9/9/2015 Rejection") |
| 1027 | Nov. 23, 2015 Notice of Allowance in U.S. Application No. 13/635,207 |
| 1028 | *Shilpa Pharma, Inc. v. Novartis Pharmaceuticals Corporation*, Case No. 1:21-cv-00558-MN, Dkt. 1 (D. Del. Apr. 21, 2021) ("Complaint") |
| 1029 | Nov. 12, 2015 European Search Opinion in European Application No. EP11842990.1 ("11/12/2015 European Search Opinion") |
| 1030 | Jan. 24, 2017 Summons to Attend Oral Proceedings in European Application No. EP11842990.1 |
| 1031 | Jan. 24, 2017 Annex to Summons to Attend Oral Proceedings in European Application No. EP11842990.1 |
| 1032 | Jun. 15, 2017 Amended Claims with Annotations in European Application No. EP11842990.1 ("6/15/2017 Amended Claims") |
| 1033 | Adachi & Chiba, FTY720 story.  Its discovery and the following accelerated development of sphingosine 1-phosphate receptor agonists as immunomodulators based on reverse pharmacology.  Perspect Medicine Chem. 2007 Sept. 6;1:11–23 |

U.S. Patent No. 9,266,816
IPR2022-00886

| Exhibit No. | Exhibit Description |
|---|---|
| | ("Adachi & Chiba") |
| 1034 | United States Patent No. 8,576,985 ("the '985 patent") |
| 1035 | R.A. Young, ed. The Rietveld Method, Oxford University Press (1993) ("Rietveld Method") |
| 1036 | Oct. 1, 2014 Requirement for Restriction/Election in U.S. Application No. 13/635,207 |
| 1037 | Nov. 7, 2014 Response to Restriction Requirement in U.S. Application No. 13/635,207 |
| 1038 | Lechuga-Ballesteros *et al.*, "Properties and Stability of a Liquid Crystal Form of Cyclosporine—The First Reported Naturally Occurring Peptide That Exists as a Thermotropic Liquid Crystal," J. PHARMA. SCIS. 2003, 92(9), 1821–1831 ("Lechuga-Ballesteros") |
| 1039 | Park *et al.*, "Pharmacokinetic/pharmacodynamic relationships of FTY720 in kidney transplant recipients," BRAZILIAN J. MED. & BIOLOGICAL RESEARCH 2005, 38, 683–694 ("Park") |
| 1040 | Kappos *et al.*, "A Placebo-Controlled Trial of Oral Fingolimod in Relapsing Multiple Sclerosis," NEW ENGLAND J. MED. 2010, 362(5), 387–401 ("Kappos") |
| 1041 | Sept. 22, 2010 Press Release, "Novartis gains FDA approval for Gilenya™, a novel first-line multiple sclerosis treatment shown to significantly reduce relapses and delay disability progression" |
| 1042 | Curriculum Vitae of Dr. Richard McClurg |

## I.   PRELIMINARY STATEMENT

Novartis Pharmaceuticals Corporation requests *inter partes* review and cancellation of claims 1–4 of U.S. Patent No. 9,266,816, assigned to Shilpa Pharma, Inc. (Ex. 1001.)

The '816 patent purports to claim a new crystal form of fingolimod hydrochloride, the active ingredient in Novartis's Gilenya® brand multiple sclerosis medicine. But two prior art publications—a PCT publication by Novartis scientists Michael Mutz and Guido Jordine (Mutz) and U.S. Patent No. 8,766,005—disclosed the very same crystal form characterized by the same techniques recited in the '816 patent claims: X-Ray Powder Diffraction (XRPD) and Differential Scanning Calorimetry (DSC). Each of these prior art publications discloses all of the elements of claims 1–4 of the '816 patent and thus expressly anticipates those claims.

***Mutz.*** The '816 patent inventors admit that Mutz is prior art by discussing it in the background section of the patent. Mutz disclosed "Form I" of fingolimod hydrochloride. The '816 patent claims the same crystal form under a different name, labeling it "Form-β." Relabeling the same crystal form with a new name does not impart patentability.

The Examiner was apparently led away from actually reviewing Mutz by Shilpa's mischaracterization of the reference. The specification discusses Mutz,

but then incorrectly states that "no exact crystalline form have [sic] been reported in the literature."  (Ex. 1001 at 1:47–56.)  That statement could have led the Examiner to believe Mutz has no exact crystal form information when, in fact, it does.  The file history suggests the Examiner indeed bypassed Mutz; the Examiner cited a different reference as apparently the closest prior art, even though that reference lacked XRPD and DSC data.

If the Examiner had considered Mutz, he would have easily seen each claimed element disclosed, as follows:

| XRPD Peaks | |
|---|---|
| **'816 Patent, Claims 1–4** | **Mutz (Ex. 1004 at pp. 2, 16, Fig. 1, et seq.)** |
| 3.54 ± 0.1 | 3.6 |
| 7.07 ± 0.1 | 7.1 |
| 10.66 ± 0.1 | 10.7 |
| 15.35 ± 0.1 | 15.4 |
| 20.52 ± 0.1 | 20.6 |
| 21.4 ± 0.1 | 21.4 |
| 25.0 ± 0.1 | 25.0 |
| **DSC Peaks** | |
| **'816 Patent, Claims 1–4** | **Mutz (Ex. 1004 at pp. 1, 15, et seq.)** |
| Between 40 to 45º C. | approximately 40º C |
| Between 65 to 70º C. | approximately 66º C |
| Between 107 to 115º C. | approximately 107º C |
| Between 265 to 270º C. | onset of decomposition at ca. 260° C |

U.S. Patent No. 9,266,816
IPR2022-00886

He would have also seen that the XPRD pattern for Mutz's Form I matched that of the '816 patent's Form-β:



Indeed, Shilpa has admitted that Mutz discloses what the '816 patent claims. On April 21, 2021, Shilpa filed suit against Novartis and alleged that the fingolimod hydrochloride in Gilenya infringes the '816 patent.  In its Complaint, Shilpa relies on Mutz to establish infringement of the '816 patent, further confirming that Mutz, which is prior art, anticipates the '816 patent claims.

***The '005 Patent***.  Mutz is not the only anticipatory reference.  Three months after Mutz's publication, Ratiopharm GmbH filed a patent application relating to polymorphic forms of fingolimod hydrochloride, which issued as the '005 patent. The '005 patent discloses XRPD and DSC data for a mixture of Mutz's Form I (Shilpa's Form-β) and another form, and thus has all of the XRPD and DSC peaks recited in the '816 patent claims.  The '005 patent is a second explicit anticipation of the claims of the '816 patent.

3

The claimed elements are *explicitly* disclosed in both Mutz and the '005 patent, but to the extent there is a dispute about the explicit nature of the disclosures to a person of skill, each of Mutz and the '005 patent also inherently anticipates claims 1–4.  Finally, to the extent the Board finds that these disclosures are insufficient to anticipate, the challenged claims are obvious over Mutz in view of the knowledge of a person of ordinary skill, alone or further in view of the '005 patent.

Although Mutz appears on the face of the '816 patent and was cited in an IDS, and the '005 patent PCT application was on the Examiner's list of search results, neither was discussed during prosecution.  This was a mistake, perhaps in part because the Examiner was steered away from Mutz by Shilpa's description of it in the specification.  The Board accordingly should institute this IPR and find the challenged claims unpatentable under 35 U.S.C. §§ 102 and/or 103.

## II.   FACTS

The '816 patent purports to claim a crystal form of fingolimod hydrochloride that the patent calls "Form-β."

### A.   Fingolimod

Fingolimod (known also as "FTY" or "FTY720") has been known since the early 1990s as a potent immunosuppressant.  (Ex. 1003 ('229 patent).)  Information about fingolimod (including crystalline fingolimod hydrochloride) had been

published in many contexts.  (Ex. 1033 (Adachi & Chiba).)  Methods for making crystalline fingolimod hydrochloride have also been published.  (*See, e.g.*, Ex. 1003 ('229 patent); Ex. 1004 (Mutz); Ex. 1005 ('005 patent); Ex. 1006 (Westheim); Ex. 1007 (Kiuchi); Ex. 1008 ('522 patent); Ex. 1009 ('627 patent); Exs. 1010–1011 (CN '583 publication and translation); Exs. 1012–1013 (JP '505 patent); *see generally* Ex. 1002 (Declaration of Dr. Richard McClurg, hereinafter "McClurg Decl.") ¶40.)  And fingolimod hydrochloride in crystalline form has been available for sale since the 1990s.  (*See, e.g.*, Ex. 1016 (Diab) at 345; Ex. 1017 (Salomone) at 142, Ex. 1018 (Keller) at 282.)

In the early 2000s, Novartis carried out clinical trials to study whether fingolimod would treat transplant rejection, as well as certain forms of multiple sclerosis.  (Ex. 1039 (Park); Ex. 1040 (Kappos).)  Ultimately, Novartis applied for and received FDA approval to use fingolimod to treat relapsing forms of MS, and that drug currently is sold as Gilenya.  (Ex. 1041 (Press Release).)

### B.    Prior Fingolimod Hydrochloride Polymorphs

In connection with Novartis's research efforts, Mutz and Jordine studied fingolimod hydrochloride's crystal forms.  A crystalline solid such as fingolimod hydrochloride can exist in one or more different crystal forms, called polymorphs. (McClurg Decl. ¶¶18–21.)

U.S. Patent No. 9,266,816
IPR2022-00886

On November 11, 2008, Mutz and Jordine filed a patent application relating to crystal forms and hydrates of fingolimod hydrochloride describing Forms I, II, III, and IV.  (McClurg Decl. ¶42.)  A corresponding international application was filed on November 10, 2009 and was published on May 20, 2010.  (Ex. 1004 (Mutz).)

Mutz included data characterizing fingolimod's crystal forms, including XRPD and DSC data, the same techniques reflected in the '816 patent.  (McClurg Decl. ¶¶42–46.)  XRPD is a universally accepted technique for characterizing crystal forms.  It uses an instrument called a diffractometer to analyze a sample of a crystalline compound in powder form.  The diffractometer measures the diffracted X-ray intensity as a function of the angle at which X-rays diffract from the sample, which depends on the arrangement of molecules in the crystal, and records it in an XRPD pattern that is characteristic of the particular crystal form. (*Id.* ¶¶22–35.)

DSC is a thermal analysis technique where the difference in the amount of heat required to increase the temperature of a sample versus a reference is measured as a function of temperature.  The heat flow to the sample is plotted against temperature in what is referred to as a DSC isotherm.  DSC allows for the characterization of phase transitions such as melting as well as transitions between different crystal forms.  (*Id.* ¶¶36–35.)

Mutz used both techniques to characterize several forms of fingolimod hydrochloride, including Form I, and reported that data in the specification. As stated in Mutz, "[c]rystalline Form I of FTY720 hydrochloride is characterised by an X-ray powder diffraction pattern having peaks at least two, preferably at least four, and more preferably all, of the following 2-theta values: 3.6, 7.1, 10.7, 12.5, 15.4 and 20.6 degrees 2-theta." (Ex. 1004 at 2.) Mutz further provided a figure supporting that data. (*Id.* at 2, Fig. 1.) Similarly, Mutz discloses that "DSC heating curves showed three characteristic transitions at approximately 40 °C, 66 °C and 107 °C." (*Id.* at 15; *see generally* McClurg Decl. ¶¶6, 42–46, 117–120.)

After Mutz, another company, Ratiopharm GmbH, filed an international patent application directed to fingolimod salts on July 23, 2010. That application entered the U.S. national stage, and the '005 patent (Ex. 1005) was granted. As discussed more fully below, the '005 patent discloses the same crystal form of fingolimod hydrochloride as presented in claims 1–4 of the '816 patent. It characterizes this material by XRPD and DSC, and includes both figures and descriptions of the data. (Ex. 1005 at 13:20–24, Figs. 1–2; *see generally* McClurg Decl. ¶¶9, 47–51, 147–159.)

In later years, others likewise characterized fingolimod's forms and confirmed Mutz's findings. For instance, in 2015, Wang published a study of single crystal structures of fingolimod hydrochloride. (Ex. 1021.) Wang evaluated

samples of fingolimod hydrochloride and found that the "observed melting point of [fingolimod hydrochloride] is in agreement with previously published patent data" from Mutz, and that "the other two endothermic peaks that occurred at temperatures below the melting . . . correspond to two solid-solid phase transitions of form I to II and form II to III" (*id.* at 47), just as reported in Mutz. Wang concludes that "[t]his observation allowed for the identification of three distinct polymorphic forms (designated as I, II, and III) of [fingolimod hydrochloride]" (*id.*), as reported in Mutz. Wang delineated "temperature ranges of stability for the different polymorphic forms of the drug: below 40°C for form I, between 40 and 65°C for form II, and between 65 and 106°C for form III" (Ex. 1021 at 50), as shown                     in                    the                     figure                    below.



**Fig. 8.** Reversible interconversion of FTY 720 polymorphs.

(*Id.* at Fig. 8; *see generally* McClurg Decl. ¶52–64)

Wang also states that "[f]orm I was the most thermodynamically stable form at ambient temperature. Form II could remain stable for a few days at room temperature; however, form III was unstable at ambient condition." (Ex. 1021 at

48.)  Figure 1 from Wang showing DSC curves for Forms I, II, and III is shown below.



**Fig. 1.** DSC curves for the heating scans of FTY 720: heating scans of forms I (a), II (b), and III (c) at a scan rate of 10°C/min.

(*Id.* at Fig. 1; *see generally* McClurg Decl. ¶¶60–64.)  These DSC curves match the DSC information disclosed in Mutz and the '005 patent.  (McClurg Decl. ¶¶119–124, 135–137, 183–185.)

### C.    Prosecution of the '816 Patent

Notwithstanding the prior publications, on November 25, 2010, Shilpa Medicare Limited[1] filed an Indian patent application (Ex. 1019 (3563/CHE/2010))

---

[1]  Shilpa Medicare Limited filed for and prosecuted the '816 patent.  On January 21, 2021, Shilpa Medicare Limited assigned its rights in the '816 patent to

purporting to describe crystalline forms of fingolimod already disclosed by Mutz and Ratiopharm.  Shilpa then filed a PCT application, PCT/IN2011/000586 (Ex. 2011), on August 29, 2011.  (McClurg Decl. ¶67.)  The International Search Report (Ex. 1023) identified 12 separate Category "X" references, thereby indicating each reference as anticipatory.

Ming Chow, a U.S. patent attorney currently suspended from practice before the USPTO (Ex. 1024 (4/30/2019 OED Order)), filed the U.S. national phase application and preliminary amendment.  Thereafter, Akshay Kant Chaturvedi, an employee of Shilpa Medicare Limited, prosecuted the application to issuance.

Shilpa's application admits that Mutz is prior art, as it is discussed in the background section of the specification.  Shilpa states that "Mutz et al. in WO2010055028A2 reported various polymorphic forms of fingolimod hydrochloride," but that "other than thermal transition based forms, no exact crystalline form have [sic] been reported in the literature."  (Ex. 1001 at 1:47–56.)  Mutz, however, does disclose exact crystalline forms (Forms I, II, and III) by various techniques, including XRPD and DSC, the same techniques used to characterize the crystal forms reported in the '816 patent.  (McClurg Decl. ¶¶68–

Shilpa Pharma, Inc. (Ex. 1042 (Reel 055059, Frame 0047).)  Both entities are referred to herein as "Shilpa."

72.)  Shilpa appears to have diverted attention away from Mutz by disguising it as not disclosing exactly what it *does* disclose—"exact crystalline forms" of fingolimod.

Consistent with the Examiner not reviewing Mutz, the reference is never substantively addressed in the file history.  Instead, the Examiner cited as inherently anticipatory a paper disclosing a process to make fingolimod, Kiuchi *et al.*, *Synthesis and Immunosuppressive Activity of 2-Substituted 2-Aminopropane-1,3-diols and 2-Aminoethanols*, J. MED. CHEM 2000, 43, 2946–2961 (Ex. 1007). (Ex. 1025 (2/25/2015 Rejection) at 6; McClurg Decl. ¶¶75–76.)  In response, the applicant submitted an inventor Declaration by Vimal Kumar Shrawat "to show the difference between present invention and Kiuchi et al."  (Ex. 1014 (5/14/2015 Response) at 1.)  The Shrawat Declaration described an experiment purporting to reproduce the Kiuchi process for making fingolimod hydrochloride crystal, and included an XRPD pattern of the Kiuchi-derived material.  (Ex. 1015.) Shrawat concludes the Kiuchi-derived material is different than his claims.  (*Id.* at 2; McClurg Decl. ¶¶77–81.)

At the same time, Shilpa also presented argument echoing Shrawat's conclusion and presented Table A, listing the peaks from the Kiuchi-derived XRPD pattern in the Declaration alongside the claimed XRPD peaks.  (Ex. 1014 (April 2015 Response) at 10.)  The applicant said Table A shows the "many

U.S. Patent No. 9,266,816
IPR2022-00886

differences" between the Kiuchi and Shilpa XRPD peaks. But here, again, the Examiner appears to have been misled. Table A misaligned the rows so that each appears not to match. However, four of the five peaks in the Kiuchi-derived data did indeed match the claimed peaks of so-called Form-β within the ± 0.1 2θ° range recited in the claims. The added highlighting in Table A below shows the matching peaks to within ± 0.1, as claimed.

| Crystalline Fingolimod obtained as per Kiuchi et al. | Intensity (Greater than 2 %) | Fingolimod Form β | Intensity (Greater than 2 %) |
|---|---|---|---|
| 3.2 | 31 | 3.54 | 100 |
| 3.6 | 100 | 7.07 | 4.7 |
| 7.1 | 3.8 | 10.66 | 11.1 |
| 10.7 | 5.8 | 15.35 | 3.7 |
| 21.5 | 3.3 | 20.52 | 4.6 |
| | | 21.43 | 8.0 |
| | | 25.10 | 2.2 |

The applicant did not explain to the Examiner that four out of the five peaks obtained from the Kiuchi process matched the pending claims. (McClurg Decl. ¶¶82–85.)

The Examiner withdrew the rejection based on Kiuchi in the next Office Action. (Ex. 1026 (9/9/2015 Rejection) at 2 (stating that the applicant arrived at a "unique polymorph").) After Shilpa responded to the Examiner's other rejections, a Notice of Allowance issued on November 23, 2015. (Ex. 1027.)

12

### D.     The Issued '816 Patent and Claims

The '816 patent specification purports to "relate[] to the crystalline polymorphic forms α, β, and μ of Fingolimod HC1 (I) and processes for preparation thereof." (Ex. 1001 at 1:6–8.) It includes three processes for preparing those three different forms, and XRPD and DSC information for each. (McClurg Decl. ¶¶86–88.)

Although the specification discusses three forms, the '816 patent claims only Form β. Claims 1–4 are challenged here. **Independent claim 1** is reproduced below:

> 1. Fingolimod hydrochloride crystalline Form-β characterized by X-ray powder diffraction pattern comprising characteristic 2θ° peaks selected from the XRPD peak set of 3.54, 7.07, 10.66, 15.35, 20.52, 21.43 and 25.10±0.1 2θ°.

**Claim 2** depends from claim 1 and further requires a DSC isotherm comprising endothermic peaks falling within particular ranges.

**Independent claim 3** is directed to fingolimod hydrochloride crystalline Form-β characterized by particular XRPD peaks, as well as particular endothermic DSC peaks, and is substantively identical to claim 2, except that the "and/or" in claim 3 requires only two or more DSC endothermic peaks from the recited set.

**Claim 4** depends from claim 3 and further recites a particular XRPD pattern and DSC isothermal pattern as presented in Figures 3 and 4 of the '816 patent.  (*Id.* ¶89.)

### E.   The District Court Action

Despite having insisted in its patent application that the literature, including Mutz, did not disclose Form-β, Shilpa has now flip-flopped to allege the opposite in an April 21, 2021 lawsuit against Novartis, *Shilpa Pharma, Inc. v. Novartis Pharmaceuticals Corporation*, Case No. 1:21-cv-00558-MN (D. Del.).  (Ex. 1028 (Complaint).)

In that case, Shilpa alleges that Form I of fingolimod hydrochloride prepared in accordance with Mutz, Novartis's prior art patent application, falls within the claims of the '816 patent.  (*Id.* ¶¶38–44.)  In particular, Shilpa relies on Wang's analysis of the single crystal structure of fingolimod hydrochloride corresponding to Form I of Mutz.  As Shilpa acknowledges, Wang submitted that single-crystal data to the depository maintained by the Cambridge Crystallographic Data Center ("CCDC") in a standard file format called the "crystallographic information file," or "CIF" file format for short.  (*Id.* ¶¶38–40.)  Shilpa states that it used Wang's CIF data to create a simulated XRPD pattern for Form I and found that "[a]ll peaks for claimed Form-β are present in the peak list for Form I as calculated from the Wang

data." (*Id.* ¶¶41–43.)  Shilpa even included a table showing the presence of all

peaks of Form-β in the XRPD pattern for Form I:

| XRPD Peak Position Calculated from Wang Form I Structure CCDC No. 942684 | XRPD Form Beta Peak Position Claim 1 of US 9,266,816 (+/- 0.1 deg 2-theta) |
|---|---|
| 3.57 | 3.54 |
| 7.15 | 7.07 |
| 10.73 | 10.66 |
| 15.46 | 15.35 |
| 20.60 | 20.52 |
| 21.55 | 21.43 |
| 25.20 | 25.10 |

(*Id.* ¶43.)  "Based on this predictive PXRD pattern of fingolimod hydrochloride,"

Shilpa concludes that "the fingolimod hydrochloride in Defendants' GILENYA®

contains each of the peaks recited in the '816 patent." (*Id.* ¶44.)  These are the

same peaks Mutz disclosed years earlier.

## III.    REQUIREMENTS FOR PETITION UNDER C.F.R. § 42

### A.    Grounds for Standing (37 C.F.R. § 42.104(a)

The '816 patent is available for IPR and Petitioner is not barred or otherwise

estopped from petitioning for review on the grounds identified herein.

### B.    Identification of Challenge and Relief Requested (37 C.F.R. § 42.104(b))

Novartis requests that the Board review and cancel claims 1–4 of the '816

patent based on the grounds set forth herein and summarized in the chart below.

U.S. Patent No. 9,266,816
IPR2022-00886

| Ground | Statutory Basis for Challenge |
|--------|-------------------------------|
| 1 | Anticipation of claims 1–4 by PCT Application No. WO 2010/055028 A2 to Michael Mutz *et al.* ("Mutz") under 35 U.S.C. § 102 |
| 2 | Obviousness of claims 1–4 over Mutz and the knowledge of a person of ordinary skill alone or further in view of the '005 patent under 35 U.S.C. § 103 |
| 3 | Anticipation of claims 1–4 by U.S. Patent No. 8,766,005 to Gidwani *et al.* (the "'005 patent") under 35 U.S.C. § 102(e) |

The Petition is supported by the Declaration of Dr. McClurg (Ex. 1002), an expert in field of pharmaceutical solid state chemistry and characterization.[2]

## C.     Requirements for IPR (37 C.F.R. § 42.108(c))

The Board should institute IPR because this Petition establishes a reasonable likelihood of prevailing with respect to at least one challenged claim.  *See* 35 U.S.C.  § 314(a).

## D.     Claim Construction (37 C.F.R. § 42.204(b)(3))

Because the challenged claims are unpatentable under the plain and ordinary meaning of the claim terms, no formal claim construction is needed.  (McClurg Decl. ¶¶92–93.)

---

[2] A copy of Dr. McClurg's current curriculum vitae is attached hereto as Ex. 1042.

16

U.S. Patent No. 9,266,816
IPR2022-00886

## IV.   GROUNDS OF UNPATENTABILITY

### A.    The Person of Ordinary Skill

For purposes of analyzing the '816 patent, a person of ordinary skill in the art for purposes of the '816 patent would have at least a bachelor's degree in chemistry, chemical engineering, or related disciplines or equivalent experience, and at least five years of experience related to synthesis, crystallization, and/or detection and/or evaluation of solid-state forms in the pharmaceutical industry or an advanced degree in chemistry, chemical engineering, or related disciplines. Such a person would have a working knowledge of the preparation, characterization, and analysis of solid-state forms, including by XRPD and DSC. Additional graduate education might substitute for experience, while significant experience in the field might be a substitute for formal education. Such a person would be able to understand the '816 patent and the related state of the art discussed herein. (*Id.* ¶¶90–91.)

### B.    Priority Date

For purposes of assessing prior art, the '816 patent claims priority to PCT Application PCT/IN2011/000586, which was filed on August 29, 2011 (Ex. 1022), and Indian Application No. 3563/CHE/2010, filed on November 25, 2010 (Ex. 1019). For purposes of Section 102(b), claims 1–4 are entitled to priority to the filing date of the PCT Application. M.P.E.P. §§ 2133, 2139.01. As such, the

relevant date for Section 102(b) art is one year before August 29, 2011, *i.e.*, August 29, 2010.  For Section 102(a), the earliest possible priority date to which claims 1–4 are entitled is the date of the November 25, 2010 Indian application.  For purposes of this Petition, Novartis assumes that claims 1–4 are entitled to the November 25, 2010 priority date.  The '816 patent is to be reviewed under pre-AIA Sections 102 and 103.

### C.  Ground 1:  Claims 1–4 Are Anticipated by Mutz under 35 U.S.C. § 102

### 1.  Claims 1–4 Are Anticipated by Mutz

Mutz is a PCT Publication published on May 20, 2010 and filed on November 10, 2009 in the English language and designating the United States.  It is therefore prior art under pre-AIA Section 102(a), (b) and (e).

### a.  Claim 1:  Fingolimod hydrochloride crystalline Form-β characterized by X-ray powder diffraction pattern comprising characteristic 2θ° peaks selected from the XRPD peak set of 3.54, 7.07, 10.66, 15.35, 20.52, 21.43 and 25.10±0.1 2θ°.

Mutz "relates to crystalline forms and hydrates of the compound FTY720 [fingolimod] hydrochloride, and to the use thereof." (Ex. 1004 at 1.)  Specifically, Mutz discloses that "FTY720 hydrochloride exists in a particular crystalline form (hereinafter Form I) at room temperature."  (*Id.*; McClurg Decl. ¶94.)  As explained in Dr. McClurg's declaration and discussed further below, Mutz's Form I is the claimed Form-β, the room-temperature-stable form claimed in the '816

patent—it simply has a different name.  (*Id.* ¶¶95–103.)   And as shown in the figure below, Mutz discloses each and every one of the peaks recited in claim 1 within the claimed range.  (Ex. 1004 at Fig. 1 (annotated); McClurg Decl. ¶¶104–106.)



All seven peaks listed in the '816 patent claims are shown in the XRPD pattern in Figure 1 of Mutz, as reflected by red annotated lines above.  Indeed, five of the seven peaks recited in the '816 patent claims overlap with the peaks listed in the Mutz specification (3.55, 7.12, 10.71, 15.42, and 20.59) (Ex. 1004 at 16 (Table)), in blue in the figure above.  For fingolimod hydrochloride's polymorphs, even these five peaks would be sufficient to tell a person of ordinary skill that Mutz's Form I is the same crystalline form as Form-β, although Figure 1 of Mutz discloses all seven of the claimed peaks.  (McClurg Decl. ¶¶105–116.)

U.S. Patent No. 9,266,816
IPR2022-00886

| Form-β ('816 Pat., Cl. 1) | Mutz's Form I (Fig. 1) |
|---|---|
| 3.54 ± 0.1 | 3.55 |
| 7.07 ± 0.1 | 7.12 |
| 10.66 ± 0.1 | 10.71 |
| 15.35 ± 0.1 | 15.42 |
| 20.52 ± 0.1 | 20.59 |
| 21.43 ± 0.1 | 21.4 |
| 25.10 ± 0.1 | 25.0 |

In its Complaint in the District Court Action, Shilpa relies on Mutz to establish *infringement* of the '816 patent, further confirming that Mutz, which is prior art, anticipates the '816 patent. Specifically, Shilpa admits that it took the file reflecting the single crystal structure of Mutz's Form I, used it to create a simulated XPRD pattern for Form I, and found that "[a]ll peaks for claimed Form-β are present in the peak list for Form I as calculated from the Wang data." (Ex. 1028 (Complaint) ¶¶39–43.) If Mutz's Form I infringes, then it also anticipates. *See Upsher-SmithLabs., Inc. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir. 2005) ("A century-old axiom of patent law holds that a product which would literally infringe if later in time anticipates if earlier.") (citations omitted); *accord Peters v. Active Mfg. Co.*, 129 U.S. 530, 537 (1889) ("That which infringes, if later, would anticipate, if earlier.").

During prosecution of the European counterpart (EP11842990) to the '816 patent, the European Patent Office ("EPO") rejected all of Shilpa's stand-alone claims to Form-β over Mutz, called D1 in the EPO proceeding, stating: "***D1***

*describes a crystalline Form I* of [fingolimod] hydrochloride *having the same X-ray powder diffraction pattern as Form-β* of the present application." (Ex. 1029 (11/12/2015 European Search Opinion) at 2 (emphases added).) After the EPO maintained those novelty rejections in the Summons to Attend Oral Proceedings (Ex. 1030) and Annex thereto (Ex. 1031 at 4), Shilpa cancelled its stand-alone claims to Form-β and sought only claims that included a specific synthetic process. (Ex. 1032 (6/15/2017 Amended Claims).) Ultimately, Shilpa allowed its application to be deemed withdrawn. (Ex. 1020 (1/29/2018 Application Deemed Withdrawn).) The Board should likewise find claim 1 anticipated in view of Mutz.

> **b.    Claim 2:  Fingolimod hydrochloride crystalline Form-β according to claim 1, which is further characterized by DSC isotherm comprising endothermic peaks ranging between a. Peak-1—Between 40 to 45° C., b. Peak-2—Between 65 to 70° C., c. Peak-3—Between 107 to 115° C., d. Peak-4—Between 265 to 270° C.**

As to claim 2, Mutz discloses fingolimod hydrochloride with an XRPD pattern that includes all of the '816 patent claimed peaks, as well as DSC data that includes all four claimed endotherms, within the recited ranges. (McClurg Decl. ¶¶117–135.)

| Claim 2 | Mutz |
|---|---|
| Fingolimod hydrochloride crystalline Form-β according to claim 1 | "FTY720 [fingolimod] hydrochloride exists in a particular crystalline form (hereinafter Form I) at room temperature." (Ex. 1004 at 1.) |

| Claim 2 | Mutz |
|---|---|
| characterized by X-ray powder diffraction pattern comprising characteristic 2θ° peaks selected from the XRPD peak set of 3.54, 7.07, 10.66, 15.35, 20.52, 21.43, and 25.10±0.1 2θ° *[through dependency on claim 1]* | X-ray powder diffraction pattern with characteristic peaks at 3.6, 7.1, 10.7, 15.4, 20.6, 21.43, and 25.10 2θ°<br><br><br><br>(Ex. 1004 at Fig. 1 (annotated).) |
| which is further characterized by DSC isotherm comprising endothermic peaks ranging between<br><br>a. Peak-1—Between 40 to 45° C.<br><br>b. Peak-2—Between 65 to 70° C.<br><br>c. Peak-3—Between 107 to 115° C. | "DSC heating curves showing three characteristic transitions at approximately 40 °C, 66 °C and 107 °C."<br><br>"onset of decomposition at ca. 260 °C"<br><br>(Ex. 1004 at 15.) |

U.S. Patent No. 9,266,816
IPR2022-00886

| Claim 2 | Mutz |
|---|---|
| d. Peak-4—Between 265 to 270° C. | |

Mutz discloses "DSC heating curves show[ing] three characteristic transitions at approximately 40 °C, 66 °C and 107 °C." (Ex. 1004 at 15.) Those three transitions fall squarely within the ranges recited in claim 2. (McClurg Decl. ¶¶119–125.) This is further confirmed by Wang, which discloses endothermic DSC peaks matching those in Mutz. (*Id.* ¶¶135–137.) Mutz further discloses that the "onset of decomposition" for fingolimod hydrochloride is "at ca. 260 °C." (Ex. 1004 at 15.) A person of ordinary skill would have understood this disclosure to correspond to Peak-4 "between 265 to 270° C." "Ca." is an abbreviation for "circa," or "about," and a person of ordinary skill would consider "about" 260° C to fall within the range of "between 265 to 270 °C." (McClurg Decl. ¶126.) Furthermore, 260° C is disclosed as the "*onset*," *i.e.*, the beginning of decomposition: a person of ordinary skill would have understood that a peak associated with decomposition would be after the onset temperature, just as the peaks in Shilpa's Figure 4 occur after the "onset" temperatures. (*Id.* ¶127.)

To the extent the Board finds that the onset at "circa" or "about" 260° C does not constitute explicit disclosure of the endothermic peak at 265 to 270° C,

that peak is inherently disclosed by Mutz.  *See Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628, 631 (Fed. Cir. 1987) (a claim is anticipated "if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference"); *see also Atlas Powder Co. v. IRECO, Inc.*, 190 F.3d 1342, 1348–49 (Fed. Cir 1999) ("An inherent structure, composition, or function is not necessarily known…. Insufficient prior understanding of the inherent properties of a known composition does not defeat a finding of anticipation.").  A person of ordinary skill would understand that, experimental parameters being equal, all fingolimod hydrochloride will decompose at roughly the same temperature, regardless of what crystal form it was initially.  This will result in an endothermic peak in the claimed range.  (McClurg Decl. ¶128.)

Furthermore, a person of ordinary skill would recognize that because the details of decomposition are dependent upon the details of the experiment, and *independent* of the initial form of the material, it is not a useful transition to characterize a crystalline material.  As discussed further below in Ground 2, at this point in the DSC scan, fingolimod hydrochloride has undergone at least three phase transitions, including a transition to a "phase with lower crystalline order" (Mutz at 15) (*i.e.*, a liquid crystal), so it is not a crystal form at all.  Thus, Peak-4 between 265 to 270° C is not even a distinguishing characteristic of Form-β.  In

fact, the only transition that is characteristic of Form-β is the first one, which corresponds to the transition from Form-β/Mutz's Form I, to Mutz's Form II. Nevertheless, Mutz discloses the decomposition event at *circa* 260° C, which anticipates Peak-4, as claimed.  (McClurg Decl. ¶¶129–137.)

> c. **Claim 3:  Fingolimod hydrochloride crystalline Form-β characterized by X-ray powder diffraction pattern comprising characteristic 2θ° peaks selected from the XRPD peak set of 3.54, 7.07, 10.66, 15.35, 20.52, 21.43 and 25.10±0.1 2θ° and DSC isotherm comprising the endothermic peaks ranging between 40 to 45° C. (Peak-1), 65 to 70° C. (Peak-2), 107 to 115° C. (Peak-3) and/or 265 to 270° C. (Peak-4).**

As reflected in the chart below, claim 3 is substantively identical to claim 2, except that the "and/or" in claim 3 requires only two or more DSC endothermic peaks from the recited set.  Regardless of whether claim 3 requires two peaks or all four peaks, the analysis above with respect to claim 2 is equally applicable here.

| Claim 2 | Claim 3 |
|---|---|
| Fingolimod hydrochloride crystalline Form-β according to claim 1 | Fingolimod hydrochloride crystalline Form-β |
| characterized by X-ray powder diffraction pattern comprising characteristic 2θ° peaks selected from the XRPD peak set of 3.54, 7.07, 10.66, 15.35, 20.52, 21.43, and 25.10±0.1 2θ° *[through dependency on claim 1]* | characterized by X-ray powder diffraction pattern comprising characteristic 2θ° peaks selected from the XRPD peak set of 3.54, 7.07, 10.66, 15.35, 20.52, 21.43, and 25.10±0.1 2θ° |
| which is further characterized by DSC isotherm comprising endothermic | and DSC isotherm comprising *the* endothermic peaks ranging between 40 to 45° C. (Peak-1), 65 to 70° C. (Peak- |

U.S. Patent No. 9,266,816
IPR2022-00886

| Claim 2 | Claim 3 |
|---|---|
| peaks ranging between<br><br>a. Peak-1—Between 40 to 45° C.<br><br>b. Peak-2—Between 65 to 70° C.<br><br>c. Peak-3—Between 107 to 115° C.<br>   d. Peak-4—Between 265 to 270° C. | 2), 107 to 115° C. (Peak-3), *and/or* 265 to 270° C. (Peak-4). |

(McClurg Decl. ¶138.)

> **d.  Claim 4:  Fingolimod hydrochloride crystalline Form-β according to claim 3, characterized by X-ray powder diffraction pattern as disclosed in FIG. 3 and DSC isothermal pattern as disclosed in FIG. 4.**

Based on the XRPD information in Mutz (discussed above for claim 1), Mutz's Form I is identifiable as Shilpa's Form-β by reference to the XRPD pattern disclosed in Figure 3 of the '816 patent.  Thus, Mutz discloses fingolimod hydrochloride crystalline Form-β characterized by the XRPD pattern disclosed in Figure 3 of the '816 patent.  (*Id.* ¶139); *see H. Lundbeck A/S v. Apotex Inc.*, No. CV 18-88-LPS, 2019 WL 3206016, at *4 (D. Del. July 16, 2019) (construing "characterized by an XRPD [pattern] as shown in [any of] FIG[S] . . ." as "identifiable by reference to an x-ray powder diffraction pattern as shown in [any of] FIG[S] . . . "); *Eisai Co. v. Glenmark Pharms., Ltd.*, No. CV 13-1279-LPS, 2015 WL 1228958, at *8 (D. Del. Mar. 17, 2015) ("characterized by characteristic lines" "claim limitation is satisfied as long as the crystal form can be 'characterized

by'—that is, identified by— reference to the characteristic lines set forth in the claim").

A person of ordinary skill would have understood that XRPD patterns for the same form—indeed, even for the same sample—can vary depending on sample, preparation, instrument used, and other factors. However, a person of ordinary skill would have recognized that the patterns below are for the same crystal form, and Mutz's Form I is "characterized by" the XRPD pattern in Figure 3 of the '816 patent. In the below figure, the XRPD pattern for Form-β (Ex. 1001 at Fig. 3) (top) is overlaid with the XRPD pattern for Mutz's Form I (Ex. 1004 at Fig. 1) (bottom, recolored). (McClurg Decl. ¶¶140–141.)



Indeed, as noted above, during prosecution of the European counterpart to the '816 patent, the EPO rejected Shilpa's claims to Form-β in view of Mutz stating: "D1 describes a crystalline Form I of FTY720 hydrochloride having ***the***

*same X-ray powder diffraction pattern* than Form-β of the present application."

(Ex. 1029 (11/12/2015 European Search Opinion) at 2 (emphasis added).)

Furthermore, based on the DSC information in Mutz (discussed above for claim 2), Mutz's Form I is identifiable as Shilpa's Form-β by reference to the DSC isothermal pattern disclosed in Figure 4 of the '816 patent.  Thus, Mutz discloses fingolimod hydrochloride crystalline Form-β characterized by the DSC isothermal pattern disclosed in Figure 4.  This is confirmed by Wang, which presents a DSC isothermal pattern for an experiment beginning with Mutz's Form I and shows the same transitions disclosed in Mutz (endothermic peaks at 40 °C, 65 °C, and 108 °C).  (McClurg Decl. ¶¶142–145.); *see Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1320 (Fed. Cir. 2004) ("[T]he fact that a characteristic is a necessary feature or result of a prior-art embodiment (that is itself sufficiently described and enabled) is enough for inherent anticipation, even if that fact was unknown at the time of the prior invention."); *Atlas*, 190 F.3d at 1347 ("[T]he discovery of a previously unappreciated property of a prior art composition, or of a scientific explanation for the prior art's functioning, does not render the old composition patentably new to the discoverer.").

As with XRPD, a person of ordinary skill would understand that DSC isothermal patterns for the same form, or even sample, can vary depending on sample, preparation, instrument used, and other factors.  However, any person of

ordinary skill would have recognized that the DSC information in Mutz is for the same crystal form as that depicted in Figure 4 of the '816 patent, and, thus, that Mutz's Form I is "characterized by" the pattern in Figure 4 of the '816 patent. (McClurg Decl. ¶146.)

### D. Ground 2:  Claims 1–4 Are Obvious over Mutz and the Knowledge of a Person of Ordinary Skill Alone or Further in View of the '005 Patent

#### 1. Overview of Ground

As discussed above with respect to Ground 1, Mutz discloses fingolimod hydrochloride with an XRPD pattern that matches the claimed peaks in the '816 patent, as well as DSC data that match all four claimed endotherms.  To the extent the Board finds that this is insufficient to anticipate, Mutz and the knowledge of a person of ordinary skill as of the priority date, alone or further in view of the '005 patent, render obvious claims 1–4 of the '816 patent.  (*Id.* ¶¶147–148.)

The '005 patent (Ex. 1005) is titled "Process for Producing Fingolimod Salts" and describes polymorphic forms of fingolimod hydrochloride and its salts. (*Id.* ¶149.)  The '005 patent was filed after November 29, 2000, the WIPO publication was in English and designated the United States, and therefore is entitled to its PCT filing date of July 23, 2010 under pre-AIA Section 102(e).  The '005 patent is therefore prior art to the '816 patent under pre-AIA Section 102(e).

Like the '816 patent, the '005 patent characterizes fingolimod hydrochloride polymorphs by XRPD and DSC.   In particular, Example 2 of the '005 patent discloses a process for the preparation of "crystalline fingolimod hydrochloride." (Ex. 1005 at 13:5–24, Figs. 1&2.)   The product of Example 2 is a mixture of Mutz's Form I (Shilpa's Form-β) and Mutz's Form II, as discussed in the accompanying expert analysis of Dr. McClurg.  (McClurg Decl. ¶¶150–151, 174.)

To the extent the Board finds Mutz does not anticipate claims 1–4 of the '816 patent, it would have been obvious to a person of ordinary skill to combine the teachings of Mutz and the '005 patent to arrive at the claimed invention with a reasonable expectation of success for several reasons.  First, these references are in the same technological space, namely crystalline fingolimod hydrochloride and processes for producing the same, and address the same problem—that is, characterizing crystalline fingolimod hydrochloride improving the processes for making it.  (Ex. 1004 (Mutz); Ex. 1005 ('005 patent); (McClurg Decl. ¶152.)) Additionally, one of ordinary skill in the art would have been motivated to further characterize the crystalline fingolimod hydrochloride in Mutz, and because both references disclose data about crystal forms of fingolimod hydrochloride, it would have been natural for a person of ordinary skill to contemplate modifying, adding to, or substituting from the disclosure of Mutz with the teachings of the '005 patent in order to provide additional information, clarify or improve upon the same basic

information taught in each reference, and/or solve similar issues recited in each reference. A person of ordinary skill working with fingolimod hydrochloride would want to assess the available data regarding its polymorphs as is presented in both Mutz and the '005 patent in order to understand its properties. (McClurg Decl. ¶153.)

### 2. Claim 1

As discussed above in Ground 1, Mutz discloses each XRPD peak recited in claim 1. To the extent Shilpa argues that the disclosure of Mutz alone is somehow insufficient, a person of ordinary skill would find the peaks recited in claim 1 to be obvious in view of Mutz and the knowledge of a person of ordinary skill as of the priority date. As discussed, Figure 1 of Mutz discloses all seven peaks recited in claim 1. Although certain peaks are not *also* identified in the specification of Mutz or recited in the claims, to a person of ordinary skill, a peak in an XRPD pattern is just as specified as a tabulated peak. Thus, at the very least, a person of ordinary skill would find the XRPD peaks recited in claim 1 obvious in view of Mutz. (*Id.* ¶¶154–155.)

### 3. Claim 2

As discussed above with respect to Ground 1, in addition to the XRPD information discussed above, Mutz explicitly discloses three of the four endothermic DSC peaks in the ranges recited in claim 2. It also discloses that a

fourth thermal transition has its "onset…ca. 260 °C," or "about" 260 °C (Ex. 1004 at 15), which a person of ordinary skill would understand to begin at about 260 °C and peak at a higher temperature.  (*Id.* ¶156–158.) At a minimum, a person of ordinary skill would find an endothermic peak in the claimed range of 265 to 270° C obvious in view of this disclosure of Mutz.

First, 260° C is disclosed as the "*onset,*" *i.e.*, beginning of decomposition.  A person of ordinary skill would have understood that the peak maximum would be after the onset temperature, just as the peaks in Shilpa's Figure 4 occur after the "onset" temperatures.  (*Id.* ¶158.)

Second, a person of ordinary skill would understand that, experimental parameters being equal, all fingolimod hydrochloride will decompose at roughly the same temperature, regardless of what crystal form it was initially, which will result in an endothermic peak in the claimed range.  This is further confirmed by the endothermic peak in the '005 patent DSC scan in the claimed range, as discussed further below.  (*Id.* ¶159.)

Finally, as reflected in Mutz and understood by a person of ordinary skill, at this temperature of the DSC scan, the fingolimod hydrochloride has already undergone at least three phase transitions:  (1) a transition from Mutz's Form I (Shilpa's Form-β) to Mutz's Form II at around 40° C; (2) a transition from Mutz's Form II to Mutz's Form III at around 66° C; and (3) a transition at around 107° C.

(Ex. 1004 (Mutz) at 1.)   A person of ordinary skill would have understood that, after 107° C, fingolimod hydrochloride "forms a phase with a lower crystalline order" (*id.* at 15), likely a liquid crystal.  By the time the DSC scan reaches 260° C, the fingolimod hydrochloride is not in crystal form at all.  It will be a liquid no matter what crystal form it was to start, and therefore this final DSC peak is irrelevant to the characterization of the claimed crystal form.  Indeed, the only transition that is characteristic of Form-β is the first one, which indicates the transition from Form-β/Mutz's Form I to Mutz's Form II.  (McClurg Decl. ¶¶160–163.)

In view of the disclosure in Mutz that the onset of decomposition of Form I begins at "ca. 260° C," a person of ordinary skill would have found it obvious that there would be an endothermic peak in the DSC isotherm in the claimed range of 265 to 270° C, even though this information is irrelevant to the characterization of the crystal form.  (*Id.* ¶164.)

To the extent the Board finds that Mutz and the knowledge of a person of ordinary skill alone are insufficient to render obvious the endothermic DSC peak in the range of 265 to 270° C, a person of ordinary skill would have found that peak obvious over Mutz in view of the '005 patent.  As discussed below in Ground 3, Figure 2 of the '005 patent shows each of the four DSC peaks within the ranges recited in claim 2, including a peak at 266° C.  In view of the similarities of the

33

XRPD and DSC data between Mutz and the '005 patent, it would have been obvious to a person of ordinary skill that the DSC isothermal pattern of Mutz's Form I would have a fourth endothermic peak in the claimed range of 265 to 270° C, just like the DSC isothermal pattern in the '005 patent. (*Id.* ¶¶165–166.)

### 4. Claim 3

As discussed above in Ground 1, claim 3 is substantively identical to claim 2, except that the "and/or" in claim 3 requires only two or more DSC endothermic peaks from the recited set. Regardless of whether claim 3 requires two peaks or all four peaks, the analysis above with respect to claim 2 is equally applicable here. (*Id.* ¶167.)

### 5. Claim 4

As discussed above in Ground 1, Mutz's Form I is identifiable as Shilpa's Form-β by reference to the XRPD pattern disclosed in Figure 3 of the '816 patent. A person of ordinary skill would have recognized that there would be some differences due to experimental variation. Particularly in view of that expected variation, a person of ordinary skill would also have recognized that the patterns below are for the same crystal form, and, thus, that Mutz discloses crystalline fingolimod hydrochloride characterized by the XRPD pattern disclosed in Figure 3 of the '816 patent. (*Id.* ¶168.)

To the extent Shilpa argues that this is insufficient to anticipate, a person of ordinary skill would have certainly found the XRPD pattern recited in claim 4 (top) to be obvious in view of the nearly identical pattern disclosed in Mutz Figure 1 (bottom, color added), as reflected in the comparison below.  (*Id.* ¶169.)



As also discussed above in Ground 1, Mutz's Form I is also identifiable as Shilpa's Form-β by reference to the DSC isothermal pattern disclosed in Figure 4 of the '816 patent.  Thus, Mutz discloses crystalline fingolimod hydrochloride characterized by the DSC isothermal pattern disclosed in Figure 4 of the '816 patent.  This is further confirmed by Wang, which presents a DSC isothermal pattern for an experiment beginning with Mutz's Form I and shows the same transitions disclosed in Mutz.  (Ex. 1021 at 46–47, Fig. 1; McClurg Decl. ¶170.)

To the extent Shilpa argues that this is insufficient to anticipate, a person of ordinary skill would have found it obvious that the DSC pattern of Mutz's Form I

would be characterized by the DSC pattern in Figure 4 of the '816 patent, alone or further in view of the '005 patent.  In view of the disclosure in Mutz that the onset of decomposition of Form I begins at "ca. 260° C" (Ex. 1004 at 15), a person of ordinary skill would have found it obvious that there would be an endothermic peak in the DSC isotherm in the claimed range of 265 to 270° C.  Such person would also have understood that, experimental parameters being equal, all fingolimod hydrochloride, regardless of starting form, would have a peak in the 265 and 270° C range, as this is an inherent property of the compound.  (McClurg Decl. ¶171.)

This is confirmed by the '005 patent.  As discussed below in Ground 3, Figure 2 of the '005 patent shows each of the four DSC peaks within the ranges claimed in claim 2 and Figure 4 of the '816 patent, including an endothermic peak at 266° C.  In view of the similarities of the XRPD and DSC data between the two references, a person of ordinary skill would have understood or found it obvious that the DSC pattern of Mutz's Form I would have a fourth endothermic peak between 265 and 270° C, just like the DSC pattern in the '005 patent.  (*Id.* ¶172.)

### E.  Ground 3:  Claims 1–4 Are Anticipated by the '005 Patent under 35 U.S.C. § 102

#### 1.  Claim 1

Example 2 of the '005 patent discloses a process for the preparation of "crystalline fingolimod hydrochloride."  (Ex. 1005 at 13:5–24.)  The XRPD pattern

U.S. Patent No. 9,266,816
IPR2022-00886

for the resulting fingolimod hydrochloride, which is a mixture of Mutz's Form I (Shilpa's Form-β) and Mutz's Form II, is shown in Figure 1.  As explained in Dr. McClurg's declaration and shown in the figure below, Figure 1 discloses each and every one of the above peaks within the claimed range.  (*Id.* at Fig. 1 (annotated); McClurg Decl. ¶173.)



Although the XRPD pattern in Figure 1 contains peaks consistent with both Form I and Form II, this does not prevent the identification of Form I as a component of the sample.  The peaks indicative of Mutz's Form I/Shilpa's Form-β, including all claimed peaks in claim 1, are present, confirming that Mutz's Form I/Shilpa's Form-β is present in the sample.  (McClurg Decl. ¶174.)

### 2.    Claim 2

In addition to the XRPD data discussed above, the '005 patent also includes DSC data of the fingolimod hydrochloride produced in Example 2 following

recrystallization, also shown in Figure 2.  (Ex. 1005 at 13:22–24, Fig. 2.)   As shown in the annotated figure and table below, Figure 2 discloses endothermic peaks in each of the ranges claimed in claim 2.  The '005 patent explicitly states that the "DSC shows endothermic peaks at 67.16 °C. and 107.6 °C" (Ex. 1005 at 13:22–23) and endothermic peaks at around 41° C and 266° C are clearly visible in Figure 2.  (*Id.* at Fig. 2 (annotated); McClurg Decl. ¶¶175–176.)





| Form-β ('816 Patent, Cl. 2) | '005 Patent, Figure 2 |
| --- | --- |
| 40 to 45° C | 41° C [a] |
| 65 to 70° C | 67.16° C [b] |
| 107 to 115° C | 107.6° C [b] |
| 265 to 270° C | 266° C [a] |

a.    Peak estimated by scaling from Fig 2.

b.    Peak cited in the '005 patent, Example 2.

Thus, the '005 patent discloses endothermic peaks within each of the four claim ranges of claim 2.  (McClurg Decl. ¶177.)

### 3. Claim 3

As discussed above in Ground 1, claim 3 is substantively identical to claim 2, except that the "and/or" in claim 3 requires only two or more DSC endothermic peaks from the recited set.  Regardless of whether claim 3 requires two peaks or all four peaks, the analysis above with respect to claim 2 is equally applicable here. (*Id.* ¶178.)

### 4. Claim 4

As noted above, Example 2 of the '005 patent yields a mixture of Mutz's Form I (Shilpa's Form-β) and Mutz's Form II.  A person of ordinary skill would have recognized from the XRPD and DSC data that Form-β is present in the sample.  (*Id.* ¶179.)  The two forms could be separated, and if separated, each would have the characteristics of the individual form, including XRPD and DSC patterns.  In particular, Form-β will have the XRPD pattern and DSC isothermal pattern disclosed in Figures 3 and 4 of the '816 patent, as the XRPD and DSC patterns are inherent properties of a form.  Thus, the Form-β in the Example 2 sample is characterized by XRPD as disclosed in Figure 3 and the DSC isothermal pattern as disclosed in Figure 4.  (*Id.* ¶¶180–185.)  Indeed, as discussed above, each of the claimed XRPD and DSC peaks is visible in the patterns for the

Example 2 sample.  That the XRPD pattern also has other peaks and the DSC pattern has peaks of different areas simply reflect the fact that the sample is a mixture.  (*Id.* ¶186.)

## V.    THE PTAB SHOULD INSTITUTE REVIEW

Institution of this Petition would be an efficient use of Board resources at least because the co-pending litigations are in the early stages.  In the District Court Action, trial is not set to begin until October 2023.  Fact discovery and claim construction have only just begun.  *See Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) (precedential); *PEAG LLC v. VARTA Microbattery Gmbh*, IPR2020-01212, Paper 8 at 18 (PTAB Jan. 6, 2021) (concluding that the district court proceeding is still at its infancy when parallel proceeding has yet to proceed to claim construction hearing); *Snap, Inc. v. SRK Technology LLC*, IPR2020-00820, Paper 15 at 10 (PTAB Oct. 21, 2020) (emphasizing "no claim construction orders have issued in the District Court proceedings").

Furthermore, institution should not be denied under Section 325(d) under the two-part test in *Advanced Bionics LLC v. MED-EL Elektromedizinische Gerate GmbH* set forth below:

U.S. Patent No. 9,266,816
IPR2022-00886

(1) whether the same or substantially the same art previously was presented to the Office or whether the same or substantially the same arguments previously were presented to the Office; and

(2) if either condition of [the] first part of the framework is satisfied, whether the petitioner has demonstrated that the Office erred in a manner material to the patentability of challenged claims.

IPR2019-01469, Paper 6 at 8 (PTAB Feb. 13, 2020) (precedential). "An example of a material error may include misapprehending or overlooking specific teachings of the relevant prior art where those teachings impact patentability of the challenged claims." *Id*. at 8 n.9.

The Mutz reference relied upon herein is cited on the face of the '816 patent and was submitted in an Information Disclosure Statement ("IDS") during prosecution. The PCT publication of the '005 patent was included in the Examiner's search results and strategy. However, as described below, the Office erred in a material manner with respect to each reference. In particular, the Examiner appears to have mistakenly bypassed Mutz and the '005 patent based on signals from the applicant that the literature was deficient in ways it is not, as discussed in detail in Section II.C above and further below. The PTAB can now correct those mistakes. As such, this petition should not be denied in the Board's discretion under Section 325(d).

U.S. Patent No. 9,266,816
IPR2022-00886

### 1.    Mutz

The '816 patent describes Mutz as follows:

Mutz et al in WO2010055028A2 reported various polymorphic forms of fingolimod hydrochloride designated as Form-I (at room temperature), Form-II (however at a transition temperature of approximately 40° C.) and Form-III (however at a transition temperature of approximately 66° C.). Further, the patent application also mentions that [at] approximately 107° C., Fingolimod hydrochloride forms a phase with lower crystalline order. However, other than thermal transition based forms, no exact crystalline form have [sic] been reported in the literature.

In view of the existence of few known thermal transition based polymorphic forms of fingolimod hydrochloride, there stills [sic] appears to be a need of novel crystalline forms, which are not only stable as well as convenient to scale up but also their processes provides [sic] improved yields & quality.

(Ex. 1001 at 1:47–56.)

This characterization is incorrect, and apparently led the Examiner away from conducting a substantive review of Mutz.  As discussed above in Section II.C, Mutz discloses exact crystalline forms (Forms I, II, and III).  For each form, Mutz reports XRPD and DSC data as in the '816 patent as well as data from other laboratory techniques.   In fact, Mutz characterizes its crystal forms by more techniques than the '816 patent does.  By falsely describing the Mutz reference and

the prior literature as not reporting an "exact crystalline form" and suggesting that there "still appears to be a need of novel crystalline forms," Shilpa directed the Examiner away from properly reviewing the disclosure of crystalline forms in Mutz and incorrectly suggested that the subject matter of the '816 patent was novel.

Furthermore, the '816 patent misleadingly and confusingly distinguishes the forms described by Mutz and other literature as "thermal transition based forms." (Ex. 1001 at 1:54–56.)  But Mutz describes the exact same thermal transitions between forms that are reported in the '816 patent.  In both Mutz and the '816 patent, the DSC isotherm showed thermal transitions at approximately 40, 66 and 107° C.  (*Compare* Ex. 1004 (Mutz) at 15, *with* Ex. 1001 ('816 patent) at 2:35–43; *see also supra* Section IV.A.I.b.)  This statement may also have directed the Examiner away from properly reviewing the disclosure of Mutz.

Due to Shilpa's false and misleading statements, the Examiner erred in a manner material to the patentability of challenged claims in its consideration of Mutz. In particular, although it was cited in the '816 patent application and considered in an IDS, Mutz was not the subject of any Office Action.  Instead, the Examiner rejected the claims based on an inherent anticipation reference that did not include any XRPD or DSC data at all, Kiuchi (Ex. 1007).  Although Novartis recognizes that Mutz was "not lined through" on the IDS and was therefore

considered by the Examiner, the Examiner was not able to properly consider Mutz due to Shilpa's false and misleading statements.

### 2.    '005 Patent

The PCT publication for the '005 patent was cited in the Examiner's February 25, 2015 search results.   However, there is no indication that the Examiner ever substantively considered this reference.  *See Facebook, Inc. v. Palo Alto Research Center Inc.*, IPR2021-01264, Paper 13 at 45 (PTAB Jan. 25, 2022) ("even if the Examiner considered Konig, the Examiner overlooked or misapprehended Konig's teachings" in part because "[t]he Examiner did not apply Konig as the basis for any rejection, nor does the record include any discussion related to the reference"); *Intel Corp. v. VLSI Tech. LLC*, IPR2019-01192, Paper 15 at 10 (PTAB Jan. 9, 2020) (with respect to Becton Dickinson factor (c), stating that PTAB was "not persuaded that the Examiner considered Irie sufficiently during prosecution to warrant denial of the Petition under § 325(d).  The Board has frequently held that a reference that was neither applied against the claims nor discussed by the Examiner does not weigh in favor of exercising the Board's discretion under § 325(d) to deny a petition") (internal quotations omitted). Indeed, given the similarities between Mutz and the '005 patent, as described previously, it is unsurprising that the Examiner never considered the '005 patent substantively after being misled away from Mutz and other literature that the

U.S. Patent No. 9,266,816
IPR2022-00886

applicant said did not disclose "exact crystalline form[s]."  Thus, in addition to failing to substantively consider this important reference, the Examiner's errors with respect to Mutz apply equally to the '005 patent.

## VI.    MANDATORY NOTICES

### A.    Real Party-in-Interest (37 C.F.R. § 42.8(b)(1))

Novartis Pharmaceuticals Corporation is the real party-in-interest.

### B.    Related Matters (37 C.F.R. § 42.8(b)(2))

The '816 patent is the subject of pending litigation brought by Shilpa, *Shilpa Pharma, Inc. v. Novartis Pharmaceuticals Corporation*, Case No. 1:21-cv-00558-MN (D. Del.).

### C.    Lead and Backup Counsel (37 C.F.R. § 42.8(b)(3))

| Lead Counsel | Backup Counsel |
|---|---|
| **Jane M. Love, Ph.D. (Reg. No. 42,812)** <br> Gibson, Dunn & Crutcher LLP <br> 200 Park Avenue <br> New York, NY 10166 <br> Tel.: (212) 351-3922 <br> Fax: (212) 351-6322 <br> jlove@gibsondunn.com | **David L. Glandorf, Ph.D. (Reg. No. 62,222)** <br> Gibson, Dunn & Crutcher LLP <br> 1801 California St. <br> Denver, CO 80201-4200 <br> Tel.: (303) 298-5799 <br> Fax: (303) 313-2837 <br> dglandorf@gibsondunn.com <br><br> **Robert Trenchard (*Pro Hac Vice Application Pending*)** <br> Gibson, Dunn & Crutcher LLP <br> 200 Park Avenue <br> New York, NY 10166 <br> Tel.: (212) 351-3000 <br> Fax: (212) 351-6322 |

U.S. Patent No. 9,266,816
IPR2022-00886

| Lead Counsel | Backup Counsel |
|---|---|
| | rwtrenchard@gibsondunn.com <br><br> **Christine Ranney (*Pro Hac Vice* Application Pending)** <br> Gibson, Dunn & Crutcher LLP <br> 1801 California St. <br> Denver, CO 80201-4200 <br> Tel.: (303) 298-5799 <br> Fax: (303) 313-2837 <br> cranney@gibsondunn.com <br><br> **Allyson E. Parks (Reg. No. 73,335)** <br> Gibson, Dunn & Crutcher LLP <br> 200 Park Avenue <br> New York, NY 10166 <br> Tel.: (212) 351-3000 <br> Fax: (212) 351-6322 <br> aparks@gibsondunn.com |

Pursuant to 37 C.F.R. § 42.10(b), a Power of Attorney for Novartis has been filed herewith.

### D.     Service Information (37 C.F.R. § 42.8(b)(4))

Service of any documents via hand delivery may be made at the mailing address of lead and backup counsel designated above.   Novartis also hereby consents to electronic service at the email addresses of lead and backup counsel designated above.

U.S. Patent No. 9,266,816
IPR2022-00886

## VII.  PAYMENT OF FEES (37 C.F.R. § 42.15(a))

Pursuant to 37 C.F.R. §§ 42.103 and 42.15(a), the required fee is being submitted herewith.  The Office is authorized to charge any fee deficiency, or credit overpayment, to Novartis Deposit Account No. 50-4409.  Any additional fees due in connection with this petition may be charged to the foregoing account.

## VIII.  CONCLUSION

Novartis respectfully requests IPR and cancellation of claims 1–4 because they are unpatentable under 35 U.S.C. §§102 and 103 based on the foregoing grounds.

Date:  April 20, 2022                          Respectfully submitted,

By: */Jane M. Love, Ph.D./*
Jane M. Love, Ph.D.
Reg. No. 42,812
Lead Counsel for Novartis
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166-0193
jlove@gibsondunn.com
Tel.: 212-351-3922

U.S. Patent No. 9,266,816
IPR2022-00886

## CERTIFICATE OF COMPLIANCE PURSUANT TO 37 C.F.R. § 42.11

Pursuant to 37 C.F.R. § 42.11, the undersigned hereby certifies that the foregoing PETITION FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 9,266,816 and accompanying evidence are not being presented for an improper purpose and that all legal contentions, allegations, and denials are warranted and have evidentiary support.

Date:  April 20, 2022

Respectfully submitted,

By: */Jane M. Love, Ph.D./*
Jane M. Love, Ph.D.
Reg. No. 42,812
Lead Counsel for Novartis
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166-0193
jlove@gibsondunn.com
Tel.: 212-351-3922

48

U.S. Patent No. 9,266,816
IPR2022-00886

**CERTIFICATE OF COMPLIANCE PURSUANT TO 37 C.F.R. § 42.24(d)**

Pursuant to 37 C.F.R. § 42.24(d), the undersigned hereby certifies that the foregoing PETITION FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 9,266,816 contains 9,157 words, excluding the parts of the paper exempted by 37 C.F.R. § 42.24(a)(1), according to the word count tool in Microsoft Word™.

Date:  April 20, 2022

Respectfully submitted,

By: */Jane M. Love, Ph.D./*
Jane M. Love, Ph.D.
Reg. No. 42,812
Lead Counsel for Novartis
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166-0193
jlove@gibsondunn.com
Tel.: 212-351-3922

U.S. Patent No. 9,266,816
IPR2022-00886

**CERTIFICATION OF SERVICE (37 C.F.R. §§ 42.6(e), 42.105(a))**

The undersigned hereby certifies that on April 20, 2022, a copy of the attached PETITION FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 9,266,816, together with all exhibits, and all other papers filed therewith, including a Power of Attorney on behalf of Novartis, was served via email on the attorneys of record for Shilpa, who consented to email service, at the following address:

Shilpa Pharma, Inc.
Sughrue Mion, PLLC
2000 Pennsylvania Ave., NW
Washington, DC 20037

Date:  April 20, 2022                    Respectfully submitted,

By: */Jane M. Love, Ph.D./*
Jane M. Love, Ph.D.
Reg. No. 42,812
Lead Counsel for Novartis
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166-0193
jlove@gibsondunn.com
Tel.: 212-351-3922

# EXHIBIT 2

# EXHIBIT 3

# UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

NOVARTIS PHARMACEUTICALS CORPORATION
Petitioner,

v.

SHILPA PHARMA, INC.
Patent Owner.

———————————

Case No. IPR2022-00886
U.S. Patent No. 9,266,816

———————————

# PATENT OWNER'S RESPONSE
*37 C.F.R. § 42.120*

## TABLE OF CONTENTS

I.  Introduction And Brief Summary ................................................................. 1

II.  Background ................................................................................................... 3

    A.  Fingolimod Hydrochloride Exists in Multiple Forms ......................... 3

    B.  Polymorphism And Characterization Methods .................................... 4

    C.  The '816 Patent ................................................................................... 5

    D.  Persons Of Ordinary Skill In The Art ................................................. 6

    E.  Claim Construction ............................................................................. 6

III.  Response To Ground 1 — Mutz Does Not Anticipate Any Of Claims 1-4 .... 8

    A.  Mutz Does Not Disclose All Of The XRPD Peaks Recited In Claims 1
        And 3 Of The '816 Patent ................................................................... 8

        1.  Dr. McClurg's Methodology Is Crude And Unreliable .............. 8

        2.  Other Differences Confirm That Mutz Form I and the '816
            Patent Form β Are Not The Same Polymorphs ....................... 12

        3.  Conformational Polymorphs Can Differ In Subtle Ways ......... 12

        4.  Thermal Differences Also Confirm Form β's Novelty ........... 13

        5.  Shilpa's Complaint Does Not Support Petitioner's
            Arguments ............................................................................. 14

        6.  Dr. McClurg's Reliance On Wang And Indexing Is Off-Base . 15

    B.  Mutz Does Not Expressly Or Inherently Disclose The 4th DSC Peak
        Recited in Claims 2 and 4 ................................................................. 17

        1.  There Is No Express Disclosure Of The 4th DSC Peak ........... 17

        2.  There Is No Inherent Disclosure Of The 4th DSC Peak .......... 17

IV.  Response To Ground 2 – None Of Claims 1-4 Would Have Been Obvious
     At The Time Of The Invention ....................................................................... 22

A.    Mutz Does Not Teach Or Suggest How To Obtain A Polymorph
      Having The Seven XRPD Peaks Recited In Claim 1 ...........................23

B.    Claim 2 Would Not Have Been Obvious Over Mutz Alone, Or In
      View Of The '005 Patent ...................................................................25

      1.    Mutz And A POSA's Knowledge Do Not Teach Or Suggest
            How To Obtain A Polymorph Having The 4th DSC Peak ........25

      2.    The '005 Patent Disparages And Teaches Away From Mutz,
            And They Cannot Be Properly Combined Against Claims 2-4 27

      3.    Mutz And The '005 Patent Do Not Teach Or Suggest How To
            Modify Mutz To Obtain A Polymorph Having The 4th DSC
            Peak ..................................................................................28

C.    Claim 3 Would Not Have Been Obvious .............................................31

D.    Claim 4 Would Not Have Been Obvious .............................................32

V.  Response To Ground 3 – Petitioner Fails To Raise A Legitimate
    Anticipation Challenge Based On The '005 Patent's Mixtures of Polymorphs
    in Example 2 .................................................................................32

A.    The XRPD Pattern Of Figure 1 Of The '005 Patent Is Based On A
      Mixture Of Two or More Phases, And Cannot Anticipate Claim 1 ...33

      1.    Data From A Sample Containing Two Or More Polymorphs
            Cannot Anticipate A Claim To A Single Polymorph ...............33

      2.    Petitioner's Analysis Of Fig. 1 Does Not Prove The Presence
            Of Each Of The XRPD Peaks Recited In Claims 1-4 ..............35

B.    Petitioner Improperly Combines Data From Different Embodiments
      To Support Its Flawed Anticipation Arguments As to Claims 2-4 .....37

C.    Neither Form A Nor Form B Anticipates Any Claim ..........................40

VI.  Mutz Is Nonenabled Prior Art For Both Anticipation And Obviousness .....41

A.    Mutz's Nonenabling Disclosure Cannot Be Anticipatory .................41

      1.    Mutz Does Not Disclose A Method Of Making Fingolimod
            HCl .....................................................................................42

IPR2022-00886
Patent Owner's Response

a.    The Purported Incorporation of EP '406 is Legally Deficient ........................................................42

2.    Mutz Is Not Enabled For Form I, Form II Or Form III With or Without Fujita ..................................................48

3.    Examples 29 And 284 Fail To Disclose Or Teach The Synthesis Of Any Of Forms I, II Or III..................................49

a.    Mutz Distinguishes His Polymorphs From Fujita..........49

b.    Examples 29 And 284 Provide No Recrystallization Details ..............................................................50

c.    The Difference In Melting Points Between Mutz And Example 29 Proves That None Of Mutz's Forms Could Have Been Made By Example 29 ................................51

d.    Attempts To Replicate Example Of 29 Of Fujita Do Not Demonstrate The Enablement Of Mutz.........................52

4.    Shilpa's EP Counterpart Provides No Support For Enablement Of Mutz ........................................................56

5.    Mutz's U.S. Prosecution Supports Nonenablement ................57

6.    Mutz's Foreign Prosecutions Support Nonenablement ............57

B.    Mutz Is Nonenabling For Obviousness.................................58

VII.    Conclusion .........................................................59

Word Count Certification Of Compliance.............................................60

CERTIFICATE OF SERVICE ................................................61

IPR2022-00886
Patent Owner's Response

## TABLE OF AUTHORITIES

**Cases**

*Advanced Display Sys. Inc. v. Kent State Univ.,* 212 F.3d 1272 (Fed. Cir. 2000) .43, 44, 47

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.,* 776 F.2d 281  (Fed. Cir. 1985) ........................................................................................................58

*Broadcast Innovation, L.L.C. v. Charter Commc'ns, Inc.,* 420 F.3d 1364 (Fed. Cir. 2005) ........................................................................................................43

*Chimie v. PPG Indus., Inc.,* 402 F.3d 1371 (Fed. Cir. 2005) ...................................7

*Chiron Corp. v. Genentech Inc.,* 363 F.3d 1247 (Fed. Cir. 2004)...........................49

*Continental Can Co. USA v. Monsanto Co.*, 948 F.2d 1264  (Fed. Cir. 1991) .......22

*Ecolochem, Inc. v. Southern California Edison Co.*, 227 F.3d 1361 (Fed. Cir. 2000) ........................................................................................................39

*Eisai Co. Ltd. v. Dr. Reddy's Laboratories, Ltd*, 533 F.3d 1353 (Fed. Cir. 2008)..30

*Ex parte Adachi*, 2022 Pat. App. LEXIS 2463, (PTAB May 23, 2022).................31

*Ex parte Chen*, 2022 Pat. App. LEXIS 5529 (PTAB, Nov. 15, 2022) ...................13

*Ex parte Saerens*, 2021 Pat. App. LEXIS 1080  (PTAB Feb. 25, 2021)................31

*Gillespie v. Dywidag Sys., Int'l, USA*, 501 F.3d 1285 (Fed. Cir. 2007) ...................7

*Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043 (Fed. Cir. 1995) ...............................55

*Grünenthal Gmbh v. Alkem Labs. Ltd.*, 919 F.3d 1333 (Fed. Cir. 2019) .. 24, 30, 31, 50

*In re Arkley*, 455 F.2d 586 (CCPA 1972) ...............................................................39

*In re Armodafinil Pat. Litig. Inc.*, 939 F. Supp. 2d 456 (D. Del. 2013) .................55

*In re Gleave*, 560 F.3d 1331 (Fed. Cir. 2009) ................................................. 48, 49

*In re Kahn,* 441 F.3d 977, 988 (Fed. Cir. 2006) ......................................................24

*In re Kumar*, 418 F.3d 1361  (Fed. Cir. 2005).......................................................58

*In re Schwarz*, 2018 Pat. App. LEXIS 4708,
(P.T.A.B. June 25, 2018) ................................................................42

*In re Wiggins*, 488 F.2d 538 (CCPA 1973 ..........................................49

*LG Electronics, Inc. v. Immervision Inc.*, 2021 Pat. App. LEXIS 5001 (PTAB May
11, 2021) ....................................................................................40

*Lundbeck v. Lupin Ltd.*, No. CV 18-88-LPS, 2021 WL 4944963 (D. Del. Sept. 30,
2021) ...........................................................................................13

*Microsoft Corp. v. Biscotti, Inc.*, 878 F.3d 1052  (Fed. Cir. 2017) .........39

*Net MoneyIN Inc. v. VeriSign, Inc.*, 545 F.3d 1359 (Fed. Cir. 2008).....................39

*Pennwalt Corp. v. Akzona, Inc., 570 F.Supp. 1097 (D. Del. 1983)* .......................43

*Pharmacyclics LLC v. Alvogen, Inc.,* 2022 U.S. App. LEXIS 31479 (Fed. Cir. Nov.
15, 2022) .....................................................................................31

*Raytheon Techs. Corp. v. GE*, 993 F.3d 1374, (Fed. Cir. 2021) ............................59

*Sirona Dental Sys. GmbH v. Institut Straumann AG*, 892 F.3d 1349 (Fed. Cir.
2018) ...........................................................................................40

*Spectralytics Inc. v. Cordis Corp.*, 649 F.3d 1336 (Fed. Cir. 2011).......................28

*Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628  (Fed. Cir. 1987)....8,
21

**Statutes**

35 U.S.C. §363 ......................................................................... 42, 43

**Other Authorities**

Manual of Patent Examining Procedure § 2131 ......................................8

**Regulations**

37 C.F.R. § 57(d) .................................................................. 42, 43, 57

37 C.F.R. §1.57(c)(2) ...................................................................45

## PATENT OWNER LIST OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| 2001 | *Shilpa Pharma, Inc. v. Novartis Pharmaceuticals Corporation*, Civ. No. 21-558-MN, Stipulation and Order Regarding Amended Scheduling Order, D.I. 141 (D. Del. June 23, 2022) |
| 2002 | *Shilpa Pharma, Inc. v. Novartis Pharmaceuticals Corporation*, Civ. No. 21-558-MN, Complaint, D.I. 1 (D. Del. April 21, 2021) |
| 2003 | *Shilpa Pharma, Inc. v. Novartis Pharmaceuticals Corporation*, Civ. No. 21-558-MN, Novartis' Initial Invalidity Contentions (D. Del. March 7, F2022) |
| 2004 | *Shilpa Pharma, Inc. v. Novartis Pharmaceuticals Corporation*, Civ. No. 21-558-MN, Joint Claim Construction Brief, D.I. 124 (D. Del. June 3, 2022) |
| 2005 | Information Disclosure Statement, Appl'n. Ser. No. 13/635,207, dated Sept. 14, 2012 |
| 2006 | Information Disclosure Statement (List of References cited by Applicant and considered by examiner), Appl'n. Ser. No. 13/635,207 (dated Feb. 23, 2015) |
| 2007 | Declaration under 37 CFR § 1.132,  Appl'n. Ser. No. 13/635,207 (dated May 14, 2015 ) |
| 2008 | Declaration of Prof. Craig Eckhardt, Ph.D. |
| 2009 | *Curriculum Vitae* of Prof. Craig Eckhardt, Ph.D. |
| 2010 | Terence L. Threlfall, *Analysis of Organic Polymorphs, A Review*, Analyst, Volume 120 p. 2435 (October 1995) |
| 2011 | U.S. Pharmacopeia 23, Chapter 941 (1995) |
| 2012 | Patent family chart  for PCT Patent Publication No. WO2010/055028 A2 ("Mutz Reference") |

IPR2022-00886
Patent Owner's Response

| 2013 | U.S. Appl'n. Ser. No. 13/964,817, Specification and Claims, dated August 12, 2013 |
| 2014 | U.S. Appl'n. Ser. No. 13/964,817, Non-Final Rejection (dated June 8, 2015) |
| 2015 | U.S. Appl'n. Ser. No. 13/964,817, Notice of Abandonment, (dated December 18, 2015) |
| 2016 | PCT/EP2009/064891, Written Opinion of the International Searching Authority (dated May 17, 2010) |
| 2017 | EP09748350, Applicant Amendment (dated May 2, 2011) |
| 2018 | EP09748350, Communication Pursuant to Article 94(3) EPC (dated February 13, 2015) |
| 2019 | JP-2011-535130, Scope of Claims (original and machine translation) |
| 2020 | JP-2011-535130, Notice of Reasons for Refusal (dated September 17, 2014) (original and machine translation) |
| 2021 | JP-2011-535130, Decision of Refusal (dated June 4, 2015) (original and machine translation) |
| 2022 | JP-2011-535130, Notice of Withdrawal of Application (dated October 2, 2015) (original and machine translation) |
| 2023 | JP-2011-535130 Divisional Application Information |
| 2024 | JP 2017-172276, Scope of Claims (original and machine translation) |
| 2025 | JP 2017-172276, Notice of Reasons for Refusal (dated June 12, 2018) (original and machine translation) |
| 2026 | JP 2017-172276, Decision of Refusal (dated February 28, 2019) (original and machine translation) |
| 2027 | JP 2015-173474, Scope of Claims (original and machine translation) |

| 2028 | JP 2015-173474, Notice of Reasons for Refusal (June 21, 2016) (original and machine translation) |
| 2029 | JP 2015-173474, Decision of Refusal (dated April 14, 2017) (original and machine translation) |
| 2030 | JP 2015-173474, Notice of Withdrawal of Application (dated September 21, 2017) (original and machine translation) |
| 2031 | JP 2014-020950, Scope of Claims (original and machine translation) |
| 2032 | JP 2014-020950, Notice of Reasons for Refusal (dated February 25, 2015) (original and machine translation) |
| 2033 | JP 2014-020950, Notice of Withdrawal of Application (dated October 2, 2015) (original and machine translation) |
| 2034 | AU 2013-263791, Patent Examination Report No. 1 (dated June 12, 2015) |
| 2035 | AU 2013-263791, Applicant Response Patent Examination Report No. 1 (dated April 5, 2016) |
| 2036 | AU 2013-263791, Applicants Claims as Amended (dated April 5, 2016) |
| 2037 | MX/a/2011/004962, Voluntary Amendment (dated July 21, 2011) (original and Google Translate machine translation) |
| 2038 | MX/a/2011/004962, Office Action (dated March 19, 2013) (original and Google Translate machine translation) |
| 2039 | KR 1020117010560, Notification of Reasons for Rejection (dated December 17, 2012) (original and Google Translate machine translation) |
| 2040 | KR 1020117010560, Applicant Amendment and Response (dated February 15, 2013) (original and Google Translate machine translation) |

| 2041 | KR 1020117010560, Notification of Reasons for Rejection (dated June 10, 2013) (original and Google Translate machine translation) |
|------|------|
| 2042 | KR 1020117010560, Applicant Request for Re-Examination of Decision of Rejection (dated September 11, 2013) (original and Google Translate machine translation) |
| 2043 | KR 1020117010560, Notification of Reasons for Rejection (dated October 4, 2013) (original and Google Translate machine translation) |
| 2044 | KR 1020117010560, Applicant Amendment and Response (dated December 4, 2013) (original and Google Translate machine translation) |
| 2045 | Reserved |
| 2046 | BRPI0921826 Notification of Reasons for Rejection (dated December 15, 2020) (original and Google Translate machine translation) |
| 2047 | CA 2,743,323, (Examiner's Report and Rejections (dated July 25, 2012), with Applicant's Response (dated January 25, 2013) |
| 2048 | Appl'n. Ser. No. 13/635,207, Amendment and Remarks under 37 C.F.R. § 1.111, dated May 15, 2015 |
| 2049 | U.S. Patent and Trademark Office Memorandum re Interim Procedure For Discretionary Denials In AIA-Post-Grant Proceedings With Parallel District Court Litigation (dated June 21, 2022) |
| 2050 | U.S. Appl'n. Ser. No. 13/964,817, Third Party Submission, dated August 19, 2014 |
| 2051 | Declaration of L. Roman Rachuba dated July 29, 2022 |
| 2052 | Declaration of Dr. William E. Mayo |
| 2053 | *Curriculum Vitae* of Dr. William E. Mayo |

| 2054 | Deposition Transcript of Dr. Richard McClurg, taken Jan. 10, 2023 |
| --- | --- |
| 2055 | Second Declaration of Craig J. Eckhardt, Ph.D. |
| 2056 | Certified Prosecution History of '816 Patent |
| 2057 | U.S. Patent No. 9,815,772 to Kumar et al |
| 2058 | U.S. Patent No. 9,216,943 to Katkam et al. |
| 2059 | Solid-State Properties of Pharmaceutical Materials, S.R. Byrn, G. Zografi & X. Chen |
| 2060 | Guidance for Industry – ANDAs: Pharmaceutical Solid Polymorphism, US. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (2007) |
| 2061 | The United States Pharmacopeia/The National Formulary, USP 32/NF 27 <941> X-Ray Diffraction, USP 32/NF 27 (2009) |
| 2062 | Introduction to X-Ray Powder Diffraction, R. Jenkins, R. Snyder, John Wiley (1996) 332-353 |
| 2063 | Fundamentals of Powder Diffraction and Structural Characterization of Materials, V.K. Pecharsky, P.J. Zavalij, 2nd Ed., Springer (2009) 382-389 |
| 2064 | C. Gilmore, G. Barr, J. Paisley, High-throughput powder diffraction. I. A new approach to qualitative and quantitative powder diffraction pattern analysis using full pattern profiles, J. App. Cryst., 37 (2004) 231-242 |
| 2065 | J-W Lee, WE. Park, J. Lee, S. Singh, K. Sohn, A deep-learning technique for phase identification in multiphase inorganic compounds using synthetic XRD powder patterns, Nature Comm., 11 (2020) 1-11 |
| 2066 | J. Kaduk, Crystallographic databases and powder diffraction, International Tables for Crystallography, Chapter 3.7 (2019) 304-324 |

| 2067 | D. Wright, C. Liu, D. Stanley, H. Chen, J. Fang, X-Rays: a fuzzy expert system for qualitative XRD analysis, Computers and Geosciences, 19 (1993) 1429-1443 |
| 2068 | U.S. Patent No. 6,118,850 to Mayo et al |
| 2069 | How to Analyze Materials – A practical Guide for Powder Diffraction, International Centre For Diffraction Data, on-line slide show, https://www.icdd.com/assets/tutorials /HowToAnalyzeMaterials.pdf |
| 2070 | Powder Diffraction Theory and Practice, R. Dinnebier, S. Billinge, RSC Publishing (2008) |
| 2071 | S. Gates-Rector, T. Blanton, The Powder Diffraction File: a quality materials characterization database, Powder Diffraction, 34 (2019) 352-360 |
| 2072 | X-ray Diffraction Procedures, H. Klug, L. Alexander, Wiley, (1974) 505-515 |
| 2073 | Introduction to X-Ray Powder Diffraction, R. Jenkins, R. Snyder, John Wiley (1996) 313-317 |
| 2074 | Reserved |
| 2075 | Reserved |
| 2076 | Thermal Analysis of Pharmaceuticals, D.Q.M. Craig and M. Reading, CRC Press, (2007) |
| 2077 | J. Kaduk, K. Zhong, A. M. Gindhart, T.N. Blanton, Crystal structure of fingolimod hydrochloride, C19H34ClNO2, Powder Diffraction, 30 (2015) 205-210 |
| 2078 | Polymorphism in Pharmaceuticals Solids, Ed. By H.G. Brittain, Informa Healthcare, (2014) 135-184 |
| 2079 | Handbook of Industrial Crystallization, ed. A.S. Myerson, D. Erdemir & A.Y. Lee, 3rd ed., Cambridge Univ. Press, (1993) 61-62 |

| 2080 | Handbook of Industrial Crystallization, ed. A.S. Myerson, D. Erdemir & A.Y. Lee, 3rd ed., Cambridge Univ. Press, (1993) 408-409 |
| 2081 | E. H. Lee, A Practical Guide to Pharmaceutical Polymorph Screening and Selection, Asian J. Pharm. Sci, 9 (2014) 163-175 |
| 2082 | A. Newman, Speciaized Solid Form Screening Techniques, Org. Proc & Res, 17 (2013) 457-471 |
| 2083 | J. Bauer, S. Spanion, R. Henry, J. Quick, W. Dziki, W. Porter, J. Morris, Ritonavir: An Extraordinary Example of Conformational Polymorphism, Pharm. Res., 18 (2001) 859-866 |
| 2084 | Declaration of Dr. Rafiuddin |
| 2085 | Bernstein (Polymorphism in Molecular Crystals), Oxford University Press, 2002 |
| 2086 | Cruz-Cabeza & Bernstein, Chem. Rev., 2014, 114, 2170-2191 |
| 2087 | Balog et al., J. Chem Phys., 2000, 112, 870-880 |
| 2088 | Pereyaslavets et al., Nature Comm. 2022, 13, 414-421 |
| 2089 | Maruyama et al. in Kinetic Control in Synthesis and Self-Assembly, Chapter 13 – Development of Polymorphic Control Technology for Pharmaceutical Compounds, 2019, pages 269-291 |
| 2090 | Caira in Comprehensive Supramolecular Chemistry II, 7.08 – Polymorphs of Molecular Crystals, 2017, pp. 127-160 |
| 2091 | Price in Polymorphism in Pharmaceutical Solids 2nd ed., 2009, Brittain (ed.), 52-75; Cains, ibid, 76-138 |
| 2092 | Caira, Topics in Current Chemistry, 1998, 198, 163-208 |
| 2093 | Bučar et al, Angew. Chem. Int. Ed. (2015) 54, 6972-6993 |
| 2094 | Coles et al., Cryst. Growth Des. 2014, 14, 1623-1628 |
| 2095 | Hall et al., Cryst. Growth Des. 2022, 22, 6262-6266 |

| 2096 | Salbego et al., ACS Omega, 2019, 4, 9697-9709 |
| 2097 | Declaration of Jerry L. Atwood, Ph.D., Case 1:21-cv-00558-MN Document 225 Filed 12/09/22 |
| 2098 | C. Suryanarayana and M. Grant Norton, X-Ray Diffraction – A Practical Approach, Plenum Press (1998), 23-27 |
| 2099 | Rajni Garg et al., Work Function Engineering of Graphene, Nanomaterials 2014, 4, 267-300 |
| 2100 | Peter Rudolph, in Springer Handbook of Crystal Growth, G. Dhanaraj (Eds.), Chapter 6 - Defect Formation During Crystal Growth from the Melt (2010), 159-201 |
| 2101 | C. Suryanarayana and M. Grant Norton, X-Ray Diffraction – A Practical Approach, Plenum Press, (1998) 50-52 |
| 2102 | V.K. Pecharsky and P.J. Zavalij, Fundamentals of Powder Diffraction and Structural Characterization of Materials, 2nd Ed., Springer (2009) 280-283 |
| 2103 | Scott A Speakman, Ph.D., Basics of X-Ray Powder Diffraction, Massachusetts Institute of Technology, (2011) http://prism.mit.edu/xray |
| 2104 | B.D. Cullity and S.R. Stock, Elements of X-Ray Diffraction, Third Edition, Pearson (2014) 35-38 |
| 2105 | Duncan Q. M. Craig and Mike Reading (Eds.), Thermal Analysis of Pharmaceuticals, CRC Press (2007) 1-21 |
| 2106 | H.G. Brittain (Ed.), Polymorphism in Pharmaceuticals Solids, 2nd Edition, Informa Healthcare, (2009) 318-323 |
| 2107 | International Standard ISO 11357-1, Plastics – Differential Scanning Calorimetry (DSC) – Part 1: General Principles (3rd ed. 2016) |
| 2108 | Zachariah Steven Baird, et al, Physical Properties of 7-Methyl-1,5,7-triazabicyclo[4.4.0]dec-5-ene (mTBD), International Journal of Thermophysics (2019) 40:71 |

| 2109 | Sherif S. Z. Hindi, Birefringence of bio-based liquid crystals, BioCrystals Journal, Vol. 1, Issue 1 (2016) 13-25 |
|------|---|
| 2110 | Hang Woo Lee, et al, Lyotropic Liquid-Crystalline Solutions of High-Concentration Dispersions of Single-Walled Carbon Nanotubes with Conjugated Polymers, Small vol. 5, no. 9 (2009) 1019-1024 |
| 2111 | Eclipse E600POL (1992), Nikon's Museum of Microscopy/MicroscopyU, https://www.microscopyu.com/museum/eclipse-e600pol, accessed 1/22/2023 |
| 2112 | THMS600 Versatile Heating and Cooling Stage brochure, Linkam Scientific Instruments Ltd. (v1.4 2022) |
| 2113 | EP 2 829 268 A1 (Buranachokpaisan et al) |
| 2114 | S.R. Byrn, G. Zografi & X. Chen, Solid-State Properties of Pharmaceutical Materials (Wiley 2017) 142-143 |
| 2115 | US 2013/0281739 A1 to Shrawat et al. |
| 2116 | Kaduk et al (Ex. 2077) data 00-064-1495 from the Powder Diffraction File, International Centre for Diffraction Data |
| 2117 | EP 0 627 406 A1 to Fujita et al. |
| 2118 | The Board's email from September 6, 2022 in Novartis v. Shilpa, Case No. IPR2022-00886 |
| 2119 | File History of counterpart EP 2 356 090 A2 to Mutz et al. |
| 2120 | Prosecution History of counterpart U.S. Application No. 13/964,817, Mutz et al |
| 2121 | Espacenet web page showing EP '406 publications, [https://worldwide.espacenet.com/patent/search/family/026499282/publication/EP0627406B1?q=pn%3DEP0627406B1 |
| 2122 | Declaration of L. Roman Rachuba dated January 31, 2023 |

## I.    Introduction And Brief Summary

***Ground 1 (Mutz)*** – Claims 1-4 of the '816 patent are not anticipated by Mutz's Form I.  However, Mutz does not teach how to make Form I, even if Fujita '406 is incorporated.  Mutz is non-enabling with respect to its own claims, Example 14 relied on for the proposed rejections, and Form β as claimed in '816.  The Board erred in concluding otherwise in the Institution Decision, Paper 13 (ID).

Further, the Petition's attempt to show the presence of precisely claimed XRPD peaks at 21.43° and 25.0° ±0.1°2θ, recited in each of claims 1-4, by visual estimation with a ruler and vertical stacking of scaled different-sized graphs, is inaccurate and unreliable.  Claims 2 and 4 are not anticipated for the additional reason that the fourth DSC endothermic peak between 265-270°C is not disclosed by Mutz, its absence is undisputed, and Petitioner's theories based on inherency fail because, e.g., the evidence includes several examples where the asserted inevitability simply does not occur.

***Ground 2 (Obviousness)***  Claims 1-4 would not have been obvious over Mutz, or further in view of the '005 patent for claims 2-4.  Petitioner's arguments lack merit first and foremost because it is undisputed that predicting the existence of a polymorphic form and the properties thereof was beyond the capability of a POSA at the time of the invention in 2010.  It was not possible to predict the characteristics of a given polymorph before making it and testing it for its properties—as recognized

by both parties' experts and the Federal Circuit.  Where specific XRPD peaks at 21.43° and/or 25.10° ±0.1°2θ are missing, Petitioner offers no theory or evidence as to how a POSA would have modified Mutz to obtain a form having such peaks. Similarly, as to the fourth DSC peak missing from Mutz, Petitioner offers no theory or evidence as to how a POSA would have modified Mutz to obtain a form having such a peak.

*Ground 3 (The '005 Patent)* – Claims 1-4 are not anticipated by '005's Example 2, which yields a first mixture of two phases, A+B, with an XRPD diffraction pattern Fig. 1.  Fig. 1 does not anticipate the seven XRPD peaks of claim 1 because it is based on a *mixture of two phases, A+B, and likely another unidentified phase.*  The peaks in Fig. 1 that are attributable uniquely to form A and those which are attributable uniquely to form B cannot be determined; nor does Petitioner attempt such attributions.  The lack of anticipation of claim 1 appears to have been accepted in the ID at 37-38.

Example 2 of '005 reports that a second product, recrystallized in ethanol from the first A+B mixture, had DSC endothermic peaks at 67.16°C and 107.6°C (Ex.1005, 13:22-23; Fig. 2), clearly different than the first A+B mixture having DSC peaks at 68.6°C and 100.77°C.  *Id.*, 13:18-19.  Thus, the two samples reported in Example 2 are indisputably not the same as both parties' experts agree.  Because anticipation does not permit mixing and matching disclosures from different examples or embodiments within a single reference to meet the elements of a

challenged claim, the Petition fails to prove as a matter of law, logic and science, that claims 2-4 of '816 are anticipated by Example 2 for this additional reason.

## II.    Background

### A. Fingolimod Hydrochloride Exists in Multiple Forms

Fingolimod hydrochloride was first described by researchers in Japan in the 1990's for use as an immunosuppressant.  Ex.2117 (Fujita).  Mutz claims to have discovered its polymorphism (Ex.1004, p.1).  Fingolimod hydrochloride exists in different crystalline forms.  *See e.g.,* Ex.1001 ('816), Forms α, β, μ; Ex.1004 (Mutz), Forms I, II, III; Ex.1005 ('005), Forms A, B; Ex.2057 ('772), Form Y (4:49-56); Ex. 2077, Kaduk (corresponds to '816 Form α).  Fingolimod hydrochloride can also exist in amorphous solid forms. Ex.2058 ('943, three different preparations of amorphous fingolimod HCl at Examples 11-13, Figs. 2-.4)

This case is about Form β described and claimed in '816, which is a novel crystalline polymorph. (Declaration of Dr. Craig Eckhardt, Ex.2008, ¶17). [1] Petitioner and its expert, Dr. McClurg, repeatedly assert that Form β, a sample

---

[1] Professor Emeritus Craig J. Eckhardt has 50+ years of experience in organic solid-state chemistry, theory of organic solid-state reactions, collective interactions, polymorphism and phase transitions in two- and three-dimensional crystals and is an expert in associated theories and techniques including XRPD and DSC.  Ex.2008, ¶¶3-11; Ex.2009 (CV).

obtained from China analyzed by Wang in 2015 (Ex.1021), and even Forms A and B of '005, are actually Mutz Forms I, II and/or III, but that is incorrect as shown below.

### B. Polymorphism And Characterization Methods

Various aspects of polymorphs, and methods of characterization thereof, are discussed by Dr. Eckhardt (Ex.2008, ¶¶21-38; Ex.2055, ¶¶6-18) and Dr. Mayo (Ex.2052, ¶¶46-86). Dr. Mayo also testifies in detail about the applicability of the asserted art to the '816 claims. *Id.*, *passim*.[2]

Different polymorphs of a compound can have widely varying properties including different X-ray diffraction scattering, thermodynamic, and pharmacological properties, and can yield significantly different results when subjected to various analytical methods. However, the opposite may also be true in that some polymorphs have both physical and chemical behaviors that differ from each in a subtle manner. Ex.2008, ¶29. An example is conformational polymorphism, which occurs when different conformations of the same molecule ("conformers") occur in different crystal forms. Ex.2055, ¶¶6-10.

---

[2] Dr. William Mayo also has 50+ years of experience with characterization of structural polymorphs, such as those that occur in pharmaceuticals, among many related qualifications. See Ex.2052, ¶¶14-22, and Ex.2053 (CV).

It is not uncommon for crystals comprised of molecules of labile geometry, *e.g.*, molecules that comprise long chains of atoms such as fingolimod hydrochloride, to exist as conformational polymorphs. These forms can differ only slightly, and physical measurements such as XRPD between distinct, conformational polymorphs may appear to be nearly identical. Ex.2008, ¶28; Ex.2055, ¶¶14-18.

Although XRPD is one of the most commonly used and effective techniques for characterizing polymorphs, two different polymorphs can, and often do, share a number of peaks in their XRPD patterns. But two crystal forms are considered to be distinct if even one of the peaks in their respective XRPD patterns does not match. Ex. 2008, ¶32; Ex. 2010, p.2445.

DSC data can be used to identify transition temperatures or melting points that can provide more identification. Ex.2008, ¶37. Distinct conformers of a given compound may have different inherent melting points and endotherm values, whereas others may have melting points and endotherm values that are very close together. Modern DSCs can measure temperature accuracy to ±0.025ºC and temperature precision to 0.005ºC. Ex.2008, ¶38.

### C. The '816 Patent

The '816 Patent describes several novel polymorphic forms of fingolimod HCl, designated α, β, and µ and processes for making the same. The '816 Patent claims crystalline Form β, characterized by reference to specific XRPD peaks 2θ, to

a precise tolerance of ±0.1°2θ, and specific endothermic peaks in a DSC scan. Ex.1001, claims 1-4. *Id.*

### D. Persons Of Ordinary Skill In The Art

A person of ordinary skill in the art (POSA) with respect to the claimed subject matter would include a person who possesses an advanced degree (*e.g.*, Master's degree or Ph.D., or foreign equivalents of either of the foregoing) in the fields of solid-state chemistry, chemical engineering, or a related discipline (*i.e.*, organic chemistry) and several years of experience in crystal technology. A person of ordinary skill in the art could have a lower level of formal education, such as a Bachelor's degree, if such a person had a higher degree of experience. Such a person would understand that the process of developing pharmaceutical compositions requires a multi-disciplinary approach, and would draw upon not only his or her own skills, but would also take advantage of certain specialized skills of others, to solve any given problem. Ex. 2008, ¶¶14-15 (Eckhardt).

Dr. Mayo's and Dr. Eckhardt's views are consistent, and their analyses would not change under Petitioner's definition. Ex.2052, ¶¶36-41; Ex.2055, ¶5.

### E. Claim Construction

The Petition does not identify any claim construction issues. However, Dr. McClurg raises one at Ex.1002, ¶105, asserting that claim 1 of '816 requires only two XRPD peaks instead of all seven listed. However, he conceded on cross-examination that he was not aware that the prosecution history was relevant to claim

construction, and that he did not review Shilpa's May 15, 2015 Amendment (Ex. 2048), where the amendment and Remarks make crystal clear that all seven XRPD peaks are required. (Ex. 2054 (McClurg transcript), 42:20–50:4). In the May 15th Amendment, Shilpa amended claims 7 and 9 ('816 claims 1 and 3) by deleting "comprising at least 4" characteristic 2θ° peaks, leaving all seven such peaks, and stated in the Remarks, "From the presently amended claim, for a person skilled in the art *it is clear that crystalline polymorphic form of Fingolimod HCl designated as Form-β, if and only if every peak in the claim is present the XRPD.*" *Id.* (emphasis added) Shilpa's statement left no doubt that all seven XRPD peaks would be required to define Form β in claims 1 and 3; fewer than the seven named peaks would ***not*** be sufficient. *Chimie v. PPG Indus., Inc.,* 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history … is to 'exclude any interpretation that was disclaimed during prosecution."). Shilpa's unambiguous actions excluded any claim scope that required fewer than all seven recited peaks. *See Gillespie v. Dywidag Sys., Int'l, USA*, 501 F.3d 1285, 1291 (Fed. Cir. 2007) ("The public notice function of a patent and its prosecution history *requires that a patentee be held to what he declares during the prosecution of his patent*") (emphasis added).

Thus, claims 1-3 of '816 should be construed to require the seven XRPD peaks, and Dr. Mayo has applied this construction. Ex.2052, ¶¶42-45.

## III.   Response To Ground 1 — Mutz Does Not Anticipate Any Of Claims 1-4

### A.   *Mutz Does Not Disclose All Of The XRPD Peaks Recited In Claims 1 And 3 Of The '816 Patent*

The Board's finding that "it is *undisputed* that Mutz teaches all limitations of claims 1-4" is incorrect and unsupported (ID, p.25) (emphasis added).  It is disputed, based on the plain disclosure of Mutz.  It is standard practice that a POPR does not have to include all arguments, or any merits-based arguments.  Patent Owner made a valid election to only present Mutz nonenablement arguments in the POPR.

Only 5 of 7 the seven XRPD peaks of claims 1-4 are disclosed by Mutz. Moreover, the fourth DSC peak of claims 2 and 4  is not disclosed in Mutz, and  there is no basis to categorically disregard a claimed feature as inconsequential when evaluating anticipation, as Petitioner urges.  MPEP § 2131; *Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628, 631 (Fed. Cir. 1987).

### 1.   *Dr. McClurg's Methodology Is Crude And Unreliable*

Petitioner asserts at pp. 18-21 that claim 1 is anticipated by Form I of Mutz. However, it has not been established that peaks at 21.43 and 25.10, each ±0.1°2θ, are present in Form I.  Ex.2052, ¶¶89-90, 117.  While  the challenged '816 claims were drafted with precision as to the XRPD peaks, allowing deviation from the recited peak value of only ±0.1°2θ (Ex.1001, claims 1 and 3), Petitioner relies on an annotated Fig. 1 of Mutz, and Dr. McClurg's testimony of a visual estimation using

a ruler and extrapolation to *estimate* peaks at 21.4 and 25.0 in Fig. 1.  Pet., table at top of p.20; Ex.1002, ¶¶106-109.

Dr. McClurg's methodology is  too crude to establish the presence of peaks at **21.43 and 25.10**, ±*0.1 2θ*°.[3]  Dr. McClurg's use of a ruler to ***estimate*** the positions of peaks at 21.4° and 25.0° is highly inaccurate since comparison of corresponding peak positions in two different XRPD patterns requires an accuracy of ±0.1°2θ, which corresponds to about ±0.01" in Mutz Figure 1. That is smaller than the finest division of 1/64" on a precision ruler.  Dr. McClurg's estimation of peaks at 21.4° and 25.0° is not reliable evidence that Mutz discloses peaks at 21.43° and 25.10° ±0.1°2θ.  As a result, a POSA would not be able to reproduce the data that Dr. McClurg relied upon for his analysis.  Ex.2052, ¶¶117-124 (Mayo).

A simple calculation shows that ±0.1°2θ on the scale in Fig. 1 of Mutz used by Dr. McClurg would have been beyond the ruler measurement capability and visual acuity of a POSA in 2010. Note that the range of the x-axis in Mutz is 33° spread out over a width of only 3.58" (91 mm). Ex.2052, ¶120, Fig.23.  Thus, an error of ±0.1° corresponds to a distance on the X axis of about ±0.01" (0.276 mm)

---

[3] The USP<941> monograph in force in 2010 (Ex.2061) also told a POSA that when comparing corresponding peaks in a test and reference pattern, the allowed error is ±0.1°2θ.  Ex.2052, ¶¶89, 119.

based on simple proportionality, which corresponds to approximately 3 pixels on a printed page at 300 dpi.  *Id.*, ¶120.

Another way to gauge the impossibility of Dr. McClurg's method is to consider that the maximum separation distance of about 0.01" is smaller than the smallest division 0f 1/64[th] of an inch (0.016") on a precision ruler. Even a POSA with perfect 20/20 vision would not only have been able to accurately locate such a non-digitized peak with a ruler with accuracy to about 0.01", but the POSA would have a hard time seeing two lines so closely spaced since the resolving power needed is at the very limit of the human eye's resolving power.  *Id.,* ¶120.

Dr. McClurg's estimate is based on annotated Fig. 1 of Mutz, seen at Pet. p. 19 (see Table top of 20, and Ex.1002, ¶¶106-109), showing red lines alleged to correspond to the estimated peaks at 21.43 and 25.10:



Ex.2052, ¶121.  When closely analyzed, the thick red line corresponding to estimated

25.0 is actually shaded to the right of the 25 mark on the x-axis.  And it is unclear

where the red line said to correspond to 21.4 would actually land on Mutz's x-axis,

although that stick also appears to be shaded slightly to the right of the tall peak in

the graph.  Further, the red lines appear to be thicker than 0.1°2θ.  Ex.2052, ¶122.

When critically analyzed, Dr. McClurg's methodology is scientifically unreliable,

and highly unlikely to be accurate.  *Id.,* at ¶¶122-124.

Because all of claims 1-4 require peaks at 21.43° and 25.0° ±0.1°2θ, no claim

is anticipated for at least this reason.

IPR2022-00886
Patent Owner's Response

### 2. *Other Differences Confirm That Mutz Form I and the '816 Patent Form β Are Not The Same Polymorphs*

There are other subtle differences between the XRPD patterns of Mutz Form I, Fig. 1 and the '816 Form β, Fig. 3, that indicate changes in their respective atomic arrangements within the fingolimod HCl molecule, and which confirm that these are not the same polymorphs.  For example, in the region between roughly 17.5° and 22.5° for the XRPD patterns of the two materials, Mutz Form I  (bottom spectrum) has five peaks in a narrow range near 20° 2θ while the '816 Form β (top spectrum) shows fewer peaks over this same region. Also, there are significant differences in intensities of corresponding peaks in the two samples, which further evidences different atomic arrangements.  Ex.2052, ¶125.

### 3. *Conformational Polymorphs Can Differ In Subtle Ways*

Distinct conformational polymorphs of a crystalline compound can differ from one another in subtle ways.  They can share overlapping peaks, and differ by as little as one peak.  Section II.B, *supra;* Ex. 2055, ¶¶14-18; Ex.2008, ¶32.

For example, in '816, Form μ has five of the seven form β peaks in claim 1 – 3.54, 10.66, 15.35, 21.43 and 25.10 ±0.1 2θ° – differing at 7.07 and unclear as to 20.52.  Compare Ex.1001 at col.6:Table 3 and Fig. 5 (form μ) vs. claim 1 (form β). Because the XRPD peaks are all digitally assigned in '816, a direct comparison can be made.  Further, post-'816 U.S. 9,815,772 to Kumar discloses fingolimod hydrochloride Form Y, which has peaks which overlap Form β at 3.54, 10.66 and

21.43, and with Form I at 3.55, 7.12 and 10.71 using a ±0.1 2θ° tolerance.  Ex.2057,

18:5-36, Fig. 4.  Ex.2055, ¶15.  In *Ex parte Chen*, 2022 Pat. App. LEXIS 5529

(PTAB, Nov. 15, 2022), the Board was not persuaded that an overlay of the prior

art's XRPD vs. the XRPD disclosed in the application was sufficient to show identity

(*id.* at *19), and cautioned that a POSA would have recognized the importance of

exercising care when evaluating and comparing XRPD patterns, because "[i]t is

possible for polymorphs of the same . . . [API] to share overlapping peaks." *Id.* at

*20-*21, citing *Lundbeck v. Lupin Ltd*., No. CV 18-88-LPS, 2021 WL 4944963, at

*27 (D. Del. Sept. 30, 2021).

    Thus, it would not have been surprising to a POSA if Form I of Mutz and

Form β shared certain XRPD peaks. *See* Ex.2055, ¶¶14-18.

### 4. Thermal Differences Also Confirm Form β's Novelty

    Other differences in the thermal behavior of Mutz Forms I-III and '816 Form

β confirm its novelty.  Besides Mutz's missing fourth DSC peak shown in Section

III.B *infra*, Mutz is silent about the presence of any exothermic reactions in its

material.  Form β in '816, on the other hand, shows a significant exotherm near

166°C and a second exotherm which Dr. McClurg states begins at approximately

252°C. Ex. 1001, Fig.4; Ex.1002, ¶142.  Neither of these exotherms are noted in

Mutz's Example 14, no DSC scans were provided in Mutz, and no special transitions

were noted by Mutz's thermomicroscopy at these temperatures, thus further

confirming that Mutz's material and the '816's Form β are not the same polymorph. Ex.2052, ¶¶141-144.

### 5. *Shilpa's Complaint Does Not Support Petitioner's Arguments*

In its Complaint, Shilpa alleged that Wang obtained single crystal X-Ray data from crystalline material prepared from a sample of fingolimod hydrochloride from a commercial source from China (Ex.1028, ¶39; Ex.1021, p.2 (article p.46)). Wang's material did not come from Novartis and was not replicated from Mutz.

The Complaint alleges that Wang submitted the *single crystal* structure data for *his* Forms I and II (not Mutz Forms I and II) to the Cambridge Crystallographic Data Centre ("CCDC") (Ex.1028, ¶39), and that based on that data, predictive XRPD peak positions were calculated. *Id.*, ¶42. Shilpa then compared the XRPD peak positions to the Form β peak positions of claim 1 of '816 (*id.*), to show that claim 1 read on a commercial API.

Petitioner's arguments that Shilpa's Complaint allegations support its anticipation case (Pet., 3, 20) rely on a fundamental, unproven assumption—that the 2015 Wang article, Ex.1021, analyzed Form I of *Mutz*—Ex. 1004. That assumption is inaccurate. Wang did not analyze *Mutz* Form I, and Shilpa's Complaint (Ex.1028) **nowhere** even mentions Mutz, cites Mutz, replicates Mutz or "relies on Mutz to establish infringement of" '816 as falsely contended by Petitioner. (Pet. at 3). Nowhere does Shilpa's Complaint contend that Petitioner's commercial product, Gilenya, contains fingolimod hydrochloride as disclosed in Mutz. Shilpa's

Complaint charges infringement by Gilenya of claims reciting various DSC peaks, alleged to be present in the API used in Gilenya, not all of which are disclosed in Mutz as discussed below.

To a certainty, Shilpa's Complaint does ***not*** rely on Mutz to establish infringement of '816.

### 6. Dr. McClurg's Reliance On Wang And Indexing Is Off-Base

***Wang***—Dr. McClurg repeatedly compares Mutz's forms and Form β to a study by Wang in 2015, Ex.1021, arguing they are all the same. However, Wang is not relevant to either anticipation by Mutz, or obviousness based on Mutz (Ground 2, discussed below).

Wang obtained a powder sample from a Chinese source (Shanghai Growingchem Co. Ltd.) (*id*. p.46). Thus, it is clear that Wang's material was neither sourced from Novartis, nor synthesized following Fujita's Examples 28/29. Wang found that the Chinese sample underwent reversible phase transformations similar to Mutz, but also that they did not occur quickly upon cooling, except for the unstable Form III. In addition, Wang did not observe Mutz's low temperature Form IV in the Chinese sample. Ex.2052, ¶126.

Notably, Wang reported no DSC peak at 265-270°C for the Chinese sample tested, undermining Dr. McClurg's theory that such a peak is inherent in all fingolimod HCl, as discussed in III.B.2 *infra*. Ex.2052, ¶127. Wang did not compare its XRPD data to Mutz (or to '816's published application (Ex. 2115)),

even though that data had been published earlier. Wang was certainly aware of the Mutz work since they cited Mutz's DSC results. Ex.2052, ¶128.

Dr. McClurg equates the structure of Mutz Form I with the structure proposed by Wang. (Ex. 1002, ¶95). However, Wang never made such a comparison and Dr. McClurg's comparison (*id*, p.46) of the XRPD patterns of Mutz and Wang relies on a crude and inaccurate visual method of different graphs, as discussed above. Ex.2052, ¶129.

Certain similarities between Wang's 2015 report analyzing a sample from China, and Mutz, does not prove that Form β is the same as Mutz. Petitioner could have picked another 2015 report by Kaduk (Ex.2077), which analyzed a different commercial source of fingolimod hydrochloride, and found it appeared to correspond to Form α of '816 (by comparison to '816's published application (Ex. 2115)). Ex.2077, p.207; Ex.2052, ¶¶108-109. While neither Wang nor Kaduk are relevant to anticipation or obviousness, Kaduk is relevant to nonenablement of Mutz, because the melting point of the sample was identical to that obtained in Fujita Example 29, suggesting that Fujita obtained Form α not Mutz Form I. *See* Section VI.A.3.c *infra*.

***Indexing***—Moreover, Dr. McClurg also relies on 'indexing' using a proprietary algorithm called TRIADS to allegedly determine the lattice parameters of Form β. (Ex. 1002, ¶¶97-98) However, on cross-examination, Dr. McClurg testified that TRIADS is a non-GMP and non-FDA validated program. The program

is unique to Dr. McClurg's laboratory, not open to the scientific community, and its reliability and accuracy have not been confirmed or peer-reviewed by the larger scientific community.   Ex. 2054, 130:9–132:24.   Thus, Dr. McClurg's unverifiable indexing analysis should be given no weight.   Ex.2052, ¶130.

### B. *Mutz Does Not Expressly Or Inherently Disclose The 4th DSC Peak Recited in Claims 2 and 4*

#### 1.  *There Is No Express Disclosure Of The 4th DSC Peak*

There is no disclosure in Mutz of the fourth DSC peak at 265-270°C recited in claim 2, and more narrowly in claim 4.   Petitioner asserts that claim 2 is anticipated because Mutz's statement at the bottom of Ex.1004, p.15, "the onset of decomposition at ca. 260°C," is an *express* disclosure of the fourth DSC peak at 265-270°C.   Pet., 23.   ***However, the undisputed fact remains that Mutz reports no DSC endothermic peak between 265-270°C.***   At his deposition, Dr. McClurg agreed (Ex.2054, 25:3-25; 67:20-68:2), and Dr. Mayo concurs (Ex.2052, ¶¶131-137). Given that other DSC endothermic peaks were reported, it stands to reason that if a peak at 265-270°C was measured by DSC by Mutz, it would have been reported.   *Id.,* ¶131.

#### 2.  *There Is No Inherent Disclosure Of The 4th DSC Peak*

Nor is the fourth DSC peak is *inherently* disclosed by Mutz.   Pet., 23-24.   That is because (1) an onset of decomposition *ca.* 260°C observed by thermomicroscopy *does not* inevitably result in a DSC endotherm at 265-270°C, and (2) all forms of

fingolimod HCl do not necessarily and inevitably exhibit a DSC endotherm at 265-270°C.

*First*, other than Dr. McClurg's opinion, neither science nor evidence supports the theory that a visual observation of decomposition *ca.* 260°C will result in an DSC endotherm at 265-270°C.  Ex.2052, ¶137.  At his deposition, Dr. McClurg conceded the same.  Ex.2054, 30:25-31:9: ("It is not my position that the thermal microscopy implies that there is an endothermic peak at a particular temperature above the onset.")

Even assuming *arguendo* the onset of decomposition in Fig. 4 of '816 is 252°C as asserted by Dr. McClurg (Ex.1002, p.62; p.73, ¶142), the fourth endothermic peak in claim 2 (265-270°C) would be ***13 to 18°C above the onset***, disproving any theory that Mutz would inherently have an endothermic peak at 265 to 270°C, i.e., ***5 to 10°C above the onset*** of decomposition,  Thus, Dr. McClurg's theory that Mutz would inherently have an endothermic peak at 265-270°C, *i.e.,* 5-10°C above the onset of decomposition, is neither certain nor inevitable.  Ex.2052, ¶137. Consistently, Dr. McClurg recognized that Fig. 2 of '005 (Ex. 1002, annotated Fig.2, ¶172) does not show an onset of decomposition 5-10°C below the endothermic peak at 266°C. (Ex.2054, 73:22–75:10).

And finally, Dr. McClurg conceded that the onset of decomposition by thermomicroscopy is not a reliable indicator of the point at which an endothermic peak would be measured above that by DSC:

6      Q  Okay.  And a measurement of the onset of
7   decomposition by thermomicroscopy is not a reliable
8   indicator of the point at which an endothermic peak
9   would be measured above that by DSC, correct? [objection omitted]
12      A  It is correct that thermomicroscopy does not
13   specify whether a particular observed transformation
14   is endothermic or exothermic, nor does it predict
15   when the endothermic contribution would occur as in
16   this case.

Ex.2054, 41:6-16.  Thus, there is no scientific basis for the proposition that a DSC endothermic peak will occur 5-10°C above the onset of decomposition observed by thermomicroscopy, as conceded by Petitioner's expert.  Ex.2052, ¶137.

*Second*, Petitioner's theory that—experimental parameters being equal—all fingolimod hydrochloride will decompose at roughly the same temperature and have an endothermic peak in the claimed range, is plainly wrong and unsupported by the evidence.  Pet. at 24, citing McClurg, Ex.1002, ¶128.

Neither the Petition nor Dr. McClurg state what experimental parameters must allegedly be equal.  Second, the evidence shows that ***not all fingolimod hydrochloride forms have an endothermic peak in the claimed range of 265-270°C***.  For example, Fig.4 of '005, stated to be a DSC of Form B (Ex.1005, Example 4, 13:43-59) completely refutes this; in fact, Fig 4 shows an *exothermic* event around the claimed range:

Figure 4:   DSC of Fingolimod hydrochloride as obtained in Example 4 (freeze-drying)



Ex.1005, Fig.4; *see also id.* at Fig.5 of '005 from another fingolimod hydrochloride produced in Example 6, lacking an endothermic peak at 265-270°C.  Ex.2052, ¶139. Moreover, '816's Form α exhibits an endothermic peak *above* 270°C.  Ex. 1001, Fig.2 taken from Example 1 at 8:9-28; 3:33-54 (fourth DSC peak 270-280°C); Ex.2052, ¶139.  The record evidence plainly disproves Petitioner's contention that all fingolimod hydrochloride exhibits an endothermic peak, as measured by DSC, at 265-270°C.

*Third*, the Petition asserts that the fourth DSC peak at 265-270°C is not a "distinguishing feature of form β," because Mutz's crystal has purportedly decomposed by that point.  Pet., 24-25.  Petitioner's argument is irrelevant.  The DSC peak at 265-270°C is a claimed feature which **must** be considered for

anticipation. *Verdegaal Bros.*, 814 F.2d at 631. Petitioner cites no authority for disregarding a claim limitation because it is "not useful" (Pet. 24), "irrelevant" (Pet. 33), or not a "distinguishing characteristic" (Pet. 24). Equally irrelevant is the physical state of the claimed fingolimod HCl at 265-270°C because the claim would be understood to require a crystalline form only at the onset of DSC, and does not distinguish between fingolimod HCl that is melted, liquid crystalline, decomposed, etc. at the Peak 4 range.

Moreover, a POSA would understand that Form β after melting can retain certain aspects of crystalline order, and provide a DSC endotherm between 265°–270° C as shown Fig. 4 of '816, while different conformational polymorphs, such as those described in Mutz's Example 14, could exhibit different thermal behaviors post-melt. Ex.2052, ¶10.C.iv. Thus, the molecular conformation of Form β could be the origin of the exotherms at 160-180°C and 261° C along with the endotherm at 265-270°C, while a different molecular conformation such as Mutz's Example 14 could result in different thermal behavior such as the absence of any of the exotherms and a lower dissociation temperature. *Id.*, ¶¶140-144.

Nor can Petitioner credibly argue the DSC peak at 265-270°C is not "characteristic" of the claimed Form β. As shown above, other crystalline forms of fingolimod HCl do not contain a DSC endothermic peak in this range. *See e.g.*, Form B (exothermic event in Fig. 4, '005), Form α (endothermic peak *above* 270°C., '816 ), milled fingolimod HCl (exothermic event in Fig. 5, '005).

Thus, far from being "irrelevant" as the Petition asserts, the fourth DSC peak is a defining, distinguishing characteristic of Form β, and plainly missing from Mutz. Ex.2052, ¶¶144-145.

Petitioner has failed to establish that Mutz inherently discloses the 4th DSC peak in claim 2, because evidence shows it does not result from DSC scans of all forms of fingolimod hydrochloride.  It is black letter law that an inherent limitation is one that is "necessarily present' and not one that may be established by "probabilities or possibilities."  *Continental Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1268-1269 (Fed. Cir. 1991).  That is, "'[t]he mere fact that a certain thing *may* result from a given set of circumstances is not sufficient.'" *Id*. at 1269.

Since claim 4 more narrowly defines the fourth DSC peak vs. claim 2 by reference to Fig. 4, claim 4 is not anticipated for at least the same reasons that claim 2 is not anticipated.

## IV.    Response To Ground 2 – None Of Claims 1-4 Would Have Been Obvious At The Time Of The Invention

Petitioner argues that claims 1-4 would have been obvious if the claims are not anticipated by Mutz, but isn't clear on which peaks are missing; presumably those at 21.43 and/or 25.10.  Pet., p.31.  Petitioner relies on Mutz for teaching the first three DSC peaks of, *e.g*., claim 2.  *Id*.  For the fourth claimed DSC peak recited in claim 2 (at 265-270°C), the Petition asserts that it would have been obvious over Mutz alone, or alternatively obvious over Mutz in view of '005.  *Id.* at 32-34.

First, these arguments fail because Mutz is non-enabling for its own claims, Example 14 including Form I, and Form β as claimed in '816. *See* Section VI.B, *infra*. In the alternative, the Petition fatally fails to establish how all of the seven XRPD peaks recited in claim 1-4 would have been obtained starting from Mutz, and how a POSA would have modified Mutz to obtain a polymorph having the claimed fourth DSC peak of claims 2 and 4.

### A. *Mutz Does Not Teach Or Suggest How To Obtain A Polymorph Having The Seven XRPD Peaks Recited In Claim 1*

With respect to claim 1, the Petition appears to assert that the 2θ peaks at 21.43±0.1 and 25.10±0.1, recited in claim 1 but not expressly disclosed in Mutz, would have been obvious to a POSA from Fig. 1 of Mutz. Pet., 31, citing Ex.1002, ¶¶154-155. However, if the issue of obviousness of claim 1 over Mutz is reached, it will already have been determined that claim 1 is not anticipated by Mutz, and that Mutz's Fig. 1 is not an accurate disclosure of claim 1's 21.43 and/or 25.10 peaks. *Critically, neither the Petition nor Dr. McClurg explain how a POSA would modify Mutz Form I to arrive at the 21.43 and 25.10 peaks*; instead, they simply offer the conclusory statement that a POSA "would find it obvious that Mutz discloses XRPD peaks falling within the ranges recited in Claim 1." Ex.1002, ¶155; *see* Pet., 31. But this argument fails where Dr. McClurg conceded that he made no attempt to show how a POSA would have modified Mutz to obtain any missing peak. Ex.2054, 63:16-22. This is fatal to Petitioner's case for obviousness of claim 1.

It is well established that "rejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *In re Kahn,* 441 F.3d 977, 988 (Fed. Cir. 2006). Indeed, because Mutz provides no guidance as to what particular solvents, temperatures, concentrations, times, agitation rates, etc., would have resulted in Form β of claim 1, Petitioner failed to prove that a POSA would have reasonably expected to obtain Form β of claim 1 from Mutz. Ex.2052, ¶¶151-152. *See Grünenthal Gmbh v. Alkem Labs. Ltd*., 919 F.3d 1333, 1337, 1341-1345 (Fed. Cir. 2019).

As noted, it was well known to a POSA in 2010 that distinct conformational polymorphs of a crystalline compound can be closely related structurally, and thus have overlapping peaks. Ex.2055, ¶¶14-18. It was also well known in 2010 that even slight processing differences in synthesis techniques can lead to such distinct polymorphs, and that it was not possible to predict in advance the characteristics of a given polymorph before making it and testing for its properties. Ex.2052, ¶¶10.D.i-iii, 151-155; Ex.2054, 97:6-22. Neither Petitioner nor Dr. McClurg posit how the XRPD peaks at 21.43 and 25.10 could be obtained by modifying any of the teachings of Mutz. Ex.2052, 10.D.i; *see Grünenthal*, 919 F.3d at 1341-1345 (polymorph claim was not invalid as obvious where the prior art did not disclose which specific variables should be altered, or to what extent they should be altered, to obtain the claimed polymorph). Because Petitioner fails to disclose which specific variables

should be altered, and to what extent, to ostensibly obtain peaks at 21.43 and/or 25.10 of claim 1, its obviousness attack fails.

### B. Claim 2 Would Not Have Been Obvious Over Mutz Alone, Or In View Of The '005 Patent

#### 1. Mutz And A POSA's Knowledge Do Not Teach Or Suggest How To Obtain A Polymorph Having The 4th DSC Peak

As set forth above, there is no DSC peak at 265-270°C reported in Mutz. Section III.B.1, *supra*; Ex.2052, ¶¶131-137 (Mayo); Ex.2054, 25:3-25; 67:20–68:2 (McClurg). *Similar to claim 1*, **neither the Petition nor Dr. McClurg explain how a POSA would modify Mutz Form I to arrive at claim 2's fourth DSC peak, which is fatal.**

Petitioner's argument that "the onset of decomposition at *ca*. 260°C" as observed by thermomicroscopy is somehow a disclosure or suggestion of a DSC endotherm between 265-270°C has already been walked back by Dr. McClurg, as discussed above. Petitioner's obviousness argument based on the same theory (p.32) fares no better, because there is neither scientific nor evidentiary support for the argument that an onset of decomposition *ca*. 260°C observed by thermomicroscopy will lead to a DSC endothermic peak at 265-270°C. Ex. 2052 (Mayo), ¶¶10.D.iv-vi, 156-158. Dr. McClurg conceded the same. Ex.2054, 30:25-31:9; 41:6-16.

As with anticipation, the Petition urges that all fingolimod hydrochloride crystal forms will have a DSC endothermic peak within the claimed range, citing the DSC scan from Fig. 2 of Example 2 of '005. Pet., 32, citing Ex.1002, ¶159. But the

evidence it cites dooms its own argument because the peak in the 265-270°C range appears to result from only one of two polymorphs in a mixture, meaning the other would lack that peak, or it could be from an unknown phase; '005 is silent on that point. Ex.2052, ¶184. The DSC scan of Form B (Ex.1005, Fig. 4) is instructive, and completely refutes the assertion that all fingolimod polymorphs have an endothermic peak at 265 to 270°C, because it shows an *exothermic* event around the claimed range. *See also id.* at Fig. 5 taken from fingolimod hydrochloride of Example 6, lacking an endothermic peak in that range. Moreover, '816's Form α exhibits an endothermic peak above 270°C. Ex. 1001, Figure 2 taken from Example 1 at 8:9-28; 3:33-54 (fourth DSC peak 270-280°C). Ex.2052, ¶¶139, 156-159. The evidence squarely contradicts the claim that all fingolimod hydrochloride will exhibit a DSC peak at 265-270°C.

Again, the Petition asserts at 32-33 that claim 2's fourth DSC peak at 265-270°C is "irrelevant" because the material will be a liquid at that point. As set forth above, the fourth DSC peak is a defining characteristic of Form β, and plainly missing from Mutz. The fact that the material is liquid at that point is of no moment to the DSC, again as explained above, and as Dr. Mayo confirms. Ex.2052, ¶¶160-169.

### *2. The '005 Patent Disparages And Teaches Away From Mutz, And They Cannot Be Properly Combined Against Claims 2-4*

Petitioner argues that Mutz combined with Fig. 2 of '005 would render obvious claims 2-4.  Pet., 32-33.  First, a POSA would not have combined '005 with Mutz, because '005 disparages EP '406's process for making fingolimod, and therefore teaches against the combination of their teachings.  Ex. 1005, 1:13-20, 1:39 to 2:8; Ex.2052, ¶¶170-173.

Specifically, (1) '005 uses a fingolimod derivative of formula II to form the HCl salt (Ex.1005, Examples 1-2), not freebase fingolimod as shown on page 1, second paragraph of Mutz (Ex.1004); (2) '005 also cites the toxicity of pyridine, a solvent used to produce the freebase used in '406; (3) '005 criticizes the low yield of about 26% from the process of '406 and reports a greatly improved yield of 76.5% with the inventive process (Ex.1005, 13:36); and (4) '005 describes improved economics and purity over '406 Examples 28/29.  Given the different starting materials and methods in Mutz/'406 on the one hand and '005 on the other, as well as different techniques to form the HCl salts in Example 29 of '406 and Example 2 of '005,[4] a POSA would not have combined their disclosures.  Ex.2052, ¶¶170-173.

---

[4] Compare EP '406 Example 29 (Ex.2117, p.168) with '005 Example 2 (Ex.1005, 13:6-24, disclosing two separate products formed).

Moreover, '005 *expressly teaches away* from using the freebase of fingolimod in EP '406, stating "the avoidance of the free base of fingolimod results in a desirable increase of purity and yield." Ex. 1005 at 7:31-39. References that teach away from their combination cannot jointly serve to create a *prima facie* case of obviousness. *Spectralytics Inc. v. Cordis Corp.*, 649 F.3d 1336, 1343 (Fed. Cir. 2011) ("A reference may be said to teach away when a …[POSA] would be discouraged from following the path set out in the reference…"). A POSA would not have combined their teachings for at least these reasons.

### 3. Mutz And The '005 Patent Do Not Teach Or Suggest How To Modify Mutz To Obtain A Polymorph Having The 4th DSC Peak

However, even if Mutz were combined with '005, the asserted ground is still technically and legally deficient. The Petition states "[t]he product of Example 2" of '005 is a mixture of Mutz's Forms I and II (Pet. 30, Ex.1002 ¶¶150-151, 174), but that is misleading because Example 2 is not one "product" (Ex.2052, ¶182), and is incorrect and unsupported as well. Ex.2052, ¶¶174-180.

Example 2 describes preparation of a first mixture of polymorphs A and B, and Fig. 1 depicts XRPD data from that mixture. Ex.1005, 13:6-21. Example 2 then recrystallized that mixture from ethanol to create a second product, from which DSC data in Fig. 2 was measured. *Id.*, 13:22-24. For the first A+B mixture, no DSC peaks are reported other than 68.6°C (from A) and 100.77°C (from B); thus, only one of four DSC peaks recited in claim 2 is disclosed. Ex.2052, ¶182. For the second,

recrystallized product, no XRPD data is disclosed, and the example reports DSC peaks at 67.16°C and 107.6°C—indicating that the second product is likely another A+B mixture with different crystal structures than the first mixture. Ex.2052, ¶¶184. Petitioner's reliance on 'the product' of Example 2 (Pet. at 30, lines 4-6) is incorrect and misleading, since two separate and distinct mixtures are described, each of which is characterized by certain data. Ex.2052, ¶¶182.

Even if Fig. 2 taken from the second A+B mixture shows an endothermic peak in the range of 265-270°C, that does not lead to a conclusion that Mutz in view of '005 renders claim 2 obvious. ***Petitioner's theory randomly combines features of different polymorphs, without describing any teaching or rationale as to how a POSA could develop a method that would actually lead to a polymorph with all the characteristics of claim 2, starting from Mutz Form I, and what that method would be***. Ex.2052, ¶¶185-187. Again, this is fatal to the combination of Mutz and '005 against claim 2.

Some indisputable facts supporting denial of this Ground are:

- Mutz's Form I does not disclose a DSC peak at 265-270°C (Ex.1003, Example 14);

- Form A of '005 lacks a DSC peak at 107-115°C (Ex.1005, 8:18-34, 8:62 to 9:2);

- Form B lacks endothermic DSC peaks at 65-70°C and 265-270°C (*id.*, *see also* Example 4, Fig. 4);

- in the first A+B mixture in Example 2 of '005, Form B contributes a peak at 100.77°C (*id.*, 13:18-19)—outside the scope of claim 2; and

- '005 does not teach how to synthesize Form A alone, or isolate it from the mixtures of Example 2 (Ex.1005).

Petitioner's theory that it would have been obvious to "add" a DSC peak in the 265-270°C range to Mutz Form I is unsupported, and fails to satisfy the legal requirements for establishing obviousness. The lack of any articulated reasoning to support Petitioner's conclusions is fatal to its claim given the undisputed fact that predicting polymorphism and the properties of the resulting forms was beyond the capability of a POSA in 2010, and it was not possible to predict in advance the characteristics of a given polymorph before making it and testing it for its properties—as recognized by both parties' experts. Ex.2052, ¶¶10.D.i-iii, 151-155 (Mayo); Ex.2054, 97:6-22 (McClurg). This unpredictability makes it particularly necessary to articulate reasons why and how a POSA would modify a known composition in a particular manner to obtain a predictable outcome. *Eisai Co. Ltd. v. Dr. Reddy's Laboratories, Ltd*, 533 F.3d 1353, 1359 (Fed. Cir. 2008). Simply combining random features of one polymorph with another does not result in obviousness, as a matter of law; *Grünenthal* bars a finding of obviousness here. In

*Pharmacyclics LLC v. Alvogen, Inc.,* 2022 U.S. App. LEXIS 31479* (Fed. Cir. Nov. 15, 2022), the Federal Circuit affirmed the district court's judgment that a polymorph claim to a crystalline form of ibrutinib, Form A, was neither anticipated nor rendered obvious based on a finding that production of polymorphs and their physical properties was unpredictable. The panel, citing *Grünenthal*, affirmed those findings as well as the district court's finding that the prior art provided no reasonable expectation of success in producing Form A. *Id.* at *27-*30.

Applying *Grünenthal*, the Board in *Ex parte Adachi*, 2022 Pat. App. LEXIS 2463, *6-*7 (PTAB May 23, 2022), ruled that trial and error was not enough to support combining features of references: "To support a conclusion of obviousness, the prior art must give some indication of which parameters were critical or which of many possible choices is likely to be successful," citing *Grünenthal*, 919 F.3d at 1345; *see also Ex parte Saerens*, 2021 Pat. App. LEXIS 1080, *3 (PTAB Feb. 25, 2021).

### C. Claim 3 Would Not Have Been Obvious

The Petition asserts that claim 3 would have been obvious, relying on the position with respect to claim 2. Pet., 34. However, claim 3 does not require the 4th DSC peak; that is the only disclosure of '005 on which the Petition relies against claim 2. Because claim 3 contains the same seven XRPD peaks recited in claim 1, Mutz fails to render obvious claim 3 for the same reasons set forth for claim 1 in Section IV.A above.

### D. Claim 4 Would Not Have Been Obvious

Claim 4 contains the seven XRPD peaks in claim 3, by virtue of dependency, and claim 4 specifically recites them plus more via Fig. 3.  Similarly, claim 4 via Fig. 4 specifically requires each of the four DSC peaks recited in claim 3, but as more narrowly disclosed in Fig. 4.  Thus, claim 4 is narrower than claim 2, by having additional XRPD peaks and narrower DSC requirements, and would not have been obvious for at least the same reasons set forth above with respect to claim 2.

## V. Response To Ground 3 – Petitioner Fails To Raise A Legitimate Anticipation Challenge Based On The '005 Patent's Mixtures of Polymorphs in Example 2

Petitioner relies only on Example 2 for its anticipation challenge, and asserts that a first reported mixture of polymorphs A+B in Example 2, and its XRPD of Fig.1, anticipates claim 1.  Pet., 36-37.  Example 2 adds that 100 mg of that first A+B mixture was recrystallized to form a second product, with DSC data in Fig. 2.  Petitioner asserts that Figs. 1 and  2 together anticipate claims 2-4.  Pet., 37-40.

Petitioner's challenge fails because (1) XRPD data in Fig. 1 is taken from a *mixture* of polymorphs A+B *and possibly other unidentified phase(s)* (Ex.2054 (McClurg), 125:12-25; Ex.2052, ¶¶178-180, 192, 195, 199 (Mayo)), and the Petition makes no effort to show which peaks are attributable to Form A and which are attributable to Form B; (2) the DSC data in Fig. 2 is taken from a *different product* in Example 2 than the A+B mixture from which Fig. 1 derives; thus, claims 2-4 cannot be anticipated by combining different embodiments;  (3) all of the DSC peaks

in Fig. 2 cannot be attributed to either Form A or Form B; and (4) although not asserted in the Petition, neither Form A nor Form B individually anticipates any claim.

### A. The XRPD Pattern Of Figure 1 Of The '005 Patent Is Based On A Mixture Of Two or More Phases, And Cannot Anticipate Claim 1

#### 1. Data From A Sample Containing Two Or More Polymorphs Cannot Anticipate A Claim To A Single Polymorph

The '005 process is said to result in a mixture of two polymorphic forms of fingolimod HCl, Forms A and B.  Ex. 1005, col. 8, ll. 30-34, Examples 1 and 2; *compare* Ex. 1001, col. 8 at Ex. 2, Process A (Form β).  The mixture in Example 2 from which the XRPD shown as Fig. 1 was taken, was expressly stated to be *a mixture of two polymorphs, designated A and B.*  Ex. 1005, 13:6-21.  Because there are no XRPD reference diffractograms provided for polymorphs A and B individually relied on in the Petition or Dr. McClurg's declaration, no specific peaks in the Fig. 1 XRPD pattern can be ascribed to either specific polymorph, and Petitioner does not attempt to do so.  Ex. 2008, ¶¶47, 49 (Eckhardt);  Ex. 1002, ¶¶173-179 (McClurg attempts to find Form β peaks in Fig. 1, but not Form A or Form B); Ex. 2054 (McClurg cross), 110:16 – 111:1; Ex. 2052, ¶10.E.ii-iv (Mayo).  Accordingly, claim 1 of '816 cannot be anticipated because the Petition's mixing of data from two different polymorphs fails to establish that any specific polymorph yields the seven XRPD peaks recited in claim 1.  Petitioner's challenge to claims 2-4 fails for identical reasons.

The mixture of forms A+B in Example 2 is confirmed by both DSC and XRPD. Ex.1005, col. 13, ll. 6-21. While the actual DSC thermogram of that A+B mixture is not provided, Example 2 states that "DSC shows endothermic peaks at 68.6ºC and 100.77ºC, *indicating a mixture of polymorphic forms A and B*." Ex.1005, col. 13, ll. 18-19 (emphasis added). The XRPD diffraction pattern of that A+B mixture (Fig. 1) has no digital peak assignments or tabular peak data and, as noted, neither Example 2, the Petition, nor Dr. McClurg attempt to show peak assignments of Fig. 1 to Forms A or B, respectively. Pet., 36-37; Ex.1002, ¶173-174; Ex. 2054, 110:16–111:1; Ex. 2008, ¶49; Ex. 2052, ¶¶10.E.ii-iv, 181, 192, 195, 201.

Compounding Petitioner's failure to ascribe the peaks of Fig. 1 to either Form A or Form B, Dr. McClurg conceded that he relied on a diffractogram containing a mixture of phases, Fig. 1 of '005, to allege anticipation of the single phase Form β of '816 claim 1. Ex.2054, 111:2-17. Moreover, he did not take into account the significant XRPD peak between 2 and 3° 2θ in Fig. 1 of '005, which he conceded is not present in either Mutz or '816 (Ex.2054, 102:10–109:3), nor did he attempt to match that unidentified XRPD peak with any known phase of fingolimod hydrochloride (Ex.2054, 126:1-16). Given this, it is not surprising that Dr. McClurg testified that Fig. 1 of '005 shows the presence of **two or more** phases. Ex.2054, 125:12-25. Dr. Mayo confirmed that Fig. 1 of '005 contains an unknown impurity phase(s), in addition to whatever peaks were contributed by A+B. Ex.2052, ¶¶178-180, 192, 195, 199.

The XRPD data of Fig. 1 are taken from the first mixture of two distinct polymorphs, A+B.  But challenged claim 1 is directed to a single form—Form β—and cannot be anticipated by a mixture of forms contaminated with unknown phase(s), where the Petition identifies no discrete polymorph alleged to have all the XRPD peaks listed in claims 1-4.  In the Board's analysis, ID at 37-38, the Board seemed to accept that the Fig. 1 XRPD, taken from a mixture of materials, cannot be anticipatory, looking instead at Forms A and B.  But Petitioner nowhere argues anticipation by Form A or B individually, and nowhere provides support for that challenge.

### 2. Petitioner's Analysis Of Fig. 1 Does Not Prove The Presence Of Each Of The XRPD Peaks Recited In Claims 1-4

The Petition contends that Fig. 1 discloses each of the seven XRPD peaks recited in claim 1.  Pet. 36-37, citing Ex.1002, ¶¶173-174.  But Fig. 1 contains a mixture of at least 2 distinct materials and cannot anticipate for that reason alone.

Petitioner relies on Dr. McClurg's visual extrapolation of peaks from Fig. 1 of '005 to Fig. 3 of '816 using a ruler and a red pen, to determine that XRPD peaks claimed in hundredths of a degree are present to within $\pm.1°2\theta$. Ex.1002, ¶173.  As explained by Dr. Mayo, this technique cannot credibly determine the presence of peaks to $\pm.1°2\theta$.  Ex.2052, ¶¶181, 202.

As Dr. Mayo explains, Dr. McClurg superimposes XRPD patterns taken from different references (Ex.1002, ¶¶173, 182), each presenting its figures at a different

scale. For example, Figure 1 of '005 displays the region of 2° to 30° over 150 mm while Figure 3 of '816 shows the same range of 2° - 30° over 144 mm. This difference is significant, and requires an unexplained scaling, in addition to vertical stacking of rescaled patterns, using a ruler to line peaks in the vertical stack.. However, trying to determine if two peaks in a vertical stack are within ±0.1° or its equivalent ±0.01" is not possible, even for a POSA with a ruler and perfect vision; for perspective, 0.01" is smaller than the smallest division on a precision ruler, which is 1/64th of an inch (0.016"). Ex.2052, ¶204.

Further, Dr. McClurg's annotated Fig. 1 from '005 has red lines that are much thicker than .1° 2θ (maybe 5 can fit between 20 and 21, so the width would be ∼ 0.15 - ∼.2° 2θ), the red line for the fifth peak is shaded to the left of the midpoint between 20 and 21, so the peak cannot be 20.52±0.1°2θ, and the seventh peak and red line are shaded to the left of 25, so the alleged peak cannot be 25.10± .1 2θ:



See Pet. at 37, citing Ex. 1002 at ¶173; Ex.2052, ¶¶205-206.

### B. Petitioner Improperly Combines Data From Different Embodiments To Support Its Flawed Anticipation Arguments As to Claims 2-4

In addition to relying on data from a contaminated mixture to allegedly anticipate the claimed single phase Form β in claim 1, Petitioner improperly combines data from *distinct samples* made in Example 2 to support its anticipation challenge against claims 2-4, claiming that "… each of the claimed XRPD and DSC peaks is visible in the patterns *for the Example 2 sample*."  Pet., 39-40 (emphasis added).  This misleadingly implies that "Example 2" is a single sample, but it is not as discussed above.

Specifically, Petitioner relies on the XRPD data of the ***first*** A+B polymorphic mixture in Example 2/Fig. 1 to allegedly meet the XRPD limitations of claims 2-4. Pet. 37-39.  But Petitioner does not rely on the corresponding DSC data from that first A+B mixture to allege anticipation of claims 2-4, because only two peaks are given (68.6 and 100.77, Ex. 1005 at 13:18-19) *and the 100.77 peak does not correspond to any peak in '816 claims 2-4*.  Instead, Petitioner relies on DSC data, Fig. 2, from the ***second*** recrystallized sample of Example 2, for which no XRPD data is provided.  Thus, neither sample of Example 2 can anticipate claims 2-4.

Petitioner is forced to ***combine*** the first A+B product's XRPD data with the DSC data from the second, *recrystallized* product of Example 2 (Ex.1005 at 13:22-24) which was used to generate the DSC scan of Fig. 2 (*id.*).   (Pet. 37-40).

Petitioner's cherry-picking of features from disparate embodiments is legally and scientifically improper.

While Example 2 is silent on the identification of the substances comprising the second, recrystallized product, both parties' experts characterized the second sample of Example 2 as a mixture. Ex. 2054, 125:12-25 (McClurg); Ex.2052, ¶¶184, 191, 199-200 (Mayo). While no XRPD data are provided for the second, recrystallized product, it is clear that the second, recrystallized product is **_different_** from the first A+B mixture based on DSC data. The first A+B mixture gave an endothermic peak at 100.77°C, outside the scope of claims 2-4, and the recrystallized product shows no corresponding peak. Rather, the recrystallized product shows an endothermic peak at 107.6°C. Ex.1005, 13:18-19, 13:22-24. Thus, the A+B mixture used to generate the XRPD of Fig. 1 is clearly distinct from the recrystallized product used to generate the DSC of Fig. 2, as both experts agree. Ex.2054, 112:1-7; Ex.2052, ¶¶182-184, 191, 193, 201. The Petition's reliance on that data to argue anticipation of '816 claims 2-4 is wholly improper, because it combines distinct samples with different properties; in other words, Petitioner relies upon **_combined_** patterns from two separate products to allege anticipation of a single crystalline form—Form β as defined by seven XRPD peaks and four DSC peaks in '816, claim 2. Ex.2054, 112:1-7; Ex.2052, ¶¶10.E.iii-vi, 201. '816's specification makes clear that those XRPD and DSC peaks were generated from a single polymorph—Form β, not a mixture—that was produced in Example 2, Process A. Ex. 1001, col. 8, ll. 30-47.

"Anticipation is not proven by 'multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention.'" *Microsoft Corp. v. Biscotti, Inc.*, 878 F.3d 1052, 1069 (Fed. Cir. 2017) (citing *Net MoneyIN Inc. v. VeriSign, Inc*., 545 F.3d 1359, 1371 (Fed. Cir. 2008); *In re Arkley*, 455 F.2d 586, 587 (CCPA 1972) ("[The] reference must clearly and unequivocally disclose the claimed [invention] … without any need for picking, choosing, and combining various disclosures not directly related to each other by the teachings of the cited reference.").

The Federal Circuit's decision in *Net MoneyIN* is particularly apt, where claims to an internet payment system were not anticipated by a reference that disclosed all the components of the invention, but disclosed two separate payment protocols, each of which contained only a subset of the components claimed in the patent at issue: "[t]he district court was also wrong to combine parts of the separate protocols shown in the iKP reference in concluding that claim 23 was anticipated." 545 F.3d at 1371.  Here, combining XRPD data from the first A+B mixture with DSC data from the second recrystallized product is an equally improper basis to allege anticipation. *Ecolochem, Inc. v. Southern California Edison Co*., 227 F.3d 1361, 1369 (Fed. Cir. 2000) (no anticipation by a reference that taught all elements of the claim, but did not contain a discussion suggesting or linking hydrazine with the mixed bed in the figure, and thus did not show the invention arranged as in the claim).

### C. Neither Form A Nor Form B Anticipates Any Claim

Unlike the Petition, the Board went on to consider whether either of Forms A or B, individually, anticipated the claims.  ID, 37-38; *see also* pp.33-34 discussing Form B.  The Board's improper expansion of the asserted grounds set forth in the Petition should not be considered. "[T]he petitioner's petition, not the Director's discretion is supposed to guide the life of the litigation," and "the petitioner's contentions, not the Director's discretion, define the scope of the litigation all the way from institution through to conclusion." *Sirona Dental Sys. GmbH v. Institut Straumann AG*, 892 F.3d 1349, 1356 (Fed. Cir. 2018).  A new theory of unpatentability, not presented in the Petition, should not be considered.  *LG Electronics, Inc. v. Immervision Inc*., 2021 Pat. App. LEXIS 5001, *38-40 (PTAB May 11, 2021).

Neither Petitioner nor Dr. McClurg ever argued that Form A or Form B individually anticipates any '816 claim to Form β.  Dr. McClurg refused to answer the simple questions as to whether he asserted that Form A anticipates any claim of '816, or whether Form A was ever isolated and characterized in '005 (Ex.2054, 126:18-129:25), and plainly conceded that Form B "is not covered under the '816 Patent claims." (Ex.2054, 130:1-8).

If considered on the merits, neither Form A nor Form B anticipates Form β.  Form B has no DSC endotherm between 65-70ºC as the Board acknowledged (ID, p.37), and no endothermic peak between 265-270ºC ('005 Fig. 4).  Dr. McClurg

testified that Form B "is not covered under the '816 Patent's claims." (Ex.2054, 130:1-8). Moreover, the record lacks any showing that Form B has the XRPD peaks of '816 claims 1-4.  Ex.2052, ¶209.

Nor can Form A anticipate any claim. There is no DSC of Form A in '005 on which to base a theory of anticipation.  Even if Form B peaks were "subtracted" from the DSC of the mixture of Fig. 2, there is no way to reliably establish that Form A independently has DSC peaks at 40-45, 107-115°C or 265-270°C.  And nowhere does Petitioner, Dr. McClurg or the Board account for the *presence* of an exotherm at 160-180°C in '005 Figs. 2 and 6 - but its *absence* in Fig. 5. Moreover, '005 at 9:23-28 states that Form A has a DSC peak at 66-69°C, but that the A/B crude mixture adds a peak at 100 to 110°C, which confirms that neither A nor B has both DSC peaks. Example 2 confirms this, indicating that an A+B mixture is first formed by virtue of the presence of both peaks. *See also* '005, Example 3. Thus, any implication that Form A has both DSC peaks in the 66-69°C range and the 100-110°C range is undermined by the clear text of '005.  Further, there are no simply no XRPD data provided in '005 for Form A upon which a showing of anticipation could be premised. Ex.2052, ¶208.

## VI.  Mutz Is Nonenabled Prior Art For Both Anticipation And Obviousness

### A.    *Mutz's Nonenabling Disclosure Cannot Be Anticipatory*

Mutz cannot anticipate because it does not contain an enabling disclosure of any of Forms I, II or III reported in Example 14, or of Form β of '816.

### 1. Mutz Does Not Disclose A Method Of Making Fingolimod HCl

It is not disputed that Mutz fails to disclose how to make any of Forms I-III of Example 14 by chemical synthesis or recrystallization. Paper 011 (Novartis relies on EP '406); Ex.2052, ¶¶10.A.i, 94-95. Therefore, enablement depends on the incorporation of "the relevant disclosure" of EP '406, which is legally improper. Even if, *arguendo*, EP '406 is incorporated, Mutz still does not enable formation of the forms disclosed in Example 14 (also set forth in Mutz's claims), or Form β of the challenged claims.

### a. The Purported Incorporation of EP '406 is Legally Deficient

#### i. 37 CFR §1.57(d) Applies To A Published PCT Application Designating The U.S.

In finding Rule 57(d) inapplicable (ID, 25-26), the Board erred in stating that Mutz was "a foreign patent application." On its face, Mutz is a published international / PCT application, which designates the U.S.; as such, under 35 U.S.C. §363, it is a "regular" U.S. patent application:

> An international application designating the United States shall have the effect, from its international filing date under article 11 of the treaty, of a national application for patent regularly filed in the Patent and Trademark Office. *Id.*

Mutz is *not* a foreign patent application (Ex.1004), and the Board's contrary conclusion was legal error. The "Mutz" application entered the national stage in the U.S. as Appl'n. No. 13/128,825 on May 11, 2011. Ex.2012, p.2. *See In re Schwarz*, 2018 Pat. App. LEXIS 4708, *3 (P.T.A.B. June 25, 2018) ("Schwarz

'470 is the U.S. National Stage entry for PCT Publication No. WO2007/053973.

*For international applications filed under the Patent Cooperation Treaty, the international application and the national stage application are the same application.* See 35 U.S.C. §363.") (emphasis added); *Broadcast Innovation, L.L.C. v. Charter Commc'ns, Inc.*, 420 F.3d 1364, 1368 (Fed. Cir. 2005) ("under 35 U.S.C. §363, the international filing date of a PCT application is also the U.S. filing date for the corresponding national stage application").

No authority was cited by either Petitioner or the Board that draws a distinction between a PCT application designating the U.S., and then entering the U.S., from the U.S. application itself in terms of the applicability of Rule 57(d).[5]  In asserting that Mutz is enabled only when EP '406 (Fujita) is incorporated by reference, Petitioner concedes the incorporated disclosure is essential to enablement. Paper 11, 1-3.  But that incorporation is improper under Rule 57(d), because EP '406 is neither a U.S. patent nor a U.S. patent application publication.

---

[5] The incorporation by reference standards apply to U.S. prior art asserted against a U.S. patent in litigation; in other words, the standards are not just applicable in prosecution.  *Advanced Display Sys. Inc. v. Kent State Univ.,* 212 F.3d 1272, 1281-84 (Fed. Cir. 2000); *Pennwalt Corp. v. Akzona, Inc.*, 570 F.Supp. 1097, 1103 (D. Del. 1983).

### ii. The Purported Incorporation Is Too Vague To Satisfy The Federal Circuit Standard

The Board's standard of incorporation—whether a POSA could "ferret out" an adequate disclosure from the voluminous EP '406 document (ID, 30-31)—disregards the requirement that ***the host document must identify with detailed particularity what specific material it incorporates and clearly indicate where that material is found***. *Advanced Display Sys. Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000). Mutz's nonspecific incorporation of "the relevant disclosure" of Fujita is the **exact opposite** of the **detailed particularity** required by the Federal Circuit, and wrongfully requires a POSA to ferret out "the relevant disclosure."

Mutz states that "2-Amino-2-[2-(4-$C_{2-20}$-alkyl-phenyl)ethyl] propane-1,3-diol compounds are disclosed in EP-A-0627406..." (Ex. 1004, p.1). But Mutz doesn't say which of the 3 EP '406 documents with 3 different disclosures (A1, A4, B1) is being referred to.[6] On August 31, 2022, Novartis filed Ex.1048, the *B1* version, not admitted (Ex.2118) but cited by the Board (ID, p.29). ***Ex.1048 (B1) lacks the details of Example 284 (another method for making fingolimod and its HCl salt which cannot be Mutz Form I) in the A1 version (Ex.2117)***, discussed below,

---

[6] Mutz cites "EP-A-0627406." *See* Ex.2121, p.2, listing A1, A4 and B1 publications. EP 0 627 406 **A1** is a published application (258 pages), EP 0 627 406 **A4** is a search report and claim set (35 pages) and EP 0 627 406 **B1** a European patent (222 pages).

demonstrating that even Novartis could not determine the right document.  Thus, the incorporation fails to even accurately identify the reference document, in violation of 37 C.F.R. §1.57(c)(2).

Notwithstanding, the Board found Rule 57(d) inapplicable, and zeroed in on Examples 28/29 of Fujita, which relate to synthesis of fingolimod and then its hydrochloride salt.  ID, 25-26.  But Mutz never states that the incorporation of Fujita *was for the purpose of synthesizing Form I (or any of Forms I-III) reported in Mutz's Example 14.*  Ex.1004; Ex.2052, ¶10.A.ii, 96.  Thus, both Petitioner and the Board started their analysis based on an unsupported assumption—that the purpose of the incorporation was to provide missing synthesis details—which is undermined by the text of Mutz itself.  And, both Petitioner and the Board were working off of the B1 version of EP '406 (Ex.1048), *which lacks Example 284's details found only in the A1 version* (Ex.2117, p.201-202), and which support Patent Owner's case for nonenablement as discussed below.

Specifically, Mutz claims to be the first to discover polymorphic forms of fingolimod hydrochloride, stating that "[t]he present invention is based in part on a *discovery* that the FTY720 hydrochloride exhibits polymorphism . . . [a]ccordingly, the present invention provides *novel crystalline forms* of FTY720 hydrochloride." Ex. 1004, p.1 (emphasis added).  Ex.2052, ¶¶107.  It cannot be disputed that since Mutz describes and claims *novel crystalline polymorphic forms of fingolimod hydrochloride*, they cannot have been made by Fujita's Example 29, or by Example

45

284.   Both the Petitioner and the Board materially erred in disregarding Mutz's disclosure on this point. It is completely contrary to Mutz's "discovery" that "[fingolimod HCl] exhibits polymorphism" for his application to have incorporated by reference the *synthesis* of fingolimod HCl in in Examples 28/29, and Example 284, of Fujita.  Mutz's purported incorporation was at best directed to unspecified 'relevant disclosure' among the class of "2-Amino-2"[2-(4-$C_{2-20}$-alkyl-phenyl)ethyl]propane-1,3-diol compounds"—it was not directed to the preparation of a crystalline hydrochloride salt of a single member of that class. Ex.2052, ¶¶10.A.ii.

Citing Ex.1048 ('406 B1, which is not in the record per Paper 9, p.2 and Ex.2118), the Board recognized the large genus of compounds disclosed in Fujita, and concluded that a POSA "would then look to Fujita for the method of synthesizing the sole compound disclosed by Mutz: . . . crystalline fingolimod hydrochloride."  ID at 29-30.  But such a conclusion is not supported, because

1)   Mutz never identified which version of Fujita was incorporated;

2)   Mutz never expressly incorporated Fujita to supply the missing synthesis of Form I in Example 14;

3)   the clear text of Mutz states that its polymorphic forms are novel; and

4)   Petitioner and the Board—not Mutz—supplied the detailed particularity required for incorporation.

*Nothing in the Mutz application states that the "relevant disclosure" of "2-Amino-2"[2-{4-C$_{2-20}$-alkyl-phenyl)ethyl]propane-1,3-diol compounds" in Fujita was directed specifically to Examples 28/29 (ID, 30-31)*, and the Board erred if finding otherwise.  Mutz's statement of *the relevant disclosure* does not even identify the issue as to which the unidentified disclosure relates.  Mutz could have *easily* incorporated by reference Examples 28/29 or Example 284 of EP '406 by naming those Examples specifically if synthesis details were desired, but it did not, in violation of *Advanced Display,* 212 F.3d at 1282.

However, having represented that its disclosed polymorphs were novel, Mutz could not specifically incorporate Examples 28/29 (or Example 284) as teaching how to make any of Forms I-III, and nowhere does Mutz state that any of Forms I-III were synthesized according to a procedure of EP '406.  More likely is that a POSA would have understood in 2010 that the incorporation was for purposes of referencing known background compounds, against which Mutz asserted his novel forms were an improvement.  Ex.2052, ¶¶10.A.ii, 92, 96.

Through impermissible hindsight and using Petitioner's arguments, the Board cherry-picked Examples 28/29 from the broader disclosure in EP '406, even though Mutz is silent about those Examples.

Finally, the Board clearly erred in adopting Petitioner's argument that "Fujita expressly teaches the synthesis of Form I in Examples 28 and 29..."  ID at 30, ll.1-2.  This finding is directly contradicted by Mutz's statements that he "*discovered*"

polymorphism for fingolimod HCl, that his Form I was *novel* over Fujita, that Fujita Example 29 says nothing about any polymorphic form and contains no XRPD or DSC data, and that there is a reported 11-13°C difference in melting point between the compound of Example 29 and Form I of Mutz—proving that Fujita did not "teach[ ] the synthesis of Form I," (*id.*) as discussed further below.  Ex.2052, ¶96. This improper interim finding appears to have tainted the Board's entire enablement analysis.

### 2. *Mutz Is Not Enabled For Form I, Form II Or Form III With or Without Fujita*

Nowhere in Example 14 or any other example does Mutz explain how to make Forms I, II or III by chemical synthesis methods.  Ex.2052, ¶¶10.A.i, -vii, 94-95; Ex. 2008, ¶43.  Example 14 is utterly silent as to source of the materials from which XRPD and DSC measurements were allegedly recorded.  For Form I, there are no process steps recited, and nowhere does the reference disclose any starting materials, any reaction or recrystallization conditions, or any purification or drying conditions or times.  No solvents or reaction temperatures are specified.  Ex.2052, ¶¶10.A.i-iii, 95, 101; Ex. 2008, ¶43.  On its face, Form I—alleged to anticipate claim 1 of '816— is not enabled. *See In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009).

Form II is described as a temperature-based polymorphic form that exists between 40⁻66ºC (Ex. 1004, p.1), and Form III is also a temperature-based form said to exist between 66-107ºC.  *Id*.  Page 3 of Mutz reports the formation of Form I by

cooling crystalline Forms II or III to a temperature of less than 40ºC, but nowhere does Mutz disclose how to prepare or synthesize Forms II or III as starting materials for Form I. No reaction conditions, solvents, temperatures, times, drying conditions, purification steps or any other parameters are provided for making Forms I, II and III. Ex. 2008, ¶¶43-46; Ex.2052, ¶95. Mutz's mere XRPD and DSC observations in Example 14 cannot constitute an enabling description in a reference asserted under §102. *In re Gleave*, 560 F.3d at 1337, (citing *In re Wiggins*, 488 F.2d 538, 543 (CCPA 1973). Even if Fujita is incorporated, there is absolutely no disclosure of what the product of Example 29 is, or how to transform it into Form II, the apparent starting material in Mutz to obtain Form I.

The need for an enabling disclosure in the Mutz reference is especially acute because Mutz claims to be the first to discover polymorphic forms of fingolimod hydrochloride. A ***discovery of novel crystalline forms*** (Ex.1004, p.1) demands an explanation of how those forms are to be made. *Chiron Corp. v. Genentech Inc.*, 363 F.3d 1247, 1254 (Fed. Cir. 2004).

### 3. *Examples 29 And 284 Fail To Disclose Or Teach The Synthesis Of Any Of Forms I, II Or III*

#### a. *Mutz Distinguishes His Polymorphs From Fujita*

In claiming on p.1 to have ***discovered*** that fingolimod HCl exhibits polymorphism and describing ***novel*** crystalline forms thereof (Ex. 1004, p.1), Mutz

makes clear that Forms I-III were not—*by definition*—disclosed in Fujita.  Whatever product Examples 29 and 284 yielded, they were ***not*** Forms I-III.

### b.  *Examples 29 And 284 Provide No Recrystallization Details*

Example 29, quoted in part at ID 27, lines 2-6, describes recrystallization of the HCl salt of fingolimod from ethanol, but does not specify the process conditions for recrystallization and does not state whether a polymorphic form was obtained. Ex.2117, p.168, ll.4-5.  In 2010, it was well known to a POSA that recrystallization conditions would have significant impacts on polymorph crystal structure, as both parties' experts agree. Ex, 2052, ¶10.A.viii, 101; Ex.2097, ¶¶23-24 (Petitioner's district court expert, Prof. Atwood).  Indeed, even slight processing differences in synthesis techniques can lead to distinct polymorphs, and  it was not possible to predict in advance the characteristics of a given polymorph before making it and testing for its properties. Ex, 2052, ¶10.D.ii, 154; Ex. 2054, 97:6:22; Ex.2055, ¶11-13.  Because Example 29 provides no guidance as to what temperatures, concentrations, times, drying conditions, etc., were used in the recrystallization to bring the material out of solution, the product obtained will differ depending on recrystallization details not provided.  *Id.*  Example 284 does not even state that crystals were obtained in the final step. Ex.2117, p.202, ll.25-26.  *See Grünenthal Gmbh v. Alkem Labs. Ltd*., 919 F.3d 1333, 1341-45 (Fed. Cir. 2019).

### c. *The Difference In Melting Points Between Mutz And Example 29 Proves That None Of Mutz's Forms Could Have Been Made By Example 29*

The product of Example 29 is reported to have a melting point of 118°C-120°C. In contrast, Mutz discloses a melting point of 107°C, which is well below the value reported in Example 29. The 11-13°C difference is much larger than can be explained by typical experimental errors (Ex.2052, ¶¶10.a.ii-iv, 92, 96, 101-106), and is  concrete, scientific evidence that the product of Example 29 was ***not*** any of Forms I-III disclosed in Mutz (consistent with Mutz's statement that Forms I-III were novel over Fujita). The Board erred in disregarding this data.

Nor would a POSA have concluded that Mutz followed Example 284 of EP '406, which produced fingolimod freebase by a different procedure than Example 28, and then the hydrochloride salt, and reported a melting point for fingolimod of 125-126°C (Ex.2117, p.202, lines 23-25)—more than 20° C higher than reported in Example 28, 103-105°C (Ex.2117, p.167, lines 50-52).  Ex.2052, ¶¶10.a.ii, 92, 101.

Still further, Kaduk's 2015 article, Ex.2077, analyzed a commercial sample of fingolimod hydrochloride different from the Chinese sample of Wang, and not from Novartis.  Kaduk concluded that the sample corresponded to Form α of '816, distinct from Form β (and not Mutz's forms). *Id.* at p.207, citing Ex.2115, the published application of '816.  Of particular note, Kaduk reported data from their study to ICCD, indicating that the sample analyzed had a melting point of 391-393°K (118-120°C) (Ex. 2116, p. 2), which is identical to the value reported by Fujita

Example 29.   Ex.2052, ¶¶108-109.   These facts tend to show that what Fujita obtained in Example 29 may have been '816 Form α, not Mutz Form I or '816 Form β.

The evidence shows that the starting material used by Mutz was not the same as that of EP '406. A POSA seeking to reproduce Mutz could not do so without extensive, undue experimentation.  Ex.2052, ¶¶10.A.vii, 95-100, 113-116; 153-154; Ex.2055, ¶11-13.

### d. Attempts To Replicate Example Of 29 Of Fujita Do Not Demonstrate The Enablement Of Mutz

*Shilpa's Complaint* – In carrying out an experiment within the scope of Example 29 of U.S. '229, Ex. 1003 (U.S. counterpart of Fujita), Shilpa's Complaint makes clear that it selected a number of conditions for recrystallization **not specified** in U.S. '229.  Ex.1028, ¶¶ 31–32.  The details of those selections are provided by Dr. Rafiuddin. Ex.2084. Shilpa's experiment does *not* demonstrate that U.S. '229 is enabling for any of Forms I-III of Mutz.

Beyond the 11-13°C melting point differences between Fujita Example 29 and Mutz, no experimental details specify the conditions for recrystallization in Example 29, and no XRPD or DSC data are present to allow a POSA to understand whether a crystalline form was even obtained, or what that form may have been *even if* obtained.  The same is true for Example 284.  Ex.2117, pp.168, 202.  In fact, the details of the recrystallization omitted from Examples 29 and 284 of '229 were likely

outcome-determinative as to any crystalline form of the product obtained. Petitioner's district court expert Prof. Atwood testified that with respect to fingolimod hydrochloride "[i]t is the recrystallization step that is the ***most important*** for the determination of crystal form" (Ex.2097, ¶23) (emphasis added), adding that "[t]he temperature of the recrystallization can have a ***profound effect*** on crystalline form" (*id.,* ¶24) (emphasis added).  It is not credible for Petitioner to argue that Example 29 enables the production of Form I of Mutz, when the recrystallization details—*the same ones that Petitioner's expert testified are the **most** important*—are plainly absent from Example 29.

Tellingly, while Dr. Rafiuddin employed conditions (time, temperature, solvent removal, etc.) not specified in the recrystallization of Example 29 and—with knowledge of Shilpa's work on fingolimod hydrochloride—obtained crystalline Form β (Ex.1028, ¶¶31-32; Ex.2084, ¶¶4-5), others attempting to replicate that experiment without Shilpa's knowledge have obtained different results, proving that Mutz Form I is ***not inherently*** produced in Example 29.

***Westheim*** – Petitioner mischaracterizes the disclosure of Westheim in asserting that Example 29 of Fujita "produces a stable and crystalline form . . . Form I".  Paper 11, p.3.  Close-cropping the quotations from several disconnected paragraphs, Petitioner presents an incorrect statement as one of fact.  *Id. citing* Ex.1006 at [0002]-[0005], [0010]-[0011]. [0013], [0021], Figs 1 and 4.  Although [0010] is worded awkwardly, read as a whole correctly Westheim actually says

that—although Fujita described its own product as "recrystallized from ethanol" (Ex.2117, p168, l.5)—Westheim's reproduction of Fujita resulted in "waxy- or a cotton-like solid with poor filterability and flowability." Ex.1006, [0004]. Nowhere does Westheim state that they replicated Fujita and obtained stable crystals by its process, and Petitioner's statement to the contrary should be disregarded. As proof, Westheim's replication of Example 29 resulted in an "off-white, greasy to sticky solid with lumps" (in its Comparative example 1). *Id.*, [0021] Moreover no XRPD data is given for Comparative example 1, and no specific DSC endotherms are provided. Westheim clearly distinguishes between what Fujita obtained as the product of Example 29, and their own replication.

Petitioner further misconstrues Westheim by stating that Figs. 1 and 4 are replications of the prior art. Paper 11, p. 3. They are not. Figures 1 and 4 are based on *inventive* Example 1, not *Comparative* example 1. Ex.1006, p.8, Ex.1, ll.1-12, Form I, p.12 (Fig.1); p.15, Form I (Fig.4).

Westheim repeated the crystallization processes of Example 29 of Fujita, and disparaged the results, stating that "fingolimod hydrochloride is obtainable only as a waxy- or a cotton-like solid with poor filterability and flowability" and thus inconvenient for large scale processing and formulation into pharmaceutical compositions. Ex.1006 at [0004]. But Westheim: (1) does not state what specific conditions were used to perform Example 29's recrystallization; (2) does not report the resultant sample as crystalline; and (3) does not report any XRPD data on the

sample obtained.   Importantly, Westheim chose to describe its replication as *Comparative* example I, which result is described as an "off-white, greasy to sticky solid with lumps," Ex.1006, [0021].   Westheim's replicated sample does not comport with Fujita Example 29's vague description of "the resultant crystals were recrystallized from ethanol to give 4.2 g of the subject compound." Ex.2117, p.168, ll.4-5.

Further, Westheim disparages the method disclosed in Fujita of obtaining fingolimod HCl through ethanol recrystallization, by stating removal of the ethanol solvent by evaporation in Example 29 of Fujita disadvantageously results in impurities or mixtures of forms. Ex.1006, [0013]. In sum, Westheim does *not* confirm that Example 29 produced crystalline Form I of Mutz, as alleged by Petitioner and found by the Board.  ID, 27; Ex.2052, ¶¶110-112.

When replicating Example 29 in 2020 with selected crystallization conditions and knowledge of Shilpa's prior work, Shilpa obtained crystalline Form β as discussed above; on the other hand, Westheim obtained an "off-white, greasy to sticky solid with lumps."  Enablement cannot be shown using a specific compound not inherently formed by a prior art reference, only generally describing a process that does not always result in the compound. *Cf., Glaxo Inc. v. Novopharm Ltd*., 52 F.3d 1043, 1047-48 (Fed. Cir. 1995); *see also In re Armodafinil Pat. Litig. Inc.*, 939 F. Supp. 2d 456, 465 (D. Del. 2013) (citing *Glaxo*, 52 F.3d at 1047-48) (finding no inherent anticipation where testing evidence demonstrated that the prior art example

could yield crystals of either the claimed polymorph or a different polymorph). Fujita does not inherently result in any particular crystalline form and cannot inherently enable Mutz's anticipation of the Form β claims, given the lack of crystallization conditions reported.

### 4. Shilpa's EP Counterpart Provides No Support For Enablement Of Mutz

The Petition (Pet., pp. 20-21) asserts that EPO prosecution of a Shilpa counterpart also supports its anticipation case, because Shilpa allegedly acquiesced in a rejection of Form β claims over Mutz. The Board adopted this argument (ID, 28-29) in error.

If Mutz was enabled, the EPO would not have rejected the Mutz counterpart application (Ex.2012, p.2 (patent family report); Ex.2019 (file history for EP2356090 (see pp.349-352 re grant))) for lack of sufficiency for failure to disclose how to obtain claimed Forms I-III (Ex.2019, p.57, Written Opinion of ISA, VIII-1). Following that rejection, Mutz then withdrew all claims to Forms I, II and II, and filed claims solely to **compositions** comprising the **hydrated** form. Ex.2019, pp.129, 170. Ultimately, those claims were issued, after the specification was amended and the incorporation by reference to EP '406 was deleted. *Id.*, p.198.

At best, the EPO's different positions on Mutz's disclosure are equivocal, and do not support any conclusion that the EPO considered Mutz to be enabled.

### 5.  *Mutz's U.S. Prosecution Supports Nonenablement*

In the ID at p.28, the Board stated that there was no evidence of record that the Examiner, in rejecting Mutz's U.S. counterpart 13/964,817 application, ***considered the incorporation by reference of Fujita's teachings concerning the synthesis of fingolimod HCl***.  That is clear legal error.

*First*, the Mutz *U.S.* '817 application (Ex.2120)[7] is clearly subject to Rule 57(d), and cannot incorporate EP '406 for essential subject matter. *Second*, the Examiner did have Fujita before him—both as EP '406 and as U.S. '229.  Ex.2120, p.680 (initialed PTO/SB/08).  The '817 claims to Forms I-III were rejected on June 8, 2015 for lack of possession under Section 112(a) because there was no disclosed procedure of how to make those forms other than from each other.  Ex.2120, pp.664-665; Ex.2014, pp.6-7.  Rather than respond to that rejection, Mutz abandoned the application. Ex.2120, p.719.

### 6.  *Mutz's Foreign Prosecutions Support Nonenablement*

Patent Offices in Europe (Ex.2019, discussed above), Japan (JP-2011-535130, Ex.2012, p.3; Exs.2019-2022), Australia (AU2013-263791, Ex.2012, p.3; Exs.2034-2036) and Mexico (MX/a/2011/004962, Ex.2012, p.3; Exs.2037-2038), among other countries, all rejected claims in Mutz's counterpart applications for failure to

---

[7] '817 is a continuation of Application No. 13/128,825, filed May 20, 2011, listed in the Mutz patent family report (Ex.2012, p.2).  Ex.2120, p.16.

adequately disclose how to obtain Forms I, II or III.   These facts support

nonenablement of Mutz.

### B.   *Mutz Is Nonenabling For Obviousness*

The same grounds establishing nonenablement of Mutz for anticipation also

disqualify Mutz under Ground 2.   Although Mutz need not be "self-enabling" to be

prior art under §103, Mutz must nevertheless enable a POSA to make and use the

invention claimed in '816 when combined with another reference or the knowledge

of a person of ordinary skill in the art.   *In re Kumar*, 418 F.3d 1361, 1368 (Fed. Cir.

2005).   None of Petitioner's asserted challenges including the Mutz reference meet

this standard, because none of Petitioner's assertions or proofs show how to make

the claimed Form β *starting from Mutz Form I, with or without '005.   See* Section

IV *supra*. Thus, the Petition's Ground 2 obviousness assertions are facially and

fatally deficient.

Petitioner's obviousness challenge fails *ab initio*, where Petitioner does not

contend that specific missing information from Mutz (i.e., how to make Form β from

Form I is XRPD peaks and/or fourth DSC peak are missing, even if Fujita is

available) is provided by the knowledge of a POSA.   *Id.   See Ashland Oil, Inc. v.*

*Delta Resins & Refractories, Inc.,* 776 F.2d 281, 297 (Fed. Cir. 1985) (test is whether

the prior art provided an enabling disclosure of the prior art compound.)   Because

Petitioner nowhere alleges that the knowledge of the skilled artisan supplements the

disclosure of Mutz by adding unidentified processes for modifying  Form I alleged

to arrive at claim 1 or claim 2 (Section IV *supra*), Mutz is nonenabling under §103.

In this context, "the reference must necessarily enable the relied-upon portion of its

own disclosure—the same standard applied to anticipatory references." *Raytheon*

*Techs. Corp. v. GE*, 993 F.3d 1374, 1381 (Fed. Cir. 2021).  For the same reasons

that Mutz is not enabled for anticipation (Section VI.A *supra*), Mutz is not enabled

for obviousness.

## VII.  Conclusion

For the reasons set forth above, Grounds 1-3 should be rejected, and claims

1-4 of the '816 patent should be confirmed as patentable.


Date: January 31, 2023                     Respectfully submitted,

                                           */Mark Boland/*
                                           Mark Boland
                                           Registration No. 32,197
                                           Michael R. Dzwonczyk
                                           Registration No. 36,787
                                           Raja N. Saliba
                                           Registration No. 43,078
                                           Brett S. Sylvester (Reg. No. 32,765)
                                           Registration No. 32,765
                                           L. Roman Rachuba
                                           Registration No. 75,180

                                           Sughrue Mion, PLLC
                                           Telephone: (202) 293-7060
                                           Customer No. 23373

**Word Count Certification Of Compliance**

This Patent Owner Response complies with the type-volume limitation of 37

C.F.R. § 42.24(a)(1)(i) because, according to the "word count" function of

Microsoft Word, the Response contains 13,900 words, excluding the parts of the

Petition exempted from the word count by 37 C.F.R. § 42.24(a)(1).


Date: January 31, 2023                    Respectfully submitted,

                                          /Mark Boland/
                                          Mark Boland
                                          Registration No. 32,197
                                          Michael R. Dzwonczyk
                                          Registration No. 36,787
                                          Raja N. Saliba
                                          Registration No. 43,078
                                          Brett S. Sylvester (Reg. No. 32,765)
                                          Registration No. 32,765
                                          L. Roman Rachuba
                                          Registration No. 75,180

                                          Sughrue Mion, PLLC
                                          Telephone: (202) 293-7060
                                          Customer No. 23373

IPR2022-00886
Patent Owner's Response

## CERTIFICATE OF SERVICE

The undersigned certifies that true and correct copy of the Patent Owner

Response for *Inter Partes* Review of U.S. Patent No. 9,266,816 is being served by

electronic mail on the following counsel of record:

> Jane M. Love: jlove@gibsondunn.com
> David L. Glandorf: dglandorf@gibsondunn.com
> Robert W. Trenchard: rtrenchard@gibsondunn.com
> Christine C. Ranney: cranney@gibsondunn.com
> Allyson E. Parks: aparks@gibsondunn.com

Date: January 31, 2023                 Respectfully submitted,

                                       /Soo Jin Hur/
                                       Soo Jin Hur

                                       Sughrue Mion, PLLC
                                       Telephone: (202) 293-7060
                                       Customer No. 23373

# EXHIBIT 4

| | |
|---|---|
| **From:** | Trenchard, Robert W. |
| **To:** | Sylvester, Brett S.; Dzwonczyk, Michael R. |
| **Cc:** | Rachuba, L Roman; Saliba, Raja; Boland, Mark; Love, Jane M.; Ranney, Christine; DSilver@McCarter.com; ajoyce@mccarter.com; nbelgam; eormerod; Torchia, Paul E.; Glandorf, David; SHILPA |
| **Subject:** | IPR/Protective Order |
| **Date:** | Tuesday, February 7, 2023 12:23:04 PM |

Hi Brett and Michael.  In November of last year, we alerted Shilpa to its obligation to produce documents ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Now that we have received and reviewed the response, and with knowledge of the documents Shilpa has produced in the District Court, it appears that Shilpa has not abided by these obligations.

We propose two alternative ways to resolve the issue:  (1) Shilpa can de-designate under the District Court Protective Order the documents identified below and allow Novartis to use them in the IPR; or (2) Shilpa can "produce" the documents in the IPR as required by the PTAB rules, with the agreement from Novartis to enter a confidentiality order in the IPR that will main the documents' protected status.

To the extent Shilpa declines to de-designate the documents or give permission to Novartis to use them in the IPR (subject to a PTAB protective order), we plan to seek an order from the district court modifying the Protective Order.  *See, e.g., Lubrizol Specialty Products, Inc. v. Baker Hughes Inc.*, Case No. H-15-2915, Dkt. 108 (S.D. Tex. Nov. 22, 2016); *Finjan, Inc. v. Juniper Networks, Inc.*, Case No. 17-cv-05659-WHA, Dkt. No. 207 (N.D. Cal. Oct. 9, 2018).

As we previously explained in our November 22, 2022 email,





Please confirm by Friday, February 10 that Shilpa will de-designate or otherwise permit use in the IPR of the documents listed above, as well as any other ████████████████████████████ ████████████████████████████

Best, Bob.

**Robert Trenchard**

GIBSON DUNN

Gibson, Dunn & Crutcher LLP
200 Park Avenue, New York, NY 10166-0193
Tel +1 212.351.3942 • Cell +1 646.963.5770 • Fax +1 212.351.5242
RTrenchard@gibsondunn.com • www.gibsondunn.com

# EXHIBIT 5



SUGHRUE MION, PLLC

2000 Pennsylvania Avenue, NW
Washington, DC 20006
T 202.293.7060
F 202.293.7860

www.sughrue.com

**Brett S. Sylvester**
T 202.663.7360
bsylvester@sughrue.com

February 13, 2023

**<u>CONTAINS CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER</u>**

*<u>Via Electronic Mail</u>*
Robert W. Trenchard, Esq.
GIBSON DUNN  LLP
200 Park Avenue
New York, NY 10166

   Re: ***Shilpa Pharma, Inc., v. Novartis Pharmaceuticals Corporation***,
     **C.A. No. 21-558-MN (D. Del. 2021)**

Dear Bob:

   This is in response to your e-mail message of February 7, 2023 requesting that Shilpa de-designate numerous documents under the District Court Protective Order and allow Novartis to use them indiscriminately in the *Inter Partes* Review (IPR) before the Patent Office; or that Shilpa "produce" the documents in the IPR, with an agreement from Novartis to enter a confidentiality order in the IPR that will maintain the documents' protected status.

   Shilpa will not de-designate or otherwise permit use in the IPR of the documents you have listed, all of which are designated highly confidential – attorneys' eyes only, under the Protective Order.  Moreover, your characterization that "it appears that Shilpa has not abided by [its] obligations" is entirely inappropriate.

   It appears that Novartis is attempting to embark on a campaign of using District Court discovery to obtain information it will then seek to utilize in the IPR.  That is wholly improper. The IPR is based on two references prior to the '816 patent's filing date in November 2010, and how a person of ordinary skill in the art would have interpreted those disclosures as of that date. Yet your request recites laundry lists of dozens of Shilpa's internal, confidential research documents post-dating the '816 patent that have nothing to do with issues briefed in the IPR.

   The IPR rules do not contemplate allowing such wide-ranging fishing expeditions of irrelevant, confidential materials from District Court discovery, and testimony from Shilpa witnesses you intend to depose.  The documents you cite relate to Shilpa's research concerning post-patent work on potentially commercializing fingolimod hydrochloride, including communications with third parties.  But none of that is relevant to the '816 patent or Novartis's specific IPR challenges, and IPR rules do not permit such indiscriminate discovery.



Robert W. Trenchard, Esq.
February 13, 2023
Page 2

Furthermore, Novartis is estopped from raising defenses based on the Mutz WO publication or the Gidwani '005 patent in the District Court, and we do not intend to permit discovery in depositions on Novartis's allegations about Mutz or the '005 patent, for alleged use in the IPR. That would be a clear abuse of District Court discovery with an *ultra vires* purpose in contradiction to the Protective Order. Nor will Shilpa agree to or condone Novartis's further attempts to conduct an unsupported smear campaign against Shilpa in the District Court for use in the IPR, by using Kiuchi-related discovery having a basis only in your unsupported inequitable conduct allegations, which are not at issue in the IPR.

Therefore, Shilpa does not agree with your over-reaching requests.

The USPTO rule provides that "a party must serve relevant information that is inconsistent with a position advanced by the party during the proceeding concurrent with the filing of the documents or things that contains the inconsistency. This requirement does not make discoverable anything otherwise protected by legally recognized privileges such as attorney-client or attorney work product." 37 C.F.R. § 42.51(b)(1)(iii). Shilpa has complied with Rule 42.51(b)(1)(iii) by producing to Novartis in the District Court litigation all of the documents you allege have not been produced according to the rule.

Your allegations to the contrary are inaccurate and reflect what we believe to be a misunderstanding of the rule. In *B/E Aerospace, Inc. v. MAG Aerospace Industries, LLC*, 2016 Pat. App. LEXIS 7579 (March 18, 2016), the Board denied a request for an order mandating disclosure of District Court documents in an IPR proceeding as somehow violative of Rule 42.51, stating "[w]e denied Petitioner's request that we order Patent Owner to serve the documents as routine discovery because Petitioner already had the documents from the related litigation." Id. at *18. The Board observed that "this is not a situation where one party advances a position and withholds from the other party information that is [allegedly] inconsistent with that position. Rather, Petitioner had the information; it was obtained in the related litigation." *Id*.

As to modifying the Protective Order, Shilpa respectfully does not agree that the documents to which you refer ██████████████████████████████ The burden is on Novartis to show otherwise and to justify any proposed modification of the Protective Order in the Delaware litigation.

None of the documents identified are inconsistent with any position advanced in Shilpa's Patent Owner's Response (POR). Novartis seeks to indiscriminately cite to post-'816 patent non-public documents, taken out of context, then to be stretched only by attorney argument to purport to support a Novartis position. This tactic is wholly improper. We object and will vigorously oppose your request. Moreover, by Novartis's attempt to only raise such material in



Robert W. Trenchard, Esq.
February 13, 2023
Page 3

its Reply, Shilpa will be severely prejudiced because Shilpa's Sur-Reply cannot include new evidence, such as Shilpa testimony setting the record straight where Novartis has distorted it.

Some of the topics Novartis states to be Shilpa's position are not in fact Shilpa's position at all. It appears you have created fake Shilpa "positions" in order to say that some of Shilpa's production documents are inconsistent.

We address each of the topics in your February 7th e-mail in turn.

*1.     Evidence of Shilpa's or others' reproduction of procedures in the prior art for making fingolimod hydrochloride, including the '229 Patent reproduction referenced at Paragraph 31 of Shilpa's complaint and Shilpa's 2014 and 2015 reproductions of the Kiuchi reference, and evidence that Shilpa held out such experiments to third parties as reproductions of the prior art. This evidence is inconsistent with Shilpa's position that a person of skill would have been unable to make crystalline fingolimod hydrochloride, in particular Mutz's Form I.*
*1.     Document Beg. Bates Nos: SHIL0003032; SHIL0330044; SHIL0137009; SHIL0060007; SHIL0135347; SHIL0002959; SHIL0265160; SHIL0265161; SHIL0270501; SHIL0270502; SHIL0270504; SHIL0060126; SHIL0137011; SHIL0137013; SHIL0137014; SHIL0137016; SHIL0137018; SHIL0137020; SHIL0308992*

None of these documents is inconsistent with any position advanced in Shilpa's POR. Shilpa's position is that Mutz is nonenabling as to Form I, and that Fujita's disclosure ('229 or EP '406) does not teach how to make Form I for all of the reasons set forth in the POR. Kiuchi is not relevant and was not addressed in the POR.

In more detail, your Topic 1 refers to "Shilpa's position that a person of skill would have been unable to make crystalline fingolimod hydrochloride." That is not Shilpa's position at all – please cite to where in the POR Shilpa has taken that position. Shilpa's position has been, and is, that **Mutz** does not contain an enabling disclosure of any of Forms I, II or III reported **in Mutz**, and a person of skill in the art would not have known how to make **Mutz's Form I** based on the prior art teachings. By misrepresenting Shilpa's actual position in your e-mail, you list seemingly inconsistent documents that purportedly contradict a position Shilpa has never taken.

The documents Novartis has cited are not at all inconsistent with the *actual* positions Shilpa has taken. None of the documents referred to in your e-mail are inconsistent with Shilpa's position that Mutz does not enable the preparation of any of Forms I, II or III, because none of the documents even refer to Mutz. And even if Novartis's Topic 1 was actually a position Shilpa had taken (which it is not, as explained above), the documents are still not inconsistent. Most of the documents describe work on sample FMH/R-I/S-III/0046, based on Example 29 of the '229 Patent. The description of the process steps undertaken by Shilpa goes



Robert W. Trenchard, Esq.
February 13, 2023
Page 4





Robert W. Trenchard, Esq.
February 13, 2023
Page 5

4.    *Evidence that Shilpa knew that Mutz's Form I was at least similar to Shilpa's*
*Form-*





Robert W. Trenchard, Esq.
February 13, 2023
Page 6





Robert W. Trenchard, Esq.
February 13, 2023
Page 7





Robert W. Trenchard, Esq.
February 13, 2023
Page 8



For at least the above reasons, Shilpa will not de-designate or otherwise permit use in the IPR of the documents you have listed.

Sincerely,

Brett S. Sylvester

# EXHIBIT 6



2000 Pennsylvania Avenue, NW, Suite 9000
Washington, DC 20006–1811
T 202.293.7060
F 202.293.7860

www.sughrue.com

**L. Roman Rachuba**
T 202.663.7945
lrachuba@sughrue.com

January 6, 2023

Paul E. Torchia
PTorchia@gibsondunn.com
GIBSON DUNN
200 Park Ave.
New York, N.Y. 10166-0193

> **Re:**   ***Shilpa Pharma, Inc., v. Novartis Pharmaceuticals Corporation***,
> <u>**C.A. No. 21-558-MN (D. Del. 2021)**</u>

Dear Paul:

We write in response to your January 2, 2023 letter.

As an initial matter, Shilpa reiterates its position that it has never made U.S. sales of fingolimod, commercial or otherwise. That is, Shilpa has not sold fingolimod in the U.S., and is not aware of any non-U.S. sales of fingolimod which subsequently were imported into the U.S. As such, Shilpa's foreign sales of fingolimod are entirely irrelevant to the instant case.

Despite our repeated requests, you have failed to provide any authority holding that a patentee's non-U.S. sales of unpatented products are relevant and discoverable, *e.g.*, for damages purposes. Your reliance on *Georgia-Pacific* factor 9 ("The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.") is a non-starter. Factor 9 "involves examination of the benefits which the invention conferred" and clearly relates to the technical merits of the invention. The factor does not involve or even touch upon a patentee's sales, foreign or otherwise. *Standard Mfg. Co. v. U.S.*, 42 Fed. Cl. 748, 770 (Cl. Ct. 1999).

A patentee's non-U.S. sales are simply not relevant to a damages calculation. *Finjan, Inc. v. Qualys Inc*., No. 18-cv-07229-YGR (TSH), 2020 U.S. Dist. LEXIS 172636 (N.D. Cal. Sep. 17, 2020) ("If the alleged exploitation of the patented invention occurred overseas, 'information regarding defendant's foreign sales is not relevant to the hypothetical negotiation of the reasonable royalty amount because defendant would not be liable for foreign sales that do not violate U.S. patent laws.'") (citing *Kajeet, Inc. v. Qustodio, LLC*, No. SA CV 18-1519-JAK (PLAx), 2019 U.S. Dist. LEXIS 227979 (C.D. Cal. Oct. 22, 2019)); *Enpat, Inc. v. Microsoft Corp.*, 6 F.Supp.2d 537, 539-40 (E.D. Va. 1998) ("[N]one of [the *Georgia-Pacific*] factors support a conclusion that Microsoft would pay for the right to engage in foreign sales it already has a legal right to make. Accordingly, . . . Microsoft's foreign sales may not be taken into account in any determination of a reasonable royalty."); *France Telecom S.A. v. Marvell Semiconductor Inc.*, 39 F.Supp.3d 1080, 1098-101 (N.D. Cal. 2014) ("using factors delineated in

Paul E. Torchia
January 6, 2023
Page 2

*Georgia-Pacific []*, none of those factors support a conclusion that [the defendant] would pay for the right to engage in foreign sales it already has a legal right to make. Accordingly, we conclude that [the defendant's] foreign sales may not be taken into account in any determination of a reasonable royalty.") (citing *Enpat*); *Infernal Tech., LLC v. Sony Interactive Entm't LLC*, No. 2:19-CV-00248-JRG, 2021 U.S. Dist. LEXIS 23633 (E.D. Tex. Feb. 3, 2021) ("Plaintiffs have not presented sufficient evidence of a causal nexus between these foreign sales and any domestic acts of infringement. . . . Accordingly, these sales are to be excluded from Plaintiffs' damages case.") (internal citations omitted).

Moreover, Shilpa maintains its objection that Novartis' requests for worldwide and non-U.S. sales information is unduly burdensome, particularly in view of the demonstrative lack of evidence of the requested documents and information.

Additionally, none of the Shilpa documents you cited evidence that U.S. sales of fingolimod were made by Shilpa. SHIL0092215, which you specifically identified during the call on January 3, 2023, is a log of various drug exports from India. On its face the document lists Mylan Laboratories Ltd. as the exporter of fingolimod and Mylan Pharmaceutical Inc. as the consignee. Shilpa is not listed as a party to the transaction.

Regardless, Shilpa will not continue to engage in a back-and-forth discussion to correct your misreading of individual production documents. Novartis is free to pursue its theories during depositions of Shilpa witnesses.

With respect to 35 U.S.C § 287(a), to be clear, Shilpa has never sold fingolimod in the U.S., and to the best of its knowledge, is not aware of any foreign sales of fingolimod which were subsequently imported into the U.S. The marking provisions of § 287(a) do not apply to patentees who neither sell nor offer for sale products within the U.S., nor does the statute require that a patentee mark products sold outside of the U.S. *See Arctic Cat Inc. v. Bombardier Rec. Prods.*, 950 F.3d 860 (Fed. Cir. 2020).

Very truly yours,

/ *Roman Rachuba* /

L. Roman Rachuba

# EXHIBIT 7

# EXHIBIT 8

# EXHIBIT 9

# EXHIBIT 10

# EXHIBIT 11

# EXHIBIT 12

# EXHIBIT 13

# EXHIBIT 14

# EXHIBIT 15

# EXHIBIT 16

# EXHIBIT 17

# EXHIBIT 18

# EXHIBIT 19

# EXHIBIT 20

# EXHIBIT 21

# EXHIBIT 22

# EXHIBIT 23

# EXHIBIT 24

**EXHIBIT 25**

# EXHIBIT 26

# EXHIBIT 27

# EXHIBIT 28

# EXHIBIT 29

# EXHIBIT 30

# EXHIBIT 31

# EXHIBIT 32

# EXHIBIT 33

# EXHIBIT 34

# EXHIBIT 35

# EXHIBIT 36

# EXHIBIT 37



# EXHIBIT 38

# EXHIBIT 39



# EXHIBIT 40

# EXHIBIT 41

# EXHIBIT 42

# EXHIBIT 43

# EXHIBIT 44

# EXHIBIT 45

# EXHIBIT 46

# EXHIBIT 47

# EXHIBIT 48

# EXHIBIT 49

# EXHIBIT 50

# EXHIBIT 51

# EXHIBIT 52

# EXHIBIT 53

# EXHIBIT 54

# EXHIBIT 55

# EXHIBIT 56

# EXHIBIT 57

# EXHIBIT 58

# EXHIBIT 59

# EXHIBIT 60

# EXHIBIT 61

# EXHIBIT 62

# EXHIBIT 63

# EXHIBIT 64

# EXHIBIT 65

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that true and correct copies of the foregoing document were caused to be served on March 1, 2023 on the following counsel in the manner indicated below.

### VIA EMAIL

Neal C. Belgam
Eve H. Ormerod
SMITH, KATZENSTEIN & JENKINS LLP
1000 West Street, Ste. 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
eormerod@skjlaw.com

Brett Sylvester
Michael R. Dzwonczyk
Jay Lytle
John Callahan
Raja N. Saliba
Roman Rachuba
SUGHRUE MION, PLLC
2000 Pennsylvania Ave., NW
Washington, DC 20037
(202) 293-7060
bsylvester@sughrue.com
mdzwonczky@sughrue.com
jlytle@sughrue.com
jcallahan@sughrue.com
rsaliba@sughrue.com
lrachuba@sughrue.com

*Counsel for Plaintiff Shilpa Pharma, Inc.*

Dated: March 1, 2023

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)

ME1 44294252v.1